EXHIBIT 1



Español | Customer Support | FedEx Locations    Search   Go

| Package/Envelope | Freight | Expedited | Office/Print Services ✱ |

Ship ▸    Track ▸    Manage ▸    Business Solutions ▸

# FedEx Facts



- ● About FedEx
- ● Our Company
  - ▼ Company Information
    - ● FedEx Facts
      - **FedEx Corporation**
      - ▸ FedEx Express
      - ▸ FedEx Ground
      - ▸ FedEx Freight
      - ▸ FedEx Services
      - Regional Facts
      - Mission, Strategy, Values
      - ▸ FedEx History
    - ▸ Vision and Leadership
      - Marketing and Advertising
      - FedEx Innovation
      - Small Business Solutions
      - Publications and Reports
- ● Corporate Responsibility
- ● Global Newsroom
- ● Investor Relations
- ● Careers
- ● More Information

## FedEx Corporation

**History**
The modern air and ground express industry was pioneered with the founding of Federal Express in 1971; the corporation was created in 1998 as FDX Corporation and became FedEx Corporation in January 2000.

**Headquarters**
Memphis, Tenn.

**Principal Officers**
- ● Frederick W. Smith, Chairman, President and CEO
- ● Robert B. Carter, Executive Vice President, FedEx Information Services and CIO
- ● T. Michael Glenn, Executive Vice President, Market Development and Corporate Communications
- ● Alan B. Graf Jr., Executive Vice President and CFO
- ● Christine P. Richards, Executive Vice President, General Counsel and Secretary

**NYSE Listing**
FDX (since December 1978)

**FY08 Revenue (Consolidated Information for all FedEx Companies)**
$38 billion

**Workforce**
More than 290,000 team members worldwide

**Average Daily Volume**
More than 7.5 million shipments for express, ground, freight and expedited delivery services

**Service Area**
More than 220 countries and territories, including every address in the United States

**fedex.com**
Today, fedex.com hosts an average of 15 million unique visitors per month and handles on average 3 million package tracking requests daily. Electronic transactions account for almost two-thirds of the more than 6 million shipments FedEx delivers daily.

**Operating Facilities**
- ● Express: 1,052 stations; 10 air express hubs
- ● Ground: 30 ground hubs; over 500 pickup/delivery terminals
- ● Freight: Approximately 470 service centers
- ● Office: Approximately 2,000 locations including FedEx Office Print and Ship Centers, FedEx Office Ship Centers, FedEx Office Signs and Graphics Centers, and closed-door production centers

**Air Operations**
672 aircraft; more than 375 airports served worldwide

KPC 00001



**Shipping Information**
Popular Terms
Go ▶

**Search**

Ground Fleet
More than 80,000 motorized vehicles for express, ground, freight and expedited delivery service

**Dropoff Locations**

- 709 FedEx World Service Centers
- 1,796 FedEx Office locations
- 6,551 FedEx Authorized ShipCenters®
- 42,936 FedEx Drop Boxes (including 4,979 US Postal Service locations)

**Recent Awards**

- FedEx ranked #1 in the category of customer service in the esteemed Harris Interactive Reputation Quotient ™ (RQ) survey (July 2008).
- FedEx ranked #1 in Customer Satisfaction among Express Delivery companies and #1 among all companies rated in the University of Michigan's American Customer Satisfaction Index (May 2008).
- FedEx received the Presidential "E" Award for excellence in exporting (May 2008).
- The American Red Cross awarded FedEx the prestigious Henry Dunant International Partnership Excellence Award at the organization's Heritage of Service Dinner (May 2008).
- FedEx named as a FORTUNE magazine and the Great Places to Work Institute **"FORTUNE 100 Best Companies to Work For"** in the United States. (Jan 2008)
- FedEx Express Canada has won the "Best Contact Center World Award 2007" for mid-size call centers from ContactCenterWorld.com (November 2007).
- FORTUNE magazine: No. 6 among "America's Most Admired Companies" (2007)

Global Home | FedEx Mobile | Service Info | About FedEx | Investor Relations | Careers | fedex.com Terms of Use | Privacy Policy | Site Map
This site is protected by copyright and trademark laws under US and International law. All rights reserved. © 1995-2008 FedEx

KPC 00002

EXHIBIT 2

**Forrand et. al v. FedEx Express**
**60-11414**

| Number of Hourly Employees Working in California at Some Point Between December 13, 2002 and July 23, 2008 | |
|---|---|
| **Division** | **Total** |
| AGFS | 11,113 |
| AOD | 831 |
| CSSD | 6 |
| CUSTOMER SVCS & OPS SUPT | 652 |
| FINANCE | 1 |
| GLOBAL TRADE SVCS | 10 |
| HR | 4 |
| LEGAL | 19 |
| U.S. OPS (DGO) | 8,598 |
| WW CUST OPS | 10 |
| **Grand Total** | **21,244** |

| Current Status of Hourly Employees Working in California at Some Point Between December 13, 2002 and July 23, 2008 | |
|---|---|
| **Current Status** | **Total** |
| ACTIVE | 9,477 |
| DECEASED | 67 |
| LOA | 406 |
| RETIRED | 256 |
| TERMINATED | 11,038 |
| **Grand Total** | **21,244** |

**Note**:  All headcount excludes couriers and service agents.

**FEX-RPT 003a**

Report of Hourly Employees in California by Division
7/23/2008
Doc#741432

KPC 00003

**Forrand et. al v. FedEx Express**
**60-11414**

| Job Code | Job Title | Count |
|---|---|---|
| | All Active Hourly Express Employees in California as of July 17, 2008 | |
| F0017 | Service Agent/Non-DOT | 40 |
| F0022 | Sr Service Agent/DOT | 1 |
| F0026 | Sr Svc Agent/Non-DOT | 431 |
| F0057 | HUB Control Room Agent | 28 |
| F0079 | Intl Doc Agent/Non-DOT | 6 |
| F0210 | Sr Trace Rep/Overgoods | 11 |
| F0300 | Svc Agt/Non-DOT/AGFS | 2 |
| F0302 | Sr Svc Agt/Non-DOT/AGFS | 43 |
| F0303 | Overgoods Assistant | 1 |
| F0320 | Service Assurance Agent | 95 |
| F0321 | Lead Import/Export Agt | 20 |
| F0323 | Import/Export Agent | 53 |
| F0327 | Sr Intl Doc Agent | 44 |
| F0363 | World Sales/Ship Agent | 4 |
| F0364 | Sr World Sales/Ship Agt | 10 |
| M0201 | Sr Glob Veh Tech/N-DOT | 46 |
| M0205 | Sr Glob Veh Tec/DOT/CDL | 25 |
| M0300 | Aviation MX Technician | 24 |
| M0301 | Sr Aviation MX Tech | 302 |
| M0302 | Lead Aviation MX Tech | 30 |
| M0304 | Sr Aviation MX Tech/Lin | 168 |
| M0305 | Lead Aviation MX Tech/L | 17 |
| M0400 | Lead Veh Tech/DOT/CDL | 1 |
| M0401 | LD Supply Clerk | 3 |
| M0402 | Sr Supply Clerk | 15 |
| M0403 | Supply Clerk | 3 |
| M0408 | Sr Global Veh Techn/DOT | 118 |
| M0410 | Lead Veh Mech/Non-DOT | 3 |
| M0601 | A/C Tool Room Attendant | 8 |
| M0602 | Ld A/C Tool Room Attend | 3 |
| M0613 | Containerization Clerk | 2 |
| M0617 | Cleaner/Hanger MX | 9 |
| R0002 | Courier/DOT | 3,842 |
| R0003 | Handler (DOT) | 76 |
| R0006 | Courier/Handler/DOT | 74 |
| R0010 | Ramp Transport Driver | 683 |
| R0015 | Handler (Non-DOT) | 1,618 |
| R0016 | Dispatcher (Non-DOT) | 144 |
| R0019 | Ramp Agt-Trunk(Non-DOT) | 210 |
| R0021 | Courier/Non-Driver | 11 |
| R0022 | Operations Agent | 52 |
| R0037 | Courier/Feeder Agt/DOT | 45 |
| R0047 | Dangerous Goods Agent | 112 |
| R0048 | Checker/Sorter | 798 |
| R0049 | Material Handler | 1,156 |
| R0068 | Handler/Shuttle Dr/DOT | 67 |
| R0069 | Shuttle Driver/DOT | 220 |

KPC 00004

## Forrand et. al v. FedEx Express
### 60-11414

| | | |
|---|---|---:|
| R0071 | Frt Handler/Non-DOT (G) | 65 |
| R0073 | Expeditor/DOT | 11 |
| R0079 | Truck Control Agent | 38 |
| R0081 | Intl Import Cage Agent | 5 |
| R0085 | Courier/Swing Drvr/CDL | 717 |
| R0088 | Courier/Non-DOT | 28 |
| R0089 | Spill Clean-Up Agent | 11 |
| R0090 | Shuttle Driver Non-DOT | 1 |
| R0093 | Shuttle Driver/CDL | 82 |
| R0094 | Courier/Handler DOT/CDL | 23 |
| R0095 | Handler/Shuttle Drv/CDL | 15 |
| R0096 | Courier/Dot/Cdl | 74 |
| R0099 | Courier/Fdr Agt/DOT/CDL | 3 |
| R0100 | Ramp Agt Trunk DOT/CDL | 3 |
| R0103 | Ramp Agt/Feeder/Non-DOT | 1 |
| R0111 | Dispatcher | 20 |
| R0117 | Intl Checker | 71 |
| R0201 | Teamleader | 210 |
| R0202 | Information Agent | 65 |
| R0205 | Input Auditor | 29 |
| R9999 | Long-term LOA | 19 |
| TRW01 | Temp Ret To Wk Frm Disa | 6 |
| TRW02 | Tmp Ret To Wk Frm Wc/Un | 11 |
| TRW03 | Temp Ret To Wk Frm Med | 12 |
| | | 12,194 |

Report of Calif. Hourly Employees by Job Codes
7/17/2008
Doc#741434

**FEX-RPT 002a**

KPC 00005

2 of 2

EXHIBIT 3

**FedEx** Express

# People Manual
## June 2006



KPC 00006



The People Manual                    25 June 2008                                       Workplace Practices

## 10-95 Workplace Practices
### (Last Revised 23 Nov 2003)

**Policy**          FedEx Express is committed to providing a healthy and safe environment for employees and ensuring guidelines are established for daily workplace practices.

**Scope**          All FedEx Express employees

**Guidelines**

Smoking Tobacco Products
In keeping with FedEx Express's commitment to providing a healthy work environment, smoking and the use of other tobacco products is prohibited in all Company buildings, facilities, and vehicles.

All FedEx Express employees are further prohibited from smoking and using other tobacco products while in Company-sponsored vanpools or Company vehicles and aboard all FedEx Express aircraft at all times.

**Designated Smoking/Tobacco Use Areas/Times.** Employees who wish to smoke or use other tobacco products may do so in areas outside FedEx Express buildings and facilities, except in areas where smoking or the use of other tobacco products would pose a safety hazard to property or employees (i.e., aircraft ramp areas). Smoking or the use of other tobacco products in designated areas is allowed only during scheduled breaks and the meal period.

**Violations.** The compliance with this policy should be handled in accordance with existing Company policies. Although the use of tobacco products in itself is not considered a basis for discipline, failure to abide by these guidelines may result in disciplinary action as outlined in 2-5 Acceptable Conduct.

Meals/Rest Breaks
FedEx Express provides a meal period for eligible employees. In states where lunch periods are mandatory, employees are provided lunch breaks according to each states' particular laws. Some states also require rest breaks. Managers review the *Personnel Legal Manual* for information concerning applicable state laws on lunch periods and rest breaks.

Full-time employees are normally scheduled to work 8- or 10-hour shifts and should be provided a meal period of 30 minutes to 1 hour in duration. Depending on the length of the work shift, part-time, casual, and temporary employees are provided meal periods in accordance with state laws and work scheduling requirements.

Meal periods should be scheduled at mid-shift (1 hour before or after the middle of the shift). Meals should be eaten in designated areas away from the employee's work station or area.

Employees are advised of meal periods by their manager. Meal periods are nonpaid and are normally 30 minutes to 1 hour in duration, as determined by location or by departmental guidelines.

Parking
FedEx Express designates parking areas, when available, for vehicles belonging to employees, visitors, and handicapped/disabled individuals.

At certain Corporate locations there are designated and open parking areas. Due to the number of vehicles and employees and the need for an orderly parking system, it may become necessary to tow improperly parked vehicles. Contact Corporate Security for information concerning specific locations.

Housekeeping
The Company's premises are always under observation by our customers, prospective customers, members of the press, and other individuals. Therefore, we must present a professional appearance at all times. Employees are responsible for keeping work areas and smoking areas clean and may be required to perform facility maintenance duties in order to meet this objective.

Employees should not be required to clean restrooms or toilets beyond the normal courtesies for the next person. Managers should assign cleaning or maintenance duties to all employees on an equitable basis taking into consideration other operational and customer requirements.

Access to Company Property Restriction
Non-FedEx Express individuals are not allowed to have access to the Company ramp/sort areas and mechanical operations except

- When part of an official Company-sponsored tour.

---

NOTE:   An official Company-sponsored tour must be scheduled through Public Relations for Memphis location and through the local tour program for all field locations.

---

KPC 00007

EXHIBIT 4

1  André E. Jardini (State Bar No. 71335)
   aej@kpclegal.com
2  KNAPP, PETERSEN & CLARKE
   550 North Brand Boulevard, Ste 1500
3  Glendale, California 91203-1904
   Telephone:  (818) 547-5000
4  Facsimile:  (818) 547-5329

5  Glen Robert Bregman, Esq.  State Bar No. 100363
   glenbregmanlaw@aol.com
6  LAW OFFICES OF GLEN ROBERT BREGMAN
   16633 Ventura Boulevard, Suite 1240
7  Encino, CA  91436
   Telephone:  (818) 981-9793
8  Facsimile:  (818) 981-9807

9  Michael S. Duberchin, Esq. (State Bar No. 108338
   msdlaw@earthlink.net
10 LAW OFFICES OF MICHAEL S. DUBERCHIN
   500 North Brand Boulevard, 20th Floor
11 Glendale, California 91203-1904
   Telephone:  (818) 246-8487
12 Facsimile:  (818) 246-6277

13 Attorneys for Plaintiffs
   DANIEL FORRAND, ARA KARAMIAN,
14 YVETTE GREEN and EUGENE COLON, on
   behalf of themselves and all others similarly situated

15

16              UNITED STATES DISTRICT COURT

17             CENTRAL DISTRICT OF CALIFORNIA

18

19 DANIEL FORRAND, ARA                ) NO.  CV08-1360 DSF (PJWx)
   KARAMIAN, YVETTE GREEN and         )
20 EUGENE COLON, on behalf of         ) Ctrm:                        840
   themselves, and all others similarly )
21 situated,                          ) Judge:     The Hon. Dale S. Fischer
                                       ) Trial Date:          6/16/2009
22        Plaintiffs,                  )
                                       ) DECLARATION OF DANIEL
23     v.                             ) FORRAND IN SUPPORT OF
                                       ) PLAINTIFFS' MOTION FOR CLASS
24 FEDERAL EXPRESS CORPORATION,       ) CERTIFICATION
                                       )
25        Defendant.                   )
                                       )
26

27

28

KNAPP,
PETERSEN
& CLARKE

                              -1-

## DECLARATION OF DANIEL FORRAND

I, Daniel Forrand, declare as follows:

1.     I am over the age of 18 years.  The following facts are within my personal knowledge, and if called as a witness, I could and would be qualified to testify thereto.

2.     I am a named representative of a class of approximately 21,000 current and former California employees of Federal Express.  I make this declaration in support of plaintiffs' motion for class certification.

3.     I began working for FedEx in April in 1993 as a handler in Burbank.  In July of 1994, I transferred into the position of aircraft mechanic at LAX, where I worked in the hangar.  I held that position for 5 years.  In March of 1999 I took a position in the field line maintenance department where I worked until September of 2005 as a senior aircraft maintenance technician.  I then transitioned back to the hangar where I currently work.

4.     Mechanics at FedEx in California work in either a field line maintenance position located at various airports, or at the LAX hangar.  The major difference in these positions is that the hangar mechanic deals with static aircraft.

5.     The hangar is a heavy maintenance location where aircrafts are thoroughly inspected and repaired prior to being returned to revenue service in the fleet.  I work with a team of approximately 350 mechanics in the LAX hangar facility, which is staffed around the clock.

6.     During much of my employment, beginning in 1996, FedEx utilized the METEOR timecard system.  Using the METEOR system, I would clock in and out at the beginning and end of my shift by swiping my badge.

7.     All mechanics at FedEx use the METEOR system to record their time in California.

8.     The METEOR system was programmed such that it would

KNAPP,
PETERSEN
& CLARKE

-2-

KPC 00009

1  automatically insert a thirty minute unpaid lunch break into my shift, regardless of
2  whether a lunch is actually taken. It did the same thing for all the other mechanics I
3  worked with. We only clocked in at the beginning and end of our shifts, never for
4  lunch, regardless of whether one was taken. I am not aware of a way that the
5  employee could interact with METEOR to manipulate or stop the automatic insertion
6  of an unpaid lunch.

7      9.    A new practice began around March of 2007, which now requires
8  mechanics to clock in and out for lunch.

9      10.    I frequently was not provided lunch breaks due to the press of work. In
10  fact, from 1999 through 2005, I was only provided uninterrupted meal breaks 10% of
11  the time. My mangers knew I wasn't getting my breaks because they were always on
12  site monitoring our work and deadlines. Further, I complained numerous times about
13  it, and they acknowledged the situation.

14      11.    The break room was connected to the call room where all the radios
15  were kept, so mechanics on break could hear calls coming in such that being on a
16  meal breaks was more like being on stand-by. Meal breaks, when we received them,
17  were regularly interrupted.

18      12.    The field line maintenance position is very busy and hectic. We were
19  frequently pressed with time deadlines by which aircrafts needed to be released for
20  flight. My coworkers and I, regularly worked through our breaks to get it done. We
21  were constantly required to work on aircraft to meet tight flight and delivery
22  schedules, and the managers were there enforcing those deadlines.

23      13.    I believe that FedEx will have electronic data showing that I, as well as
24  my fellow mechanics, worked during those unpaid periods when METEOR has
25  automatically clocked us out because mechanics are required to complete and input
26  Airworthy Release Documents (ARD's), and other data, into the computer system
27  prior to an aircraft being released for flight. The ARD's hold the mechanic
28  accountable and certify that the aircraft is safe and ready for flight.

KNAPP,
PETERSEN
& CLARKE

-3-

KPC 00010

11/09/2008  12:55     661--255-9677          FEDEX KINKO'S    1905                PAGE 04

14.     I was informed by a former manager, Rich Heimlich, that there was a mandate enforced by upper management to keep paid lunches to a minimum so mechanics were required to work through their unpaid lunches without compensation.

15.     I have complained to my managers about not being provided uninterrupted meal breaks. I complained to my manager, John Kari, approximately five times about not being provided uninterrupted meal breaks.

16.     I also complained to another manager, Dave Henry, about not receiving uninterrupted meal breaks or paid meal breaks. He didn't even attempt to address the problem. Instead he would tell me that if I didn't like it, I should go get a different job or threaten to impose collateral duties.

17.     At one point in early 2007, we had an informal meeting with senior manager Bill Cusato along with fellow mechanics Vince Punzalan and Eric Herzog to discuss the fact that we were not being provided with meal breaks or paid meal periods, when we knew that mechanics in Memphis were getting paid meal periods. We had previously discussed this with Bill Cusato at a large monthly meeting. Mr. Cusato informed us that he had spoken with the line maintenance senior manager, Steve Wilson, since the large meeting, who informed him that the mechanics agreed not to have a paid lunch. However, we did not have an agreement with Steve Wilson not to have paid lunches.

18.     When I discussed this matter with manager Dave Henry, his position on lunch breaks was essentially: You don't get paid lunches here. This is not Memphis. And if you don't like it, you can go across the street and get a different job, or we'll give you collateral duties.

19.     There are over 600 mechanics in California. Other mechanics that worked with me in LAX including: Eric Herzog, Jaime DeLaCruz, Vince Punzalon, Matt Guiterrez, Mike Condolf, Jose Caceras, and Tim Girard to name a few.

20.     Starting in approximately 2003 or 2004, I was assigned to work in the

KNAPP,
PETERSEN
& CLARKE

-4-

KPC 00011

11/09/2008  12:55    661--255-9677        FEDEX KINKO'S   1905              PAGE  05

1  FedEx Oakland location for periods between 20 and 30 days, on 5 or 6 occasions.

2  During those times, I sometimes work 14 and 16 hour days. At Oakland, the unpaid

3  meal periods were automatically inserted into my schedule, regardless of whether

4  they were taken. The practices at Oakland with regard to unpaid lunch periods were

5  the same as they were at LAX.

6      21.    On rare occasion, my manager would authorize me to enter a paid lunch

7  into the METEOR system. This happened on rare and exceptional occasions. For

8  instance, if there was more than the usual rush that required a plane be ready to get

9  off the ground, such that the manager could justify allowing the paid lunch to his

10 superiors, I would be authorized to enter a paid lunch into the system. Instead of

11 giving paid lunches to employees that were entitled to them, we were given paid

12 lunches as a rare reward.

13     22.    Approximately 25% of the time I work shifts that are in excess of 10

14 and 12 hours. However, I have never been provided a second meal break. I estimate

15 that approximately 50 employees where I work, worked 12 or more hours on a shift

16 without being provided with a second lunch.

17     23.    FedEx has recently changed their policy on paying lunches. The line

18 maintenance mechanics working the same shifts and same work location that I

19 worked, now receive paid lunches.

20     24.    I understand that by bringing this lawsuit on my own behalf, and as a

21 class representative, I assume a duty to the other employees who are members of the

22 class. I understand that I am acting on their behalf, as well as on my own behalf. I

23 also understand that I cannot compromise my own individual claim in this case at the

24 expense of the class of employees I am representing, and that I have a duty to protect

25 the interests of the class.

26     25.    I feel very strongly that while I worked at FedEx, I and the other

27 employees were subjected to unlawful practices. I am willing to serve as a class

28 representative because I believe it is appropriate to stand up for my fellow

KNAPP,
PETERSEN
& CLARKE

-5-

KPC 00012

employees. I understand that I have a duty of trust and confidence to the class members to make sure that their interests are advanced by this case and I will refrain from seeking solely to advance my own personal interests at the expense of the other class members.

26.    I do not have any conflicts of interest with the class members.

27.    I believe I am an adequate class representative for the reasons set forth herein. I have been exposed to the same unlawful practices as the other class members, and I will act on their behalf to attempt to rectify the wrongdoing they and I have been exposed to.

Executed on this ___9___ day of November, 2008, at _CASTAIC_____ (city), California.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Daniel Forrand

KNAPP,
PETERSEN
& CLARKE

-6-

KPC 00013

EXHIBIT 5

1

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   FOR THE COUNTY OF LOS ANGELES

4

5   DANIEL FORRAND, ARA                )

6   KARAMIAN, YVETTE GREEN and         )

7   EUGENE COLON, on behalf of         )

8   themselves and all others          )

9   similarly situated,                )

10           Plaintiffs,               )

11      vs.                            ) CV08-01360 DSF (PJW)

12  FEDERAL EXPRESS                    )

13  CORPORATION,                       )

14           Defendant.                )

15  _____   )

16

17       VIDEOTAPED DEPOSITION OF DANIEL FORRAND

18          WEDNESDAY, AUGUST 27, 2008

19

20

21

22

23                         Reported by:

24                         Marla D. Williams, CSR

25  ORIGINAL                Certificate No. 11924

40

1     any cumulative information?

2         A     Yes.

3         Q     What type of cumulative information can you

4     run?

5               For instance, can you see how much vacation

6     you've used to date --

7         A     Yes.

8         Q     -- through the system?   Okay.

9               Can you also see how many hours you've

10    worked in a preceding time period of, let's say, a

11    week or a month?

12        A     Not that I'm aware of.

13        Q     Okay.   What other cumulative information

14    can you gain?

15        A     None that I'm aware of.

16        Q     Okay.   Can you see when you've taken breaks

17    in the past week?

18        A     Not that I'm aware of.

19        Q     Okay.   So your basic function was start

20    shift, stop shift, start and stop lunch breaks.

21              Any other activities that you would use on

22    a regular basis, on a daily basis?

23        A     No.

24        Q     Okay.   Were you always, from '99 to '05

25    when you were working on the line, required to clock

KPC 00015

1    in and clock out for your lunch breaks?

2        A    No.

3        Q    When did that start?

4        A    It didn't.

5        Q    To this date, it's not required?

6        A    I no longer work there.

7        Q    Okay.  Through '05 it was not a requirement

8    that you clock in or clock out?

9        A    No.

10       Q    But there was a code for that on the

11   system; is that right?

12       A    Not that I'm aware of.

13       Q    I'm sorry.  I thought you said that one of

14   the buttons that was available was lunch start and

15   lunch stop.

16       A    That's correct.

17       Q    Okay.  And you used -- you did not use the

18   METEOR system for that function?

19       A    Yes.

20       Q    Yes, you did not?

21       A    Yes, I did.

22       Q    You did.  Okay.  But you're saying you were

23   not required to?

24       A    Correct.

25       Q    Okay.  So what happened if you didn't enter

1    a lunch?

2        A      Nothing that I'm aware of.

3        Q      When were you supposed to take your lunch

4    under the METEOR system from '99 to '05?

5        A      The middle of your shift.

6        Q      How was that communicated to you?

7        A      Management.

8        Q      Okay.  How did they do that?

9        A      Verbal directions.  Verbal instructions.

10       Q      Okay.  And was there any leeway on the mid

11   shift, directly on the mid shift, or was there some

12   time on either side of the mid shift?

13       A      No leeway that I know of.

14       Q      Just try and take it in the middle of your

15   shift?

16       A      Middle of the shift, yes.

17       Q      Okay.  What specifically were you told?

18   What's your best recollection?

19       A      Middle of the shift.

20       Q      That you must take it by --

21       A      Yes.

22       Q      -- the middle of the shift?  I'm sorry?

23       A      That my breaktime was at the middle of the

24   shift.

25       Q      What did you understand that to mean?

KPC 00017

```
 1       A     That my breaktime was at middle of the

 2   shift after five hours.

 3       Q     And how early could you take it and how

 4   late could you take it?

 5       A     That was not communicated to me.

 6       Q     Okay.  So from '99 to '05 when did you take

 7   your lunches?

 8       A     When I was -- When I was able to.

 9       Q     Okay.  What percentage of the time were you

10   able to take a lunch at the mid shift from '99

11   to '05?

12       A     Ten percent.

13       Q     I'm sorry?

14       A     Ten percent.

15       Q     Okay.  And how do you define mid shift for

16   that -- to reach that 10 percent?

17       A     After five hours.

18       Q     Did your posted schedule tell you when the

19   middle of your shift was?

20       A     No.

21       Q     Okay.  It was left to the employee to

22   figure out?

23       A     Yes.

24       Q     Okay.  So you knew you were working an

25   eight-hour shift.  So the middle of eight and a half
```

KPC 00018

46

1    when you couldn't take it by the midpoint, fit it in

2    later in the day?

3        A    Yes.

4        Q    Okay.  And did you ever just not have a

5    lunch at all?

6        A    Yes.

7        Q    On how many occasions between '99 and '05?

8        A    I don't recall.

9        Q    What's your best estimate?

10           MR. DUBERCHIN:  Guesstimate?

11           MR. McCONNELL:  Estimate.

12           THE WITNESS:  Twenty percent of the time.

13   BY MR. McCONNELL:

14       Q    And did you ever complain to management

15   during '99 to '05 that you were unable to take a

16   lunch at all on certain days?

17       A    Yes.

18       Q    Who did you complain to?

19       A    John Kari.

20       Q    I'm sorry.  Say the name again.

21       A    John Kari.

22       Q    I'm sorry.  Spell -- Say the name again.

23       A    John Kari, K-a-r-i.

24       Q    K-a-r-i?

25       A    Correct.

KPC 00019

1    Q    Oh, I see his name's on here.   Okay.

2         When did you talk to Mr. Kari?

3    A    I don't recall.

4    Q    How many times did you mention to him or

5    complain to him that there were occasions when you

6    were not able to have lunch at all?

7    A    Several.

8    Q    Okay.   Best estimate during '99 to '05?

9    A    A handful.

10   Q    What does that mean to you?

11   A    Five.

12   Q    Five?   Okay.

13        Did you yourself do anything on those

14   occasions when you were not able to get your lunch

15   in by the midpoint or not able to take it at all

16   during a shift, did you yourself do anything with

17   the METEOR system to reflect that?

18   A    Yes.

19   Q    What did you do?

20   A    Scanned.

21   Q    What does that mean?

22   A    Interact with the METEOR system.

23   Q    Okay.   So you would swipe your card?

24   A    Yes.

25   Q    And what buttons would you push?

KPC 00020

54

1      A    We were never -- We were never given the

2 instructions to scan for lunch.

3      Q    Okay.  You were expected to just take your

4 lunch whenever you could?

5      A    Correct.

6      Q    Okay.  And what percentage of the time from

7 '99 to '05 did you get no lunch whatever?  A

8 handful, you said?

9      A    Correct.

10      Q    Okay.  So the rest of the time you just fit

11 it in when you could?

12      A    That's correct.

13      Q    Okay.  All right.  Is management, when

14 you're working on the line, are they present at your

15 location or are they at a different location?

16      A    They're present.

17      Q    Okay.  Are they present physically in the

18 workspace where you're working or are they at

19 another part of the building?

20      A    Same workspace.

21      Q    Okay.  So they're right there with you --

22      A    Yes.

23      Q    -- looking over whatever you're doing?

24      A    Indirectly.

25      Q    Okay.

58

1    Q      Would you have approached your manager and

2    said something to the effect of, "I didn't get a

3    lunch now.  I'm going to scan in and take a paid

4    lunch"?  And he would have said, "Yeah, good job."

5    A      Yes.

6    Q      "Go ahead"?

7           Okay.  How did you know to seek approval

8    and to scan in?

9    A      Obvious workload.

10   Q      You knew that you were entitled to the paid

11   lunch if you didn't get one, correct?

12   A      Yes.

13   Q      Okay.  And you knew that, if you worked

14   through it, there was a way that you could apply for

15   that.  And that was because management told you that

16   in some form?

17   A      Yes.

18   Q      Okay.  Now, also your earlier testimony

19   about sometimes you didn't scan in whenever you

20   worked through what would have been a normal lunch

21   period.

22          How many occasions during the period of

23   1999 to 2005 did that occur?

24   A      Eighty to ninety percent.

25   Q      And what do you base that on?

KPC 00022

81

```
 1              THE WITNESS:  I got one of these.

 2    BY MR. McCONNELL:

 3         Q    Do you have that next exhibit there, No. 7?

 4         A    Yes, I do.

 5         Q    Okay.  That's the subject we were just

 6    discussing.

 7              And this is your signature on a January

 8    19th, '07, waiver of the second meal break; is that

 9    right?

10         A    Yes.

11         Q    Okay.  For what reason would you want to

12    waive a second meal break?

13         A    Get home earlier.

14         Q    Okay.  Is it the case that you very seldom

15    worked more than ten hours?

16         A    No.

17         Q    Okay.  You often worked up to 12 hours or

18    more?

19         A    Yes.

20         Q    Okay.  And what would you do about a second

21    meal break before January 19th of '07?  Did you take

22    one?

23         A    No.

24         Q    Okay.  Did you -- Did you ask for one or

25    did you feel that you were entitled to one?
```

82

1          MR. DUBERCHIN:  Which question are you

2     posing?

3          MR. McCONNELL:  Either one you want.

4          MR. DUBERCHIN:  Well, no, just one or the

5     other.  I don't want to --

6     BY MR. McCONNELL:

7     Q    Did -- Were you aware that you were

8     entitled to a second break after ten hours?

9     A    No.

10    Q    Okay.  Did you ever take a second break if

11    you worked more than ten hours prior to January 19th

12    of '07?

13    A    No.

14    Q    Okay.  Were you curious about it?

15    A    No.

16    Q    You just went home?

17    A    Yes.

18    Q    Okay.  And how frequently between September

19    11th of '05 and currently -- I'm sorry.  Strike

20    that.

21         How frequently between September 11th

22    of '05 and January 19th of '07 did you work as many

23    as 12 hours?

24    A    Two times.

25    Q    And on either occasion did you take a

KPC 00024

1      A     Overtime.

2      Q     Okay.  Okay.  And overtime is something

3  that you can put in for and take if you want or not

4  if you don't want?

5      A     Yes, that's correct.

6      Q     And you're not one of the employees who

7  frequently put in for overtime?

8      A     I was.

9      Q     Okay.  But only on two occasions did you

10  work 12 hours or more?

11      A     No.

12      Q     Okay.  How frequently did you work between

13  eight and ten hours since coming back to the LAX

14  hangar?

15      A     Quite frequently.

16      Q     Okay.  Most of the time?

17      A     No.

18      Q     Half the time?

19      A     No.

20      Q     Quarter of the time?

21      A     Yeah.

22      Q     Okay.  Is that your best estimate,

23  one-quarter of the time?

24      A     Yes.

25      Q     Okay.  And how many occasions did you work

110

1    attorneys?

2         A    I don't recall.

3         Q    Have you seen them before?

4         A    I don't recall.

5         Q    Is the writing on them yours?

6         A    I can't be for sure.

7         Q    Okay.  Michael Condolf, C-o-n-d-o-l-f, is a

8    aviation maintenance mechanic such as yourself, a

9    coworker?

10        A    Yes.

11        Q    Okay.  And who is Kenneth Eckel, E-c-k-e-l?

12        A    I have no clue.

13        Q    And Steve Zisk, Z-i-s-k?

14        A    I don't know.

15        Q    Turning over to page 12, do you know who

16   Patrick Cunningham is?

17        A    No.

18        Q    Have you ever been told by any member of

19   management words to the effect of, "No paid lunch

20   period"?

21        A    Yes.

22        Q    Who told you that?

23        A    David Henry.

24        Q    What was his position?

25        A    Manager.

KPC 00026

1      Q    Okay.  And -- But you didn't provide a

2   signature?

3      A    Apparently not.

4      Q    Were you asked for your signature?

5      A    I don't recall.

6      Q    Okay.  And you reviewed these and you

7   believe everything stated in these answers --

8      A    Yes.

9      Q    -- on your behalf to be true?

10     A    Yes.

11     Q    Okay.  All right.

12          MR. DUBERCHIN:  Talk to my client for a

13   second.

14          (Discussion held off the record

15          between Mr. Duberchin and the

16          witness.)

17   BY MR. McCONNELL:

18     Q    What changes have affected you at the LAX

19   hangar since March 26th of '07 --

20          MR. DUBERCHIN:  What changes?

21   BY MR. McCONNELL:

22     Q    -- in -- yes, sir -- in terms of your

23   paycheck, your clock-in and clock-out procedures,

24   your lunch and breaks?

25     A    Clock in and clock out is mandatory for

134

1    lunch breaks as of that date you spoke of.

2        Q    I didn't hear what you said after

3    "mandatory for lunch break."

4        A    Clocking it and clocking out for lunch is

5    now mandatory after which the date you spoke of.

6        Q    Okay.  We're talking about March of '07.

7        A    Correct.

8        Q    Okay.  And clocking in and out was not

9    mandatory before that?

10       A    That's correct.

11       Q    You were just automatically given a paid

12   lunch?

13       A    We were automatically given a lunch.

14       Q    Okay.  What else has changed since that

15   date that affects you?

16       A    In regards to?

17       Q    The items I mentioned in the previous

18   question, checking in or checking out, lunch breaks,

19   rest breaks --

20       A    None.

21       Q    -- starting in the morning, finishing in

22   the late -- at the end of the shift?

23       A    None that I -- None that I can recall.

24       Q    Okay.  Is there any restrictions since the

25   March '07th date on how early you can come to work

KPC 00028

1    today that that is not one of your claims in this

2    lawsuit.   Is that correct?

3       A    That's correct.

4       Q    Okay.   Paragraph 14, again, related to you

5    says that you were restricted in your activities

6    during unpaid meal breaks but were not paid for that

7    time.

8            Is it your -- one of your complaints in

9    this lawsuit that you were restricted in your

10   activities during meal -- unpaid meal breaks?

11      A    Yes.

12      Q    In what way?

13      A    Duties and responsibilities.

14      Q    I'm sorry?

15      A    My job duties and responsibilities.

16      Q    Okay.   And if I understand your question --

17   your answer, to paraphrase, you're saying because of

18   your -- the necessities of your job, you were not

19   always able to take a lunch break?

20      A    That's true.

21      Q    Okay.   And we've discussed that before.

22      A    Yes.

23      Q    And any other way that you -- that is meant

24   by the phrase, "Restricted in your activities during

25   unpaid meal breaks" that you can think of?  Or is it

KPC 00029

1    not afforded?

2              MR. DUBERCHIN:   Other than already

3    testified about?   Sir?

4              MR. McCONNELL:   Whether he's testified

5    about it or not, my question before the witness is:

6    Paragraph 16 of the amended complaint says,

7    "Plaintiff Forrand was not afforded paid breaks and

8    meal breaks as required by law --"

9              MR. DUBERCHIN:   Well --

10             MR. McCONNELL:   -- with specific reference

11   to meal breaks.

12   BY MR. McCONNELL:

13       Q    I'm asking you:   In what way are you

14   contending that you were not afforded meal breaks?

15             MR. DUBERCHIN:   Well, if you're asking

16   about contentions, then you're asking for legal --

17   legal conclusions.

18   BY MR. McCONNELL:

19       Q    Is it your belief that you were not

20   afforded meal breaks as required by law?

21       A    Yes.

22       Q    What do you base that opinion on?

23       A    On facts.

24       Q    I'm sorry?

25       A    On the fact.

1        A       Yes.

2        Q       Okay.  What is your basis for saying that?

3        A       My paycheck.

4        Q       Okay.  And what is it about your paycheck

5    that convinces you that the METEOR system regularly

6    failed to account for all time worked?

7        A       Because I worked through my lunches, and I

8    wasn't paid for them.

9        Q       I'm sorry.  You're dropping your voice

10   again.

11       A       I worked through my lunches, and I was not

12   paid for them.

13       Q       On how many occasions were you not paid for

14   lunches that you worked through?

15       A       Eighty --

16               MR. DUBERCHIN:  Didn't you testify?

17               THE WITNESS:  Yes, I did.

18               MR. DUBERCHIN:  Record stands.

19   BY MR. McCONNELL:

20       Q       How many?

21       A       Eighty to ninety percent of the time.

22       Q       Okay.  And of that 80 to 90 percent of the

23   time, how many of them had you, in fact, applied for

24   lunches?

25       A       I'm not sure, but I believe I testified

1          So to drag him over the coals on any of

2     this stuff is useless and waste of time.   Go on.

3          MR. McCONNELL:   So your objection is to the

4     form of the question?

5          MR. DUBERCHIN:   Yeah.

6          MR. McCONNELL:   Okay.

7     BY MR. McCONNELL:

8     Q     How is it that you are able to form the

9     opinion that the check that we discussed earlier

10    that you received for missed lunches was not

11    adequate to compensate you for the lunches that you

12    claim you missed?

13    A     Simple mathematics.

14    Q     Okay.   And tell me how you do that math.

15    A     I don't recall.

16    Q     But you've done it at some point?

17    A     Yes.

18    Q     And how wide of the mark was that check?

19    A     Very wide off.

20    Q     By how much?

21    A     Thousands of dollars.

22    Q     How many thousands of dollars?

23    A     Twelve to eighteen thousand dollars.

24         MR. DUBERCHIN:   You don't have to guess.

25    You have to estimate.

KPC 00032

162

1    didn't receive payment for missed lunches.

2                And we've discussed that here today, right?

3        A    Yes, we have.

4        Q    Okay.  Okay.  Interrogatory No. 8 asks you

5    to identify FedEx policies and practices which

6    failed to provide or unreasonably limit the

7    opportunity to take rest breaks.  And the answer

8    directs me to flight schedules and heavy workload.

9                Is there anything in addition to that that

10   you believe supports a claim that FedEx policies and

11   practices failed to provide or unreasonably limit

12   your rest break opportunities?

13       A    No.

14       Q    And interrogatory 9 talks about the request

15   for any documents and facts that you have which

16   would indicate a belief on your part that FedEx's

17   failure to pay regular and overtime wages was

18   willful or committed with malice, oppression, or

19   fraud.

20               Do you have any information, any documents

21   or any other information that leads you to believe

22   that FedEx set out purposely, with an evil intent or

23   an evil motive, to prevent you to receive regular

24   and overtime wages?

25       A    Yes.

1       Q      I'm sorry?

2       A      Yes.

3       Q      And what's that?

4       A      Conversations.

5       Q      With whom?

6       A      By management.

7       Q      Who?

8       A      Senior manager Bill Cusato.

9       Q      Have we already discussed that

10   conversation?

11      A      No.

12      Q      Okay.  Tell me about that.  When did it

13   take place?  It's referred to in one of the

14   exhibits?

15      A      In '07.  I believe it was '07.

16      Q      All right.  Prior to March of '07, sometime

17   in there?  Early part of '07?

18      A      Somewhere around in '07.

19      Q      That strikes me as correct.

20             Okay.  We've not discussed that

21   conversation.  Tell me who was present.

22      A      Eric Herzog --

23      Q      Spell the last name.

24      A      -- and Vince Punzalan.  Eric Herzog,

25   H-e-r-z-o-g.

164

1        Q       Okay.

2        A       Vince Punzalan.  He's already been

3    mentioned in here.  Would you like me to describe

4    what happened?

5        Q       Anybody else?  You, senior manager Cusato,

6    Eric, and Vince?

7        A       Yes.

8        Q       That's the group?

9        A       Yes.

10       Q       Okay.  Where did this take place?

11       A       In the LAX hangar.

12       Q       Okay.  Okay.  And was this a meeting of

13   some kind of or an informal conversation?

14       A       Informal conversation.

15       Q       Okay.  Who spoke first?

16       A       One or -- One of the two, Eric or Vince.

17       Q       Okay.  And what'd they say?

18       A       There was a question directed to

19   Bill Cusato about paid lunches --

20       Q       What was the question?

21       A       -- at the south side.

22       Q       I'm sorry.  I didn't hear you.

23       A       I said there was a question directed to

24   Bill Cusato about paid lunches at the south side.

25       Q       And what does "south side" mean?

KPC 00035

1      A      LAX line maintenance.

2      Q      Okay.  And what do you recall the question

3  being?

4      A      "Have you heard anything about paid

5  lunches?"

6      Q      At south side, I assume?

7      A      Right.

8      Q      And his response was?

9      A      And Bill Cusato's response was, "I ran into

10  Steve Wilson in Memphis."

11      Q      Mm-hmm.

12      A      And the subject of paid lunches came up.

13  And Bill Cusato said that Steve Wilson's response

14  was, "We had an agreement with those guys."

15      Q      Anything else that occurred during that

16  conversation?

17      A      Not that I recall.

18      Q      Okay.  What did you understand that to

19  mean?

20      A      I understood that to mean a reflection of

21  Dave Henry's policy on paid lunches.

22      Q      By which you mean what?

23      A      "This is not Memphis.  And if you don't

24  like it, you can go across the street and get a job.

25  Or we'll give you collateral duties."

KPC 00036

1    relation to those e-mails and Q and A's from

2    management explaining what they were.

3         A    It quite possibly could have, yes.

4         Q    Okay.   Interrogatory No. 11 asks you to

5    state facts and identify documents that would

6    reflect that FedEx encouraged its managers to fail

7    to pay wages.   And I'm directed to a California case

8    of Murphy versus Kenneth Cole.

9              Is that your answer, or is that your

10   lawyer's answer?

11        A    I'm aware of that case.

12        Q    Okay.   And what is it that you believe

13   Kenneth Cole has to say about encouraging managers

14   to fail to pay wages?

15        A    Management was directing and intimidating

16   the people not to take their lunches.

17        Q    In the Kenneth Cole matter?

18        A    I believe that had something to do with it.

19        Q    Okay.   All right.   Other than the Kenneth

20   Cole case, you have any other facts or documents

21   that you believe support a claim that FedEx

22   encouraged its managers to fail to pay wages?

23        A    Yes.

24        Q    What?

25        A    I know I've spoken with an ex-manager.

KPC 00037

172

| | | |
|---|---|---|
| 1 | Q | Who's that? |
| 2 | A | Richard Heimlich. |
| 3 | Q | How do you spell Heimlich? |
| 4 | A | H-e-i-m-l-i-c-h. |
| 5 | Q | Okay.  When did you speak with him? |
| 6 | A | Several weeks ago. |
| 7 | Q | Mm-hmm.  Tell me about the conversation. |

8    A    I asked him about his prior knowledge as a

9  manager while working at the south side, prior

10  knowledge about paid lunches.

11    Q    Do you recall how you phrased the question

12  to him, if different from what you just said?

13    A    I think it was basically the same --

14    Q    Okay.

15    A    -- or just similar.

16    Q    What'd he say?

17    A    He said there was a lot of pressure from

18  upper management to limit paid lunches.

19    Q    What else did he say?

20    A    That was it.

21    Q    Okay.  Did you ask him to explain that at

22  all?

23    A    No.

24    Q    Okay.  Anything else that you believe

25  supports a claim that FedEx encouraged its managers