EXHIBIT 6

1   André E. Jardini (State Bar No. 71335)
    aej@kpclegal.com
2   KNAPP, PETERSEN & CLARKE
    500 North Brand Boulevard, 20th Floor
3   Glendale, California 91203-1904
    Telephone: (818) 547-5000
4   Facsimile: (818) 547-5329

5   Glen Robert Bregman, Esq.  State Bar No. 100363
    glenbregmanlaw@aol.com
6   LAW OFFICES OF GLEN ROBERT BREGMAN
    16633 Ventura Boulevard, Suite 1240
7   Encino, CA 91436
    Telephone: (818) 981-9793
8   Facsimile: (818) 981-9807

9   Michael S. Duberchin, Esq. (State Bar No. 108338
    msdlaw@earthlink.net
10  LAW OFFICES OF MICHAEL S. DUBERCHIN
    500 North Brand Boulevard, 20th Floor
11  Glendale, California 91203-1904
    Telephone: (818) 246-8487
12  Facsimile: (818) 246-6277

13  Attorneys for Plaintiffs
    DANIEL FORRAND, ARA KARAMIAN,
14  YVETTE GREEN and EUGENE COLON, on
    behalf of themselves and all others similarly situated

15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18

19  DANIEL FORRAND, ARA              )  NO.   CV08-1360 DSF (PJWx)
    KARAMIAN, YVETTE GREEN and       )
20  EUGENE COLON, on behalf of       )  Ctrm:                        840
    themselves, and all others similarly )
21  situated,                        )  Judge:     The Hon. Dale S. Fischer
                                      )  Trial Date:          6/16/2009
22              Plaintiffs,           )
                                      )  PLAINTIFF DANIEL FORRAND'S
23       v.                          )  RESPONSES TO DEFENDANT'S
                                      )  REQUEST FOR PRODUCTION OF
24  FEDERAL EXPRESS CORPORATION,     )  DOCUMENTS (SET NO. ONE)
                                      )
25              Defendant.           )
                                      )
26

27

28

KNAPP,
PETERSEN
& CLARKE

                              -1-

                                                    KPC 00039

| | |
|---|---|
| PROPOUNDING PARTY: | DEFENDANT FEDERAL EXPRESS CORPORATION |
| RESPONDING PARTY: | PLAINTIFF DANIEL FORRAND |
| SET NUMBER: | ONE |

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action.  Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff has not completed investigation of the facts relating to this case and has not completed preparation for trial.  The following responses are based upon information presently available to plaintiff and are made without prejudice to plaintiff's rights to utilize subsequently discovered facts.

This preliminary statement is incorporated into each of the responses set forth below.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST FOR PRODUCTION NO. 1:

Any and all DOCUMENTS relating to YOUR employment by Defendant FedEx and any and all failures to pay for work performed or alleged discriminatory or illegal treatment, including, without limitation, all company instructional or policy DOCUMENTS in YOUR possession, performance appraisals or evaluations and performance reprimands.

KNAPP,
PETERSEN
& CLARKE

-2-

592294.1  08000/00863

1  RESPONSE TO NO. 1:

2      This request is burdensome, overly broad, vague and ambiguous.  Subject to

3  and notwithstanding the foregoing, responding party does not have responsive

4  documents in his possession.  Additionally, all of the documents sought in this

5  demand are in the possession, custody and control of the requesting party.

6

7  REQUEST FOR PRODUCTION NO. 2:

8      Any and all DOCUMENTS identified by, referred to, or relied upon by YOU

9  in YOUR response to Defendant Federal Express Corporation's Interrogatories – Set

10  One.

11  RESPONSE TO NO. 2:

12      This request is burdensome, overly broad, vague and ambiguous.  Subject to

13  and notwithstanding the foregoing, responding party does not have responsive

14  documents in his possession.  Additionally, all of the documents sought in this

15  demand are in the possession, custody and control of the requesting party.

16

17  REQUEST FOR PRODUCTION NO. 3:

18      Each DOCUMENT relating to or concerning any lawsuits to which YOU were

19  a party within the last ten years or to which you are currently a party.

20  RESPONSE TO NO. 3:

21      Responding party has not been a party to any other lawsuits and therefore does

22  not have responsive documents in his possession.

23

24  REQUEST FOR PRODUCTION NO. 4:

25      Any and all DOCUMENTS relating to YOUR claims for damages in this

26  lawsuit.

27

28

KNAPP,
PETERSEN
& CLARKE

-3-

KPC 00041

592294.1  08000/00863

1    RESPONSE TO NO. 4:

2          This request is burdensome, overly broad, vague and ambiguous.  Subject to

3    and notwithstanding the foregoing, responding party does not have responsive

4    documents in his possession.  Additionally, all of the documents sought in this

5    demand are in the possession, custody and control of the requesting party

6

7    REQUEST FOR PRODUCTION NO. 5:

8          If YOU contend that YOU have attempted to mitigate YOUR claimed losses,

9    produce any and all DOCUMENTS relating to that contention.

10   RESPONSE TO NO. 5:

11         This request is burdensome, overly broad, vague and ambiguous.  Subject to

12   and notwithstanding the foregoing, responding party does not have responsive

13   documents in his possession.  Additionally, all of the documents sought in this

14   demand are in the possession, custody and control of the requesting party.

15

16   REQUEST FOR PRODUCTION NO. 6:

17         Any and all DOCUMENTS relating to any complaints presented to Defendant

18   FedEx or any employee or representative of FedEx by YOU relating to the

19   allegations contained in the Amended Complaint.

20   RESPONSE TO NO. 6:

21         This request is burdensome, overly broad, vague and ambiguous.  Subject to

22   and notwithstanding the foregoing, an undated document to LeVerne Rogers from

23   Eric Herzog, attached as exhibit A; Inter-Office Memorandum dated January 12,

24   2007to Employees from Gregory F. Hall and Michael B. Cukor, attached as exhibit

25   B; page 7-1 of Chapter 7, "Lunch Period Scheduling" from *Aircraft Maintenance*

26   *Employee Handbook*, attached as exhibit C; Emails to and from defendant's

27   management, attached hereto as exhibit D; Inter-Office Memorandum dated January

28   15, 2007 to Aircraft Maintenance California Employees from Gregory F. Hall and

KNAPP,
PETERSEN
& CLARKE

-4-

KPC 00042

1  Michael B. Cukor, attached as exhibit E; emails relating to Tiger's retirement

2  attached as exhibit F; waiver of second meal break dated January 18, 2008, attached

3  as exhibit G; voluntary interview acknowledgement dated October 3, 2007, attached

4  as exhibit H; email dated March 20, 2007 re Q & A CA New Time Clock Procedures

5  attached hereto as exhibit I.

6        Additionally, all of the documents sought in this demand are in the possession,

7  custody and control of the requesting party.

8

9  REQUEST FOR PRODUCTION NO. 7:

10       Any and all DOCUMENTS that YOU maintained or prepared regarding any

11  of the allegations contained in the Amended Complaint filed in this action.

12  RESPONSE TO NO. 7:

13       This request is burdensome, overly broad, vague and ambiguous.  Subject to

14  and notwithstanding the foregoing, an undated document to LeVerne Rogers from

15  Eric Herzog, attached as exhibit A; Inter-Office Memorandum dated January 12,

16  2007to Employees from Gregory F. Hall and Michael B. Cukor, attached as exhibit

17  B; page 7-1 of Chapter 7, "Lunch Period Scheduling" from *Aircraft Maintenance*

18  *Employee Handbook*, attached as exhibit C; Emails to and from defendant's

19  management, attached hereto as exhibit D; Inter-Office Memorandum dated January

20  15, 2007 to Aircraft Maintenance California Employees from Gregory F. Hall and

21  Michael B. Cukor, attached as exhibit E; emails relating to Tiger's retirement

22  attached as exhibit F; waiver of second meal break dated January 18, 2008, attached

23  as exhibit G; voluntary interview acknowledgement dated October 3, 2007, attached

24  as exhibit H; email dated March 20, 2007 re Q & A CA New Time Clock Procedures

25  attached hereto as exhibit I.

26

27

28

**KNAPP,
PETERSEN
& CLARKE**

-5-

KPC 00043

1  REQUEST FOR PRODUCTION NO. 8:

2       Any and all DOCUMENTS, written statements from any PERSON, tape

3  recordings, videotapes, and/or conversations recorded by any other means relating to

4  any of the events alleged in the Amended Complaint filed in this action, or of any

5  alleged illegal treatment against yourself or others similarly situated.

6  RESPONSE TO NO. 8:

7       This request is burdensome, overly broad, vague and ambiguous.  Subject to

8  and notwithstanding the foregoing, and the documents contained therein are

9  protected by the attorney client and attorney work product privileges, other than the

10  emails that have been produced herein, responding party does not have responsive

11  documents in his possession.  Additionally, all of the documents sought in this

12  demand are in the possession, custody and control of the requesting party.

13

14  REQUEST FOR PRODUCTION NO. 9:

15       Any and all DOCUMENTS, statements or affidavits YOU or YOUR attorneys

16  have obtained relating to the subject matter of this litigation.

17  RESPONSE TO NO. 9:

18       This request is burdensome, overly broad, vague and ambiguous and the

19  documents contained therein are protected by the attorney client and attorney work

20  product privileges.  Subject to and notwithstanding the foregoing, responding party

21  does not have responsive documents in his possession.

22

23  REQUEST FOR PRODUCTION NO. 10:

24       Any and all DOCUMENTS relating to any conversations or communications

25  between YOU and any other PERSON, corporation or other entity concerning any

26  matter raised in the Amended Complaint filed in this action.

27

28

KNAPP,
PETERSEN
& CLARKE

-6-

KPC 00044

592294.1  08000/00863

1  RESPONSE TO NO. 10:

2      This request is burdensome, overly broad, vague and ambiguous and the

3  documents contained therein are protected by the attorney client and attorney work

4  product privileges.  Subject to and notwithstanding the foregoing, see the emails

5  attached as exhibit D.

6

7  REQUEST FOR PRODUCTION NO. 11:

8      With respect to the claims asserted in this lawsuit, produce each DOCUMENT

9  that YOU sent to or received from FedEx or any employee or representative of

10 FedEx.

11 RESPONSE TO NO. 11:

12     This request is burdensome, overly broad, vague and ambiguous.  Subject to

13 and notwithstanding the foregoing, an undated document to LeVerne Rogers from

14 Eric Herzog, attached as exhibit A; Inter-Office Memorandum dated January 12,

15 2007to Employees from Gregory F. Hall and Michael B. Cukor, attached as exhibit

16 B; page 7-1 of Chapter 7, "Lunch Period Scheduling" from *Aircraft Maintenance*

17 *Employee Handbook*, attached as exhibit C; Emails to and from defendant's

18 management, attached hereto as exhibit D; Inter-Office Memorandum dated January

19 15, 2007 to Aircraft Maintenance California Employees from Gregory F. Hall and

20 Michael B. Cukor, attached as exhibit E; emails relating to Tiger's retirement

21 attached as exhibit F; waiver of second meal break dated January 18, 2008, attached

22 as exhibit G; voluntary interview acknowledgement dated October 3, 2007, attached

23 as exhibit H; email dated March 20, 2007 re Q & A CA New Time Clock Procedures

24 attached hereto as exhibit I.

25     Additionally, all of the documents sought in this demand are in the possession,

26 custody and control of the requesting party.

27

28

KNAPP,
PETERSEN
& CLARKE

-7-

KPC 00045

592294.1  08000/00863

REQUEST FOR PRODUCTION NO. 12:

With respect to the claims asserted in this lawsuit, produce each DOCUMENT that YOU sent to or received from any state or federal agency.

RESPONSE TO NO. 12:

This request is burdensome, overly broad, vague and ambiguous and the documents contained therein are protected by the attorney client and attorney work product privileges.  Subject to and notwithstanding the foregoing, responding party does not have responsive documents in his possession.

REQUEST FOR PRODUCTION NO. 13:

With respect to the claims asserted in this lawsuit, produce each DOCUMENT that YOU sent to or received from any other person or entity not covered in the two foregoing Requests.

RESPONSE TO NO. 13:

This request is burdensome, overly broad, vague and ambiguous and the documents contained therein are protected by the attorney client and attorney work product privileges.  Subject to and notwithstanding the foregoing, responding party does not have responsive documents in his possession. Additionally, all of the documents sought in this demand are in the possession, custody and control of the requesting party

REQUEST FOR PRODUCTION NO. 14:

To the extent not previously provided in response to these requests, any and all DOCUMENTS within YOUR possession or control which reflect, record, discuss or relate to any of the events and/or claims alleged by YOU in the Amended Complaint filed in this action.

KNAPP,
PETERSEN
& CLARKE

-8-

KPC 00046

592294.1  08000/00863

1   RESPONSE TO NO. 14:

2        This request is burdensome, overly broad, vague and ambiguous and the

3   documents contained therein are protected by the attorney client and attorney work

4   product privileges.  Subject to and notwithstanding the foregoing, responding party

5   does not have responsive documents in his possession. Additionally, all of the

6   documents sought in this demand are in the possession, custody and control of the

7   requesting party

8

9   REQUEST FOR PRODUCTION NO. 15:

10       Any and all DOCUMENTS YOU have in YOUR possession and/or custody

11  relating to the claims asserted in the Amended Complaint against FedEx that have

12  not been produced pursuant to the previous requests.

13  RESPONSE TO NO. 15:

14       This request is burdensome, overly broad, vague and ambiguous and the

15  documents contained therein are protected by the attorney client and attorney work

16  product privileges.  Subject to and notwithstanding the foregoing, responding party

17  does not have responsive documents in his possession. Additionally, all of the

18  documents sought in this demand are in the possession, custody and control of the

19  requesting party.

20

21  Dated:  August 25, 2008                    KNAPP, PETERSEN & CLARKE

22

23

24                                      By: _____

25                                      André E. Jardini
                                        Attorneys for Plaintiff DANIEL
26                                      FORRAND, ARA KARAMIAN,
                                        YVETTE GREEN and EUGENE
27                                      COLON, on behalf of themselves
                                        and all others similarly situated
28

KNAPP,
PETERSEN
& CLARKE

-9-

KPC 00047

592294.1  08000/00863

# PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to the within action. My business address is 500 North Brand Boulevard, 20th Floor, Glendale, California 91203-1904. On August 26, 2008, I caused the foregoing document(s) described as PLAINTIFF DANIEL FORRAND'S RESPONSES TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS (SET NO. ONE) to be served on the interested parties in this action as follows:

by placing a true copy thereof enclosed in sealed envelope(s) addressed as stated on the attached mailing list.

[X]   **BY MAIL:** I sealed and placed such envelope for collection and mailing to be deposited in the mail on the same day in the ordinary course of business at Glendale, California. The envelope was mailed with postage thereon fully prepaid. I am readily familiar with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.

[X]   **BY PERSONAL SERVICE:** I personally delivered such envelope by hand to the offices of the addressee(s).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 26, 2008, at Glendale, California.

Vivian Guest
(Type or print name)

(Signature)

KNAPP,
PETERSEN
& CLARKE

-1-

KPC 00048

592294.1  08000/00863

## SERVICE LIST

Glen Robert Bregman, Esq.
Law Offices of Glen Robert Bregman
16633 Ventura Boulevard
Suite 1240
Encino, CA  91436
TEL: (818) 981-9793
FAX: (818) 981-9807

Via U.S. Mail

Michael S. Duberchin Esq.
Law Offices of Michael S. Duberchin
500 North Brand Boulevard
20th Floor
Glendale, CA 91203
TEL: (818) 246-8487 ; (818)222-7484
FAX: (818) 246-6277

Via U.S. Mail

Richard McConnell
FEDERAL EXPRESS CORPORATION
c/o Hilton Hotel
100 West Glenoaks Boulevard
Glendale, CA 91202

Via Personal Service

Keith A. Jacoby, Esq.
LITTLER MENDELSON
2049 Century Park East
5th Floor
Los Angeles, CA  90067
TEL: (310) 553-0308
FAX: (310) 553-5583

Via U.S. Mail

KNAPP,
PETERSEN
& CLARKE

-2-

KPC 00049

592294.1  08000/00863

LeVerne Rogers,

I worked for Aircraft Line Maintenance from 1999 - 2005 (South Side). During this time, I was not paid for working through my lunch period most of the time. I explained to management on many occasions that I should be receiving a paid lunch while working during my lunch period. Per our Aircraft Maintenance Handbook, if you didn't get a lunch break during one hour before or one hour after the middle of your scheduled shift, you would receive a paid lunch for the day. Obviously the Handbook didn't carry much weight. I was basically told that I had plenty of time at the start and end of my shift to take lunch. Management did not seem to care about following the Aircraft Maintenance Handbook guidelines.

Earlier this month, my Senior Manager Bill Cusato explained to the work group that if you worked through your lunch period you would be compensated per California Labor Law. It concerns me that I was not compensated for the meal periods I have had to work through. I understand you are looking into this situation and would appreciate you keeping me up to date with your findings!! Thanks much!

Eric Herzog

Exhibit A

KPC 00050

Daniel Forrand

| | | | |
|---|---|---|---|
| **From:** | Gregory-F.-Hall-&-Michael-B.-Cukor@fedex.com [Gregory-F.-Hall-&-Michael-B.-Cukor@fedex.com] | **Sent:** | Fri 1/12/2007 2:25 PM |
| **To:** | Aircraft-Mx-Employees@fedex.com | | |
| **Cc:** | James@inet01.prod.fedex.com; R.@inet01.prod.fedex.com; Parker@fedex.com | | |
| **Subject:** | NEW TIME CLOCK PROCEDURES FOR CALIFORNIA EMPLOYEES | | |
| **Attachments:** | | | |

Inter-Office Memorandum

Date:   January 12, 2007                              To: Aircraft Maintenance

Employees

From:  Gregory F. Hall                   cc: James R. Parker
       Michael B. Cukor

Re:    New Time Clock Procedures for California Employees

In order to confirm compliance with California wage orders covering the
transportation industry, FedEx Express must align METEOR procedures. Because
the California wage order has a very specific definition of working time, all
activity must be measured by time clock; all time must be accounted for in
METEOR.

We expect these METEOR procedural changes to be implemented within the next
two months, as soon as METEOR re-programming is complete. They will affect
only California employees, at this time.

Upcoming METEOR Procedures

• Scheduled Shift-Start, Clock IN Procedures
o Employees must clock IN within five minutes of scheduled shift start
time
o Early clock IN prior to five-minutes before scheduled shift start time
without manager's approval is prohibited
o Pay begins with clock IN

• Rest Period Procedures
o No change to the current procedures
o Employees are authorized to take 10-minute, paid breaks at the
mid-point of each four-hour work period

• Meal Period Procedures
o Meal periods must ordinarily begin no later that 5.5 hours from the
start of the shift clock IN
o As required by California law, meal periods must not be less than
thirty (30), uninterrupted minutes
o Any work through a meal period must be approved by the manager
o All meal periods each day must be recorded on the Multi-Purpose
Terminal (MPT) as "meal start" and "meal stop"
o Working through a meal period without a manager's approval is

KPC 00051

Exhibit B

prohibited
o      Employees are responsible for knowing when their meal period begins based on their actual clock IN time
o      Employees who work over 10 hours must have a second meal period beginning not later than 10.5 hours after start of shift clock IN
o      Employees who are called back to work will receive a second, 30-minute meal period 5.5 hours after the second clock IN
o      Penalty pay to employees for a missed meal period (not taken or started after the 5.5 hour mark) is one hour at straight time as provided by California law
o      Normal paid lunch rules apply prior to the 5.5 hour mark from clock IN
o      Normal lunch periods apply per Chapter 7 of the Aircraft Maintenance Employee Handbook (AMEH). These new procedures supplement Chapter 7, in compliance with California law.

- Clock-Out Procedures
o      No change in current procedures
o      Employees must clock OUT whenever they leave FedEx property.

A Q&A will be prepared to provide additional details and clarification. We will notify you when the changes in California procedures will take affect.

Your cooperation will be appreciated as we seek better compliance with the California law. Thank you.


Gregory F. Hall                        Michael B. Cukor
Vice President                 Vice President
Line Maintenance                    Base Maintenance

KPC 00052

**Daniel Forrand**

| | | | |
|---|---|---|---|
| **From:** | Mike-Cukor-and-Greg-Hall@fedex.com [Mike-Cukor-and-Greg-Hall@fedex.com] | **Sent:** | Fri 1/12/2007 3:16 PM |
| **To:** | All-Base-and-Line-Maintenance@fedex.com | | |
| **Cc:** | Bill Robbins | | |
| **Subject:** | New Time Clock Procedures for California Employees | | |
| **Attachments:** | | | |

In order to confirm compliance with California wage orders covering the
transportation industry, FedEx Express must align METEOR procedures. Because
the California wage order has a very specific definition of working time, all
activity must be measured by time clock; all time must be accounted for in
METEOR.

We expect these METEOR procedural changes to be implemented within the next
two months, as soon as METEOR re-programming is complete. They will affect
only California employees, at this time.

Upcoming METEOR Procedures

Scheduled Shift-Start, Clock IN Procedures
Employees must clock IN within five minutes of scheduled shift start time
Early clock IN prior to five-minutes before scheduled shift start time without
manager's approval is prohibited
Pay begins with clock IN

Rest Period Procedures
No change to the current procedures
Employees are authorized to take 10-minute, paid breaks at the mid-point of
each four-hour work period

Meal Period Procedures
Meal periods must ordinarily begin no later that 5.5 hours from the start of
the shift clock IN
As required by California law, meal periods must not be less than thirty (30),
uninterrupted minutes
Any work through a meal period must be approved by the manager
All meal periods each day must be recorded on the Multi-Purpose Terminal (MPT)
as "meal start" and "meal stop"
Working through a meal period without a manager's approval is prohibited
Employees are responsible for knowing when their meal period begins based on
their actual clock IN time
Employees who work over 10 hours must have a second meal period beginning not
later than 10.5 hours after start of shift clock IN
Employees who are called back to work will receive a second, 30-minute meal
period 5.5 hours after the second clock IN
Penalty pay to employees for a missed meal period (not taken or started after
the 5.5 hour mark) is one hour at straight time as provided by California law
Normal paid lunch rules apply prior to the 5.5 hour mark from clock IN
Normal lunch periods apply per Chapter 7 of the Aircraft Maintenance Employee
Handbook (AMEH). These new procedures supplement Chapter 7, in compliance with
California law.

Clock-Out Procedures

KPC 00053

No change in current procedures
Employees must clock OUT whenever they leave FedEx property.

A Q&A will be prepared to provide additional details and clarification. We
will notify you when the changes in California procedures will take affect.

Your cooperation will be appreciated as we seek better compliance with the
California law. Thank you.


Gregory F. Hall                        Michael B. Cukor
Vice President                  Vice President
Line Maintenance                        Base Maintenance

KPC 00054

 *Aircraft Maintenance Employee Handbook*

## CHAPTER 7
## LUNCH PERIOD SCHEDULING

1. **GENERAL**

   A. It is the intent of the Aircraft Maintenance department that all hourly personnel receive a lunch period during the mid-point of each shift, plus or minus 1 hour. However, because of our flight and maintenance schedule, there may be times when this is not possible. Therefore, anyone who does not get to eat lunch during shift mid-point plus or minus 1 hour due to workload should scan METEOR, which indicates ½ hour additional pay for that day.

   B. Managers will make every attempt to ensure that each employee receives a lunch period.

   C. In those states where lunch periods are mandatory, employees are provided a lunch break.

*Lunch Period Scheduling*                                    7–1

Exhibit C

KPC 00055

---

❶ Follow up

**Daniel Forrand**

| **From:** | Daniel Forrand | **Sent:** Tue 11/28/2006 4:19 AM |
|---|---|---|
| **To:** | Richard Diehm | |
| **Cc:** | | |
| **Subject:** | RE: PAY | |
| **Attachments:** | | |

PER OUR DISCUSSION REGARDING THIS ISSUE AND THE CALIFORNIA STATE LAWS GOVERNING IT, I HAVE NOT RECIEVED A FINAL DECISION FROM YOU. YOUR DECISION WITH REGARDS TO THIS MATTER IS APPRECIATED.

---

**From:** Richard Diehm
**Sent:** Wed 11/22/2006 2:28 PM
**To:** Daniel Forrand
**Subject:** FW: PAY

-----Original Message-----
From: David Eulberg
Sent: Wednesday, November 22, 2006 10:37 AM
To: Richard Diehm; Bill Cusato
Subject: RE: PAY

Ref AMEH 7-1A, if he was afforded a lunch period at mid-point of his shift +/- one hour he is not entitled to a paid lunch. Since his schedule has an offset lunch I would think a reasonable person would consider the mid-point of his shift would be offset. Please advise if you require further assistance.

Regards, Dave.

-----Original Message-----
From: Richard Diehm
Sent: Wednesday, November 22, 2006 6:29 AM
To: Bill Cusato; David Eulberg
Subject: FW: PAY

Gents,
    Mr. Forrand would like to be paid a "paid lunch" for the day talk with Bill on Monday 11/13/06. Your thoughts....I have my own....

Rick

-----Original Message-----
From: Daniel Forrand [mailto:178111@emc.fedex.com]
Sent: Wednesday, November 22, 2006 6:11 AM
To: DIEHM/RICHARD
Subject: PAY

KPC 00056

I HAVE NOT RECIEVED MY WORKING LUNCH PAY FOR 13 NOV, 2006 ON THIS PAY PERIOD...PLEASE RESPOND.

Exhibit D

**Daniel Forrand**

| | | | |
|---|---|---|---|
| **From:** | Daniel Forrand | **Sent:** | Tue 2/6/2007 2:31 PM |
| **To:** | Leverne Rogers | | |
| **Cc:** | Daniel Forrand | | |
| **Subject:** | MISSED MEAL/BREAK PERIODS | | |
| **Attachments:** | | | |

DURING LAST MONTHS MEETING WITH BILL CUSATO REGARDING NEW UPCOMING METEOR CLOCK-IN PROCEDURES, I BROUGHT TO HIS ATTENTION THE MEAL AND BREAK PERIODS MYSELF AND CO-WORKERS WERE SUBJECTED TO BY MANAGEMENT DURING MY TENURE AT THE LINE MAINTENANCE FACILITY. HE SUGGESTED I CONFER WITH YOU IN REGARDS TO THIS ISSUE.

DURING MY EMPLOYMENT IN THE ABOVE MENTIONED WORK CENTER, MANAGEMENT REFUSED PAID LUNCHES AND ONLY GRANTED THEM UNDER EXTREME CIRCUMSTANCES. BREAK PERIODS WERE ONLY TAKEN WHEN POSSIBLE, WHICH IS TO SAY, NOT DURING THE GUIDELINES SET FORTH BY THE STATE OF CALIFORNIA LABOR LAWS.

I AM AWARE OF A CLASS ACTION SUIT, (CASE# BC282300) IN WHICH A GROUP OF FEDEX EMPLOYEES VOICED THIS SAME COMPLAINT. I HAVE READ THIS "NOTICE OF PENDENCY OF CLASS ACTION" DOCUMENT WHICH ADDRESSES THIS ISSUE SPECIFICALLY.

AS YOU MAY RECALL, I HAD AN ISSUE WITH MY THEN MANAGER IN REGARDS TO COMPANY POLICIES. AFTER BRINGING THIS ISSUE TO YOUR ATTENTION, THE ISSUE WAS RECTIFIED. IT WAS APPARENT THE MANAGER WAS NOT AWARE OR DID NOT FOLLOW THE COMPANY POLICY. I BELIEVE THIS WAS THE CASE WITH MANAGEMENT IN REGARDS TO BREAK AND MEAL PERIODS AS DEFINED BY CALIFORNIA STATE LABOR LAW.

CASE# BC282300 "NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION FOR CERTAIN EMPLOYEES OF FEDERAL EXPRESS CORPORATION" PROPERLY ADDRESSES THIS ISSUE. I ASK YOU TO PROVIDE A TIMELY REVIEW AND RESPONSE SO I MAY RESOLVE THIS MATTER.

KPC 00057

Daniel Forrand

| | |
|---|---|
| **From:** | Richard Diehm |
| | **Sent:** Mon 1/22/2007 6:40 AM |
| **To:** | Casey Livingston; Charles Calleja; Daniel Forrand; Dario Henriquez; David Wojciechowski; Ed Sanchez; Howard Shinmoto; Jaime De La Cruz; Jeff Jordan; Joel Medina; John Tran; John Walker; Kevin Smith; Lou Zurga; Manuel Magana; Michael Pepitone; Paul Voltattorni; Robert O'Donnell; Travon Tysika; William Chin; Yossi Shimshi |
| **Cc:** | |
| **Subject:** | FW: 12-Hour Shifts |
| **Attachments:** | |

**From:** Bill Cusato
**Sent:** Friday, January 19, 2007 3:27 PM
**To:** Dan Butler; George Murphy; Jack Earls; Jane Valliere; Kevin Kelly; Mark Collins; Robert Shoemaker; Scott Collins; Ben Devarie; David Eulberg; George Hanniff; Jeffrey Krafczik; Jim Doty; Joseph Pace Jr; Louie DiCioccio; Mike Majerus; Richard Diehm; Steven Sobczak; Ted Serafin; Thomas Fay; Yoshikatsu Goya
**Cc:** Dennis Wiggs; Leverne Rogers
**Subject:** 12-Hour Shifts

I have information from Legal on some of the questions that came up in the meeting with the first shift AMTs this week.

The issue of meal period on 12-hour shifts is quite explicit.  An AMT cannot waive his/her first meal period, only the second.  An AMT MUST begin his/her actual 30 minute uninterrupted meal period not later than 5.5 hours after initial clock in.  As such, AMTs that come in at 0130 on Sunday morning for pre shift for the B check must start their meal period not later than 0700.  Accordingly, if an AMT works 2 hours pre shift, the meal period must begin not later than 0900 as opposed to the scheduled 1000.  Failure to comply will invoke the no lunch penalty as described by the CA labor law.

I have additional information which I will share next relating to some of the other questions.

William Cusato

Sr. Manager

Aircraft Maintenance-LAX

310-568-7486

Amador,

This matter was previously brought to my attention by Bill Cusato along with some of your peers.  I have already began looking into this matter. I will apprise you of the outcome, as soon as this review is completed.

Thanks

LeVerne Rogers

---

**From:** Amador Gomez
**Sent:** Tuesday, January 30, 2007 1:17 PM
**To:** Leverne Rogers
**Cc:** 113211@fedex.com; wocuasato@fedex.com
**Subject:**

LaVerne,  I have a concern with the CA state mandated .5 hour uninterrupted lunch period within the first 5 hours of shift start. From Dec. 1999 to Nov. 1995 while working at LAX LINE, I had many occurrences that caused me not to  be able to take my uninterrupted lunch period mainly due to flights I was assigned to work during the middle of my shift. When I inquired about compensation for said lunch periods I was informed by management and above that there would be no compensation. I was lead to beleive that this was standard practice within our work group. Any information you may have in this matter regarding compensation will be greatly appreciated. Thank you, Amador A. Gomez Sr. AMT Base Mx LAX employee #174579

KPC 00059

**Daniel Forrand**

| From: | Richard Diehm | Sent: | Mon 2/5/2007 6:38 AM |
|---|---|---|---|
| To: | Dario Henriquez; Daniel Forrand | | |
| Cc: | | | |
| Subject: | FW: Unpaid Lunch @ South Side | | |
| Attachments: | | | |

**From:** Bill Cusato
**Sent:** Sunday, February 04, 2007 3:26 PM
**To:** Dan Butler; George Murphy; Jack Earls; Jane Valliere; Kevin Kelly; Mark Collins; Robert Shoemaker; Scott Collins; Ben Devarie; David Eulberg; George Hanniff; Jeffrey Krafczik; Jim Doty; Joseph Pace Jr; Louie DiCioccio; Mike Majerus; Richard Diehm; Steven Sobczak; Ted Serafin; Thomas Fay; Yoshikatsu Goya
**Cc:** Leverne Rogers; Dennis Wiggs
**Subject:** Unpaid Lunch @ South Side

Gents:

HR is working on the unpaid lunch issue that has been alleged went on while working for Line MX at LAX.  LeVerne has received more than enough individual statements in writing to get the wheels in motion.  Please advise you team members of such and that they do not need advise LeVerne at the individual level anymore.  Once a determination has been reached, we will advise the entire workforce and those affected may step forward at that time.

Thanks,

William Cusato

Sr. Manager

Aircraft Maintenance-LAX

310-568-7486

KPC 00060

Thanks for bringing this matter to my attention.

---

**From:** Jose Caceres
**Sent:** Sunday, February 04, 2007 12:25 PM
**To:** Leverne Rogers
**Cc:** Bill Cusato
**Subject:** Unpaid lunch periods

LeVerne
Writing to inform you of the issues at Lax Line of unpaid lunch periods,as you are probably
aware I was employed at Lax Line from 1994 to 2004,this letter is address this issue with you
so you can keep me posted of any future plans you may have pursuing this mattter.
Thank You
Jose Caceres
Sr Amt

KPC 00061

ℹ You forwarded this message on 1/30/2007 6:01 AM.

**Mike Condolff**

| | | | |
|---|---|---|---|
| **From:** | Mike Condolff | | |
| **To:** | Leverne Rogers | **Sent:** | Mon 1/29/2007 1:13 PM |
| **Cc:** | Thomas Fay; Bill Cusato | | |
| **Subject:** | CA Paid Meals | | |
| **Attachments:** | | | |

LeVerne,

    As per our conversation on 26 January 2007, I am emailing you not only to stress the importance of the situation with CA labor law concerning meal periods, but to explain in writing so you can correctly understand and pursue this matter. From 1998-2005, I worked Aircraft Line Maintenance at LAX, rarely were these laws followed due to flight schedules and shift start times.  These concerns were brought to the attention of my management several times, their response was, you have time at the beginning and end of your shift to take a meal period and paid lunches were strictly prohibited. I hope this matter can be corrected and I may be compensated for the meals I missed during this time. I would appreciate it if you will update me with progress and steps being taken on this matter.

Michael Condolff
Sr. AMT

KPC 00062

```
Date:   August 17, 2006
To:     Patrick Cunningham
From:   Gregory F. Hall
        Michael B. Cukor
Re:     Paid Lunch
```

In response to your question CUNNINGHAM/PATRICK:

We know that system-wide and in other departments there is an effort to try to eliminate the paid lunch work time. Or at least the paid lunch. This I think is a systemwide issue and deserves a top 10 answer.
-------------------------------------------------------

Reducing unnecessary operating costs is essential for the continued success of our company, and each of us shares this responsibility. There are no plans to eliminate paid lunches. However, due to the negative financial impact on our operating budget, it has become necessary to better manage this aspect of our business.

   PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      **EMCC0000**

**KPC 00063**

Every effort is made to provide employees the opportunity to take an
uninterrupted, 30-minute meal period at the mid-point of their shift, plus or
minus an hour. There are, and will be, limited exceptions as the operations
dictate; however, such exceptions must be pre-approved by your lead or
management, and a METEOR exception form submitted.

Your understanding and usual cooperation are appreciated as we strive to
continue providing outstanding levels of service to our customers, while
maintaining our much-covetedposition in the market place.

-----------------------(Forwarded letter follows)-------------------------
Date:Saturday, 12 August 2006 1:21am CT
To: ACMXTOP10QA
From: CUNNINGHAM/PATRICK
Subject: 143672

We know that system wide and in other departments there is an effort to try t
o eliminate the paid lunch work time. Or at least the paid lunch. This I think
is a system wide issue and deserves a top 10 answer. "tactics" have been used
here to show results.:Augest 4, beginning of shift, all leads and acting lead
s were told at a meeting NO PAID LUNCH,PERIOD. The following monday, we were t

    PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      **EMCC0000**

KPC 00064

old by leads NO PAID LUNCH. NO MATTER WHAT.There was however a memo stating th
at paid lunches were "not going away" just "the execption to the rule". We wou
ld need to get "permission" from lead amt and manager.Managment knows all abou
t the flight schedule and how it could put us in a squeeze from time to time.
Managment covered itself with that email. But hourly employies are still being
held the standard of NO PAID LUNCH. When we are swamped with normal duties an
d are late to dispatch for say 16 minutes, are we or the leads going to be hel
d "accountable"? This almost happend to us. Managment pre-passed the buck to t
he leads and the hapless AMTs with that memo."asking for permission" is a sad
form of backside cover while we sweat it out on the ramp and the leads are cop
ing with limited ground time, limited man-power, ongoing maintence tc....
Top 10 is read throught A.O.D. and is therefore respected. You could restore
some credibilty here by responding to this in a public manner and offer some
guidence on how to acheive this cost saving item and do so without quiet arm
twisting of us non-union hourly people.
-------------( end of letter )-----------------------------------------------

    PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward    **EMCC0000**

**KPC 00065**

## Daniel Forrand

| | | | |
|---|---|---|---|
| **From:** | Alberto Punzalan | **Sent:** | Fri 3/23/2007 8:03 AM |
| **To:** | Daniel Forrand | | |
| **Cc:** | | | |
| **Subject:** | FW: CA labor Law (paid lunches) | | |
| **Attachments:** | | | |

---

**From:** Bill Cusato
**Sent:** Wed 2/28/2007 1:32 PM
**To:** Alberto Punzalan
**Subject:** RE: CA labor Law (paid lunches)

Al:


I just talked with LeVerne and she advised me that they are actually looking as far back as 2001, quite a bit further than I was previously advised.



Bill

---

**From:** Alberto Punzalan
**Sent:** Wednesday, February 28, 2007 11:15 AM
**To:** Bill Cusato
**Subject:** FW: CA labor Law (paid lunches)




---

**From:** Alberto Punzalan
**Sent:** Wed 2/28/2007 1:11 PM
**To:** Leverne Rogers
**Subject:** RE: CA labor Law (paid lunches)

LeVerne,


We just had a meeting with Bill Cusato, and he mentioned Fedex is still working on the back pay for the extra 15 minutes owed to employees for paid lunches, and that they are only going back approx. 18 months.  If this is true, why only 18 months,  since I know for a fact that the state law has been in effect since at least 2001?  This

KPC 00066

https://email.prod.fedex.com/exchange/178111/Inbox/FW:%20CA%20labor%20Law%20(...   8/18/2008

does not sound correct to me.  Also, does Fedex plan to do the same with us on the issue of paid lunches at
the Southside?  If so, I don't believe that is correct either.  I think we all need some input to what exactly is
being done on the no paid lunch at the Southside issue to determine if we need to get some legal advise and/or
representation. Regards,


Alberto Punzalan

---

**From:** Leverne Rogers
**Sent:** Mon 1/29/2007 3:35 PM
**To:** Alberto Punzalan
**Cc:** Thomas Fay; Bill Cusato
**Subject:** RE: CA labor Law (paid lunches)

Thanks for producing your concerns in writing to me, this is always helpful.  I understand your concerns and as
I stated, I will look into them.  I will apprise you of my findings when the review of this matter has been
completed.  Thx.



LeVerne

---

**From:** Alberto Punzalan
**Sent:** Monday, January 29, 2007 1:22 PM
**To:** Leverne Rogers
**Cc:** Thomas Fay; Bill Cusato
**Subject:** CA labor Law (paid lunches)

LeVerne,

As per our conversation on 01/26/07, I am emailing you not only to stress
the importance of this situation with Ca. labor law concerning the meal times,
but also explain in writing so you can correctly understand and pursue this
matter.  Briefly the law states that an employee should have an
uninterrupted meal time of no less than 30 min. and no later than 5 hrs. into there shift.
If for some reason this is unable, an on duty lunch (paid lunch) is owed. This
being said, from 1997-2006 I was at LAX line and these rules were never followed.
Due to the flight schedules, AMT'S were required to work through meal periods
and not allowed to have a paid lunch.  It was strictly prohibited to be awarded
a paid lunch.  This was brought up several times with management , Sr.
management and above, but we were told no paid lunches allowed. At
that time I was unaware this was a CA law and was led to
believe it was at the managers discretion.  This was standard
practice and has been before I started there and it is still being practiced
now.  Most Amt's were effected by this situation and not
given a paid lunch even though a paid  lunch should have been
given. This being said, I hope this matter can be looked into
and I can be compensated for all the paid lunches that are owed to me.  I

KPC 00067

https://email.prod.fedex.com/exchange/178111/Inbox/FW:%20CA%20labor%20Law%20(...   8/18/2008

would appreciate it if you frequently updated me with progress or step being                    taken
on this paid lunch issues. Regards

Alberto Punzalan
Sr. AMT  emp# 78826

KPC 00068

**Bill Cusato**

| | |
|---|---|
| From: | Top10qa [TOP10QA@emc.fedex.com] |
| Sent: | Tuesday, March 20, 2007 3:20 PM |
| To: | Bill Cusato |
| Subject: | Q&A CA New Time Clock Procedures |

BELOW IS LAST JANUARY'S ANNOUNCEMENT OF TIME CLOCK CHANGES NECESSARY IN CALIFORNIA. FOLLOWING THE RE-POSTING OF THIS ANNOUNCEMENT IS THE CALIFORNIA IMPLEMENTATION SCHEDULE AND THE PROMISED Q&A.
*******************************************

Inter-Office Memorandum

Date: January 15, 2007     To: Aircraft Maintenance
California Employees

From: Gregory F. Hall     cc: James R. Parker
Michael B. Cukor

Re:  New Time Clock Procedures for California Employees

In order to confirm compliance with California wage orders covering the transportation industry, FedEx Express must align METEOR procedures. Because the California wage order has a very specific definition of working time, all activity must be measured by time clock; all time must be accounted for in METEOR.

We expect these METEOR procedural changes to be implemented within the next two months, as soon as METEOR re-programming is complete. They will affect only California employees, at this time.

Upcoming METEOR Procedures

* Scheduled Shift-Start, Clock IN Procedures
   --Employees must clock IN within five minutes of scheduled shift start time
   --Early clock IN prior to five minutes before scheduled shift start time
    without manager's approval is prohibited
   --Pay begins with clock IN

* Rest Period Procedures
   --No change to the current procedures
   --Employees are authorized to take 10-minute, paid breaks at the mid-point
    of each four-hour work period

* Meal Period Procedures
   --Meal periods must ordinarily begin no later than 5.5 hours from the start
    of the shift clock IN
   --As required by California law, meal periods must not be less than thirty
    (30), uninterrupted minutes
   --Any work through a meal period must be approved by the manager
   --All meal periods each day must be recorded on the Multi-Purpose Terminal
    (MPT) as "meal start" and "meal stop"
   --Working through a meal period without a manager's approval is prohibited

*Exhibit E*

1

KPC 00069

--Employees are responsible for knowing when their meal period begins based
  on their actual clock IN time
--Employees who work over 10 hours must have a second meal period
  beginning not later than 10.5 hours after start of shift clock IN
--Penalty pay to employees for a missed meal period (not taken or started
  after the 5.5 hour mark) is one hour at straight time as provided by
  California law
--Normal paid lunch rules apply PRIOR to the 5.5 hour mark from clock IN
--Normal lunch periods apply per Chapter 7 of the Aircraft Maintenance
  Employee Handbook (AMEH). These new procedures supplement Chapter 7, in
  compliance with California law.

* Clock-Out Procedures
  --No change in current procedures
  --Employees must clock OUT whenever they leave FedEx property

A Q&A will be prepared to provide additional details and clarification. We will notify you when the changes in California procedures will take affect.

Your cooperation will be appreciated as we seek better compliance with the California law. Thank you.

Gregory F. Hall            Michael B. Cukor
Vice President             Vice President
Line Maintenance           Base Maintenance
------------( end of letter )-------------------------------------------

*******IMPLEMENTATION SCHEDULE********

Since Payroll will be moving the planned changes into production on 3/24/2007, METEOR changes will be in production on 3/26/2007. This means management will start seeing exceptions on 3/27/2007 if employees meet the eligibility for CA meal penalty. When the manager sees the 310 penalty transaction code, it should be approved through the grace period which ends on March 31, 2007.
Effective April 1, 2007, management should require proper justification for the meal penalty payment as outlined it the CA Time Clock changes Q&A's published March 20, 2007.

************************************************

CALIFORNIA TIME CLOCK CHANGES
QUESTIONS AND ANSWERS
March 20, 2007

Q1:  Can an employee clock out 8.5 hours after actual clock in? If so, that
     means an employee could clod out prior to his/her scheduled end time and
     still have a full day's pay. Will that create a METEOR exception?

A1:  An employee can clock out at end of shift up to five minutes early
     without creating an exception. Clock out beyond scheduled end of shift
     creates an exception.

2

KPC 00070

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*   \*

**Q2:** If an employee clocks out within the five minutes after scheduled end of shift, will the resulting OT create an exception?

**A2:** Exception will be created if an employee clocks out after scheduled end of shift.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Q3:** If an employee clocks in later (after his/her scheduled start time) i.e., 0533, can an employee work till 1403 and get his/her full eight hours? Will that create an exception? Is it counted against his/her punctuality record?

**A3:** Scheduled start time will be used for punctuality discipline. Clock-in after scheduled shift start time is a tardy event and creates an exception.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Q4:** What does an employee need to do to record his/her lunch/meal period?

**A4:** Employees must "Start Meal" and "Stop Meal" at an MPT for all meal periods.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Q5:** When can lunch/meal be taken?

**A5:** The lunch/meal period in California must begin not less than 3 hours and not more than 5.5 hours from clock-in. This "window" allows for some flexibility dependent on manager's direction and operational needs.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Q6:** Does the unpaid 30-minute lunch/meal period begin and end with actual swipe time?

**A6:** Employees will have 30 minutes for meal period from the time they clock "Start Meal," plus five minutes grace period at the end of the meal period. If "Stop Meal" is swiped more than 30 minutes, but not more than 35 minutes, after "Start Meal," METEOR will round back the meal end time in favor of the employee as if the employee had swiped "Stop Meal" exactly 30 minutes after "Start Meal." Employees who swipe "Stop Meal" more than 35 minutes after "Start Meal" will be charged off the clock time for the actual length of the lunch clocked. An exception will be created for the "Stop Meal" greater than 35 minutes after "Start Meal."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Q7:** What happens if an employee swipes "Stop Meal," and he/she has taken less than 30 minutes for his/her meal period? Is that considered the same as clocking in more than five minutes early at the beginning of the shift? Does the employee get the one-hour of straight time penalty

3

KPC 00071

since he/she did not get his/her full 30-minute meal period

A7:   Employees who "Stop Meal" after 20 but before 30 minutes will receive one-hour, straight time California penalty, but no paid lunch per AMEH. Employees who "Stop Meal" less than 20 minutes after "Start Meal" will receive lunch per the AMEH. Employees will be paid an additional amount to equal the one-hour straight time California penalty. Employees may submit an exception stating they were actually at lunch and not working, thus allowing the manager to adjust the time card. Exceptions will be created, and managers will monitor for corrective action.

Note:  Aircraft Maintenance Employee Handbook (AMEH) lunch period scheduling is based on work "schedules". The California meal period penalty is based on daily "actual clock-in" time.

   **************************************************
Q8:   What are the disciplinary protocols for failure to comply with the new METEOR rules?

A8:   Managers will take appropriate action in accordance with the FedEx Express PEOPLE Manual.

   **************************************************
Q9:   The Time Clock Change memo states that a meal period must begin not later than 5.5 hours into shift. The language in the California Wage Order, paragraph 11.(A) reads, "No employer shall employ any person for a work period of more than (5) hours without a meal period of not less than 30 minutes.." That would seem to infer the meal period must START not later than 5 hours into one's shift. Please clarify.

A9:   The Wage Order states the lunch must be completed before the beginning of the sixth hour from actual clock in.

   **************************************************
Q10:  Can we retain a second meal period as optional rather than mandatory for 12-hour days?

A10:  A second meal period is not required for shifts up to 12 hours, if a written waiver from the employee is on file. A waiver form can be obtained from your manager.

   **************************************************
Q11:  If employees are unable to take an uninterrupted lunch due to the flight schedule on the line, how will that be handled?

A11:  According to the California Wage Order, employees would be paid for all time worked and receive the penalty of one-hour straight time.

   **************************************************
Q12:  CA law requires the employee be paid 1-hour paid lunch as a penalty for not taking lunch.  If the employee scans METEOR (MPT) as AMEH Ch. 7 states, will this generate a 1-hour paid lunch for CA employees?

4

KPC 00072

A12: Clocking a lunch which meets the existing AMEH requirements for a paid lunch and which has a start time equal to or before 5.5 hours from clock IN will only generate the AMEH paid lunch. Clocking a lunch which meets the existing AMEH requirements for a paid lunch AND which has a start time greater than 5.5 hours from clock IN will generate the AMEH paid lunch plus the CA penalty. The AMEH paid lunch and the CA penalty together will generate additional pay not to exceed 1-hour total of additional pay.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q13: How does FedEx plan to address the matter involving Line Maintenance AMTs who routinely took their lunch break outside of the required 5.5 hour window?

A13: AMTs who routinely took their lunch break outside of the required 5.5 hour window will be paid the California penalty retroactively for up to a year.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q14: Is anyone currently researching the possibility that Line Maintenance AMTs might be entitled to some back pay?

A14: Yes. Payroll, Line and Base Maintenance management, and IT are working together to ascertain which AMTs are entitled to back pay based on this California work order.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q15: How long will this research take?

A15: The research, which is already underway, is extensive and time-consuming, but it is expected to be concluded before the end of FY07.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q16: How will the findings/outcome of this research be communicated to those impacted by the California work order?

A16: Managers are always your first line of communication. They will notify you as soon as they have learned what the research results have determined.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q17: When and how can we expect to receive this California penalty?

A17: California penalty payments will be made the same way your pay is distributed, check or direct deposit, with tax deductions. They should be distributed by the end of FY07.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q18: When does this process begin?

A18: The process begins April 1, 2007.

5

KPC 00073

07:08:57 Fri Nov 09, 2007

Case 2:08-cv-01360-DSF-PJW   Document 37-4   Filed 11/10/08   Page 37 of 91   Page ID
----- LANDY/JAMES --> ACMXTC   QA / Nov 09 #742Fri 2:47am CT   Tiger's Retirement

Date: Friday, 9 November 2007 2:47am CT
To: ACMXTOP10QA
From: LANDY/JAMES
Subject: Tiger's Retirement
In-Reply-To: The letter of Monday, 5 November 2007 4:46pm CT

I have a good idea for the people at sports marketing. Why don't they invest a
billion dollars then we can get  a return of 4 billion. Then there will be
plenty of money to give us all a nice raise.

Jim Landy
ONT LINE
------------------------( Forwarded letter 1 follows )--------------------


Date:  November 5, 2007
To:    Stephen Schuetrumpf and Rick Griffith
From:  Greg Hall
Re:    Tiger's Retirement

 PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      **EMCC0000**

Exhibit F

KPC 00074

07:09:06 Fri Nov 09, 2007
Case 2:08-cv-01360-DSF-PJW  Document 37-4  Filed 11/10/08  Page 38 of 91  Page ID
----- LANDY/JAMES --> ACMXTO:  )A / Nov 09 #7423i 2:47am CT    )iger's Retirement

FedExCup was no exception. That is also why our major competitors spend huge
dollars on sports marketing.

Greg

-------------------------( Forwarded letter 1 follows )--------------------
Date: Friday, 21 September 2007 2:36pm CT
To: SCHUETRUMPF/STEPHEN@EMC2, ACMXTOP10QA
From: GRIFFITH/RICHARD@EMC2
Subject: Tiger's Retirement
In-Reply-To: The letter of Friday, 21 September 2007 5:21am CT

Too bad the employees that made his retirement possible don't get the same
deal. We'd all retire.
Rick/GJT
-------------------------( Forwarded letter 2 follows )--------------------
Date: Friday, 21 September 2007 5:21am CT
To: ACMXTOP10QA
From: SCHUETRUMPF/STEPHEN@EMC2

 PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      **EMCC0000**

**KPC 00075**

07:09:00 Fri Nov 09, 2007
Case 2:08-cv-01360-DSF-PJW  Document 37-4  Filed 11/10/08  Page 39 of 91  Page ID
----- LANDY/JAMES --> ACMXTO   A / Nov 09 07:48:41 2:47am CT      iger's Retirement
#:424

In response to your questions/comments SCHUETRUMPF/STEPHEN and
GRIFFITH/RICHARD:

The use of $10 Million for new sponsorship and calling it "retirement" at a
time when our retirement has taken such a loss is very much a slap in the face
to all employees faced with loss of retirement income. Please reconsider
wasting employees retirement money by "awarding" it to an already millionaire
and calling it for his "retirement at age 45."

------------------------------------------------------------------
Stephen and Rick,

Sports Marketing tells me they do extensive follow-up research on all of their
sports marketing investments and have found that they generate a return of
approximately $4 for every $1 spent. They are great ways to reach key segments
of shipping decision makers because those groups (e.g., shipping managers,
CEOs, CFOs) tend to be big sports fans. The sports marketing events also give
us our greatest opportunities to host effective customer events, and the

   PF 1=Help 2=Exit 3=Return 4=Query 5=Action 7=Backward 8=Forward      EMCC0000

KPC 00076

COPY

## <u>Waiver of Second Meal Break</u>

Employee: Please read the following statement; Sign below; and Return this document to your manager.

I, *DAN FORRAND* (Employee); *178111* (Employee #), understand that I am entitled by law to a second meal period of not less than 30 minutes when I work more than 10 hours per day.  However, as permitted by law, I voluntarily waive my right to the second meal period as long as the total hours of work for the day are not more than 12 hours.

*Dan Forrand*       *18 JAN 07*
Employee Signature           Date

**Approved**   X
**Or**
**Denied**

_____     *1/19/0)*
Manager Signature          Date

**NOTE TO MANAGER:  Employee cannot waive the second meal period if he/she waived the first period.**

*Exhibit 4*

07-001BC

KPC 00077

## VOLUNTARY INTERVIEW ACKNOWLEDGEMENT

Our names are Jeffery Robertson and Sandra Isom.  We are attorneys representing FedEx Express.

- We would like to ask you some questions and talk to you about certain employment practices in your group in order to evaluate and address an internal complaint and defend the company in litigation.  Our investigation concerns issues related to breaks.

- You are not obligated to talk to us.  Your participation is voluntary.

- Regardless of your decision there will be no prejudice or benefit to you.  FedEx has an anti-retaliation policy to protect employees.  You will not be subjected to retaliation.

- You may terminate the discussion at any time.

- If you chose to talk to us, I ask only that you provide the truth.

- It is my understanding that you are currently not represented by counsel in any type of legal action involving FedEx Express.

- Due to the pending litigation that involves the issues we'd like to discuss, your interests may become adverse to FedEx's interest at some point.

- The information obtained may be relevant in the defense of FedEx's interests.

## ACKNOLWEDGEMENT BY EMPLOYEE

I have read and understand the above and agree to provide true and accurate information in this matter.  I will provide such information entirely of my own free choice and have not been subjected to any threats, coercion, duress, promises, or benefits.  I understand I can terminate the interview at any time.

DATED:  October **3** , 2007

Exhibit H

Doc. No. 698569

KPC 00078

**Daniel Forrand**

| | |
|---|---|
| **From:** | Richard Diehm |
| | **Sent:** Mon 3/26/2007 11:22 AM |
| **To:** | Casey Livingston; Charles Calleja; Daniel Forrand; Dario Henriquez; David Wojciechowski; Ed Sanchez; Howard Shinmoto; Jaime De La Cruz; Jeff Jordan; Joel Medina; John Tran; John Walker; Kevin Smith; Lou Zurga; Manuel Magana; Michael Pepitone; Paul Voltattorni; Robert O'Donnell; Travon Tysika; William Chin; Yossi Shimshi |
| **Cc:** | |
| **Subject:** | FW: Q&A CA New Time Clock Procedures |
| **Attachments:** | |

MORE INFO - PLEASE READ ...


-----Original Message-----
From: Top10qa [mailto:TOP10QA@emc.fedex.com]
Sent: Tuesday, March 20, 2007 3:20 PM
To: Richard Diehm
Subject: Q&A CA New Time Clock Procedures

BELOW IS LAST JANUARY'S ANNOUNCEMENT OF TIME CLOCK CHANGES NECESSARY IN CALIFORNIA. FOLLOWING THE RE-POSTING OF THIS ANNOUNCEMENT IS THE CALIFORNIA IMPLEMENTATION SCHEDULE AND THE PROMISED Q&A.


*****************************************

Inter-Office Memorandum

Date:  January 15, 2007        To:  Aircraft Maintenance
                                    California Employees

From:  Gregory F. Hall        cc:  James R. Parker
       Michael B. Cukor

Re:   New Time Clock Procedures for California Employees

In order to confirm compliance with California wage orders covering the transportation industry, FedEx Express must align METEOR procedures. Because the California wage order has a very specific definition of working time, all activity must be measured by time clock; all time must be accounted for in METEOR.

We expect these METEOR procedural changes to be implemented within the next two months, as soon as METEOR re-programming is complete. They will affect only California employees, at this time.

Upcoming METEOR Procedures


* Scheduled Shift-Start, Clock IN Procedures
  --Employees must clock IN within five minutes of scheduled shift start time
  --Early clock IN prior to five minutes before scheduled shift start time
    without manager's approval is prohibited
  --Pay begins with clock IN

* Rest Period Procedures
  --No change to the current procedures
  --Employees are authorized to take 10-minute, paid breaks at the mid-point

*Exhibit I*

KPC 00079

EXHIBIT 7

1   André E. Jardini (State Bar No. 71335)
    aej@kpclegal.com
2   KNAPP, PETERSEN & CLARKE
    550 North Brand Boulevard, Ste 1500
3   Glendale, California 91203-1904
    Telephone: (818) 547-5000
4   Facsimile: (818) 547-5329

5   Glen Robert Bregman, Esq. State Bar No. 100363
    glenbregmanlaw@aol.com
6   LAW OFFICES OF GLEN ROBERT BREGMAN
    16633 Ventura Boulevard, Suite 1240
7   Encino, CA 91436
    Telephone: (818) 981-9793
8   Facsimile: (818) 981-9807

9   Michael S. Duberchin, Esq. (State Bar No. 108338
    msdlaw@earthlink.net
10  LAW OFFICES OF MICHAEL S. DUBERCHIN
    500 North Brand Boulevard, 20th Floor
11  Glendale, California 91203-1904
    Telephone: (818) 246-8487
12  Facsimile: (818) 246-6277

13  Attorneys for Plaintiffs
    DANIEL FORRAND, ARA KARAMIAN,
14  YVETTE GREEN and EUGENE COLON, on
    behalf of themselves and all others similarly situated
15

16              UNITED STATES DISTRICT COURT

17             CENTRAL DISTRICT OF CALIFORNIA

18

19  DANIEL FORRAND, ARA            )  NO.   CV08-1360 DSF (PJWx)
    KARAMIAN, YVETTE GREEN and     )
20  EUGENE COLON, on behalf of     )  Ctrm:                    840
    themselves, and all others similarly )
21  situated,                      )  Judge:    The Hon. Dale S. Fischer
                                    )  Trial Date:         6/16/2009
22              Plaintiffs,         )
                                    )  DECLARATION OF YVETTE
23       v.                        )  GREEN IN SUPPORT OF
                                    )  PLAINTIFFS' MOTION FOR CLASS
24  FEDERAL EXPRESS CORPORATION,   )  CERTIFICATION
                                    )
25              Defendant.          )
                                    )
26

27

28

KNAPP,
PETERSEN
& CLARKE

                              -1-

                                              KPC 00080

609551.1 08000/00863

## DECLARATION OF YVETTE GREEN

I, Yvette Green, declare as follows:

1.      I am over the age of 18 years.  The following facts are within my personal knowledge, and if called as a witness, I could and would be qualified to testify thereto.

2.      I am a named representative of a class of approximately 21,000 current and former California employees of Federal Express.  I make this declaration in support of plaintiffs' motion for class certification.

3.      I worked for FedEx during two separate time periods, first from 1984 through 1987, and again from May of 2004 through July of 2005.  From May of 2004 to May of 2005 I worked as a handler at the Stockton, California, location. From May through July of 2005, I worked as a customer service agent at the Stockton location.

4.      During my 2004-2005 employment, my manager was Ritlesh Chand and then Michelle Estes.  I also had a manger named Kenji.

5.      While working as a handler, I was a part-time, hourly employee.  I was guaranteed a minimum of 17.5 hours per week.

6.      I worked along side approximately twenty other employee handlers on my shift, situated along a long conveyor belt in a warehouse type facility.  My regular shift began at 4:00 p.m. and would end whenever all package handling for the shift was complete, usually between 7 and 8 p.m.

7.      I would typically arrive at lease 10-15 minutes prior to my scheduled start time and punch in.  There was only one time clock for all employees, and we all were scheduled to start at the same time.  The time clock was located close to the entrance to the large warehouse-type facility where I worked.  My workstation was located at the conveyor belt at the opposite end of the facility.

8.      90-95% of the other handlers on my shift also arrived at least 10-15

KNAPP,
PETERSEN
& CLARKE

-2-

KPC 00081

609551.1 08000/00863

1  minutes early, sometimes as early as 20 minutes. After clocking in, we would all
2  walk directly to our workstations and begin preparing for the shift. After punching in,
3  we were not permitted to leave the premises.

4       9.     Our timecards were 8 ½ x 11 sheets of paper that were punched by the
5  time clock. We were also required to manually record our shift times on our
6  timecards. We were required to write in our scheduled shift time on the timecard and
7  not the time we actually clocked in and began working.

8       10.    It was necessary to begin working prior to the scheduled start time
9  because it was imperative that our workstation be organized and prepared before the
10  conveyor belt started running and packages started pouring out.

11      11.    I, along with the other handlers on my shift, would look in all the trucks
12  parked at the facility and unload all packages from the courier trucks and place them
13  on the conveyor belt. There were at approximately two dozen delivery trucks parked
14  at the facility, in addition to larger trucks. All unloading had to be complete before
15  the conveyor belt started, which was shortly after the scheduled shift start time.

16      12.    It was also necessary to prepare the work area before the conveyor belt
17  started, which included picking up any debris, making sure the huge containers
18  (called cans) that are loaded with packages and then into the 18-wheelers were
19  organized properly, scan the area for any packages and properly handle all packages
20  found.

21      13.    Once the conveyor belt started moving, the work was non-stop. We
22  were pressed for time because packages needed to be loaded onto the daily airport
23  shuttle by a specific time every evening.

24      14.    My manager was aware that I, along with the other handlers, were
25  clocking in and working prior to the scheduled start time because the managers were
26  there with us. I saw my manager every day, and my manager was present with me
27  and my co-workers as we clocked in prior to our scheduled start times and proceeded
28  to prepare the conveyor area and the trucks.

KNAPP,
PETERSEN
& CLARKE

-3-

609551.1  08000/00863

KPC 00082

15.   As a handler, I never received a meal or rest break.

16.   The shift would end whenever all packages for the day were properly handled. If the shift ended more than 15 minutes past the hour, we would write in that time. However, if the shift ended less than 15 minutes past the hour, we were instructed to record that the shift ended on the hour.

17.   After I was promoted to customer service agent in May of 2005, I began to work a regular 4:00 pm-10:00 pm shift, 5 days per week. I continued to clock in 10-15 minutes prior to my scheduled start time. This was necessary because my job duties included fulfilling the role as a gatekeeper for all the couriers scanners and truck keys.

18.   Everyday, when I arrived at my workstation, there would be truck keys and scanners spread everywhere from the couriers who had come in off their shift. I was responsible for making sure the 25-30 scanners were properly situated on their chargers and that just as many keys were organized and prepared for the next shift of couriers. My manager was aware that I came in early to handle this, because frequently she was there at my workstation fulfilling this role until I arrived to take over. This was in addition to my other duties, which included: handling the cash and paper work for couriers coming in from a shift, dealing with international package paperwork, inputting information from high-volume courier into the computer system to the airplane pilot could properly anticipate weight.

19.   While working as a customer service agent, my lunch breaks were often interrupted with work.

20.   I understand that by bringing this lawsuit on my own behalf, and as a class representative, I assume a duty to the other employees who are members of the class. I understand that I am acting on their behalf, as well as on my own behalf. I also understand that I cannot compromise my own individual claim in this case at the expense of the class of employees I am representing, and that I have a duty to protect the interests of the class.

KNAPP,
PETERSEN
& CLARKE

-4-

KPC 00083

NOV-07-2008(FRI) 15:17    53H, Inc.                    (FAX)702 262 5806        P. 006/006

21.    I feel very strongly that while I worked at FedEx, I and the other employees were subjected to unlawful practices. I am willing to serve as a class representative because I believe it is appropriate to stand up for my fellow employees. I understand that I have a duty of trust and confidence to the class members to make sure that their interests are advanced by this case and I will refrain from seeking solely to advance my own personal interests at the expense of the other class members.

22.    I do not have any conflicts of interest with the class members.

23.    I believe I am an adequate class representative for the reasons set forth herein. I have been exposed to the same unlawful practices as the other class members, and I will act on their behalf to attempt to rectify the wrongdoing they and I have been exposed to.

Executed on this 7th day of November, 2008, at Las Vegas, Nevada.

I declare under penalty of perjury that the foregoing is true and correct.

_Yvette Green_
Yvette Green

KNAPP,
PETERSEN
& CLARKE

-5-

609551.1 08000/00863

KPC 00084

EXHIBIT 8

1           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3          FOR THE COUNTY OF LOS ANGELES

4

5    DANIEL FORRAND, ARA              )

6    KARAMIAN, YVETTE GREEN and       )

7    EUGENE COLON, on behalf of       )

8    themselves and all others        )

9    similarly situated,              )

10              Plaintiffs,           )

11        vs.                         ) CV08-01360 DSF (PJW)

12   FEDERAL EXPRESS                  )

13   CORPORATION,                     )

14              Defendant.            )

15   _____     )

16

17

18        VIDEOTAPED DEPOSITION OF  YVETTE GREEN

19             MONDAY, SEPTEMBER 29, 2008

20

21

                    *ORIGINAL*
22

23                            Reported by:

24                            Marla D. Williams, CSR

25                            Certificate No. 11924

20

```
1       Q       Okay.  And at that time you were a service

2    agent but also at Stockton; is that right?

3       A       Yes.

4       Q       So the two jobs you had during the '04/'05

5    time period that we're here about today, the two

6    jobs you had were handler and service agent?

7       A       Correct --

8       Q       Okay.  Would you tell me, what were the job

9    duties of a handler?  What does a handler do at

10   FedEx?

11      A       The handler basically loads and unloads the

12   trucks that are coming in, the courier trucks.  You

13   may -- You also load cans onto the semis.  So you're

14   basically loading, unloading.  That was the majority

15   of your function --

16      Q       Okay.

17      A       -- was to --

18      Q       A handler handles packages, right?

19      A       Correct.

20      Q       You either take them from one vehicle and

21   move them to another or you take them off of a -- an

22   automated belt and move them from an automated belt

23   and load them into a vehicle; is that right?

24      A       Yes.

25      Q       Okay.  Is there anything else that a
```

KPC 00086

```
 1    handler does?

 2        A     Yes, because sometimes you may have to work

 3    in the computer generating -- what do you -- labels

 4    for certain packages that may be missing.

 5              Sometimes you had to clean up the area.

 6    There may have been debris on the belt or in the

 7    trucks that you were loading and unloading.  So you

 8    did a little cleanup work.

 9        Q     Okay.  Did you ever do any courier work as

10    a handler, fill in as a courier handler?

11        A     No.

12        Q     Now, how does the handler job differ from

13    the customer service agent or the CSA?

14        A     Mm, it differs because CSAs -- well, they

15    handle packages too, but they don't load them onto

16    the trucks.

17        Q     Take packages from customers at a customer

18    facility where they can walk up to --

19        A     Yes.

20        Q     -- the counter?

21        A     But, in this instance, I was a customer

22    service agent I guess you would call behind the

23    scenes.  I didn't have contact with the customers.

24        Q     Okay.  Why not?

25        A     Because I was working in the international
```

22

1   department.

2        Q    Okay.  So tell us what you did as a CSA in

3   the international department at the Stockton

4   station.

5        A    I basically processed international

6   packages.  I also -- I would put the scanners on

7   chargers, take keys from the couriers, things like

8   that.

9             At the end of their shift, they would bring

10  in their little scanners and turn in their keys.  So

11  it was, basically, a gatekeeper position as you can

12  call it.

13       Q    I was going to suggest that term.

14       A    Yes.  It was a gatekeeper.

15       Q    Was a gatekeeper what you did most of the

16  time when you worked at [sic] a CSA at Stockton?  Or

17  was that just something you did for one particular

18  portion of a day, like when the couriers came back?

19       A    Actually, we were short on -- We didn't

20  have a gatekeeper.  That wasn't what I signed on

21  for, but I kind of just helped out --

22       Q    Right.

23       A    -- because we were lacking a gatekeeper.

24       Q    Okay.

25       A    So that --

```
 1      Q    Was it -- Was it something that you did all
 2  day long, or was it just like when couriers finished
 3  a run?
 4      A    Basically, it was the whole time I was
 5  there.  I may have been processing packages, and a
 6  courier would come up to the window.
 7           So it could kind of vary, but I had -- I
 8  would do gatekeeper duties daily along with my
 9  customer service agent duties.
10      Q    Okay.  And this customer service agent
11  duties, was that pretty much desk work as opposed to
12  going to a counter and, as you say, interfacing with
13  customers?
14      A    Pretty much.
15      Q    You're researching packages through the
16  computer, handling paperwork, things --
17      A    Yes.
18      Q    -- of that nature?  I understand.
19      A    Yes.
20      Q    Okay.  And then from time to time you were
21  filling in as the gatekeeper.  Couriers would come
22  back, and you would take their equipment and keys
23  and put them in a locked room?
24      A    Yes.
25      Q    And then they would pick them up again --
```

24

1        A      Or a locked drawer.

2        Q      Then they would pick them up again in the

3    next shift when somebody needed them?

4        A      Exactly.

5        Q      I understand.  Now, the CSA work, you had

6    done that before, I understand.

7        A      Mm-hmm.

8        Q      But at Stockton, you did that just during

9    your last several months; is that right?

10       A      That's right.

11       Q      Okay.  So your -- The primary job that you

12   did while you were at Stockton from '04 to '05 was

13   the handler job that you've described; is that

14   right?

15       A      Yes.

16       Q      Okay.

17              (Exhibit No. 3 was marked for

18              identification by the reporter.)

19              THE WITNESS:  Okay.

20   BY MR. McCONNELL:

21       Q      These are pages marked 159 through 169.

22              Does this appear to be your application for

23   employment and signed by you on page 166, March 3rd

24   of '04?

25       A      Yes.

```
 1   is that right?

 2        A     Correct.

 3        Q     Did that happen from time to time?

 4        A     I can't recall.  Because normally I would

 5   at least get my --

 6        Q     Minimum?

 7        A     -- 17 -- yeah, normally the minimum.

 8        Q     Was that a part-time position?

 9        A     Yes.

10        Q     And the CSA position, was it also part

11   time?

12        A     Yes.

13        Q     What were your hours as a CSA at Stockton

14   during your last several months there?

15        A     It was basically the same, same hours.

16        Q     Okay.  Same days?

17        A     Yes.

18        Q     Okay.  I'd like to, as a handler, just

19   focus on that for the next series of questions.  And

20   describe your day to me chronologically, what you

21   would first do when you came in.

22              If you were scheduled to get -- say, to

23   start at 4:00, what time would you get there?

24        A     I would normally get there anywhere from

25   3:45, 3:50, something like that.
```

28

1        Q      For what purpose?

2        A      To --

3               MR. BREGMAN:  Objection.  Ambiguous.

4               THE WITNESS:  To get in and get prepared to

5    start my shift, make sure that everything was ready

6    to go.

7    BY MR. McCONNELL:

8        Q      What did that involve?

9        A      It involved checking the area where you

10   work -- where you were assigned to work.  There may

11   have been debris there, things a little out of sorts

12   because the couriers sometimes would make a mess in

13   there.

14              So you would basically kind of straighten

15   up the area and make sure that you have your cans

16   lined up properly.  Sometimes sweep the area because

17   it may have just been trash here and there.

18       Q      Anything else you'd do before this --

19   before your shift started?

20       A      Just preparing your work area.

21       Q      Okay.  When would you clock in if you were

22   scheduled to start at 4:00?

23       A      I would normally clock in about 3:45, 3:50,

24   in that area.

25       Q      When you got there?

1      A    Yes.

2      Q    Okay.  So you were paid from the start of

3  when you clocked in?

4      A    No.  I was paid from my scheduled time.

5      Q    Okay.  Did anybody tell you not to clock in

6  if you were doing this work, straightening up as

7  you've described it?

8      A    No, nobody told me not to clock in.

9      Q    And were you allowed to clock in as early

10  as you wanted?  Or was there any restriction from

11  management on when you could clock in prior to the

12  start of your shift?

13      A    I'm not positive; but if I can recall, it

14  may have been you couldn't go 15 minutes -- more

15  than 15 minutes before your start time.

16      Q    And how did you come to that information?

17      A    Common knowledge amongst the employees.

18      Q    Not something that was passed around by

19  management, an instruction at a work group meeting,

20  something like that?

21      A    No.

22      Q    Did you have a manager on-site when you

23  were handler that you reported directly to?

24      A    Yes.

25      Q    And was that an operations manager or some

36

```
 1        A      Right.

 2        Q      Is what you're saying?

 3        A      Right.

 4        Q      Okay.  Okay.

 5        A      Exactly.

 6        Q      But when you got to your work area after

 7   you'd clocked in, and you're ready to begin your

 8   work for the day, what -- what started that process

 9   once you're physically there and have clocked in?

10        A      Once you're physically there, sometimes you

11   would have to straighten out the real big

12   containers.

13               Sometimes they would be -- Like, they

14   wanted them in this certain formation.  So you would

15   go over there and make sure they were in the right

16   formation, lined up in the states that they were

17   going to.

18        Q      And this is pushing big, empty containers

19   on rollers?

20        A      Right.

21        Q      Okay.

22        A      Right.

23        Q      Within a warehouse?

24        A      Yes.

25        Q      Okay.  What after straightening the
```

1    containers?

2    A    After straightening the containers, you

3    would look for any random packages that were under

4    the conveyor belt.

5    Q    Make sure nothing had been overlooked?

6    A    Right.

7    Q    Okay.

8    A    And if you saw something there, then you

9    would place it on top of the belt.

10    Q    Okay.  What did you do next?

11    A    Next, we would wait for the conveyor buzzer

12    to start, and then we would start loading and

13    unloading the packages.

14    Q    Okay.  And do you get a rest break any time

15    in there if you're a part-time employee?

16    A    No.

17    Q    What was your understanding of when you

18    were entitled to a rest break?  Did you have to work

19    a certain number of hours to merit a rest break?

20    A    That didn't too much pertain to me.  Just

21    depending on the hours that you were there that day.

22    If you were there four or less, as I recall, you

23    didn't get a break.

24    Q    Okay.  And were you usually there four or

25    less?

42

```
 1    fairly over when that happened.  You were supposed
 2    to clear out.
 3        A    Right.  You would check the area for any
 4    left packages, straighten out cans that hadn't left
 5    the station yet, pick up debris around the area.
 6             Sometimes I would work on the FedEx ground
 7    belt, which was different than the regular belt.
 8        Q    Mm-hmm.
 9        A    So sometimes I would work over there
10    loading packages, then unloading, but in a different
11    area, separate from the normal conveyor belt.
12        Q    Before you clocked out and before you went
13    home?
14        A    Yes.
15        Q    Okay.  Did you do any work after clocking
16    out?  Or was it, like, that's the last thing you
17    did?
18        A    After clocking out, several times maybe I
19    noticed that something hadn't been processed
20    correctly or there was couple of things that needed
21    to be done in my work area.  So I would just do it
22    on the way out.
23        Q    Minute or two?  What amount of time?
24        A    I'd say maybe 10 to 15.
25        Q    On how many occasions when you were handler
```

1   at Stockton?

2        A    I can't recall the exact number of

3   occasions.

4        Q    Five or less?

5        A    I'd say more than five.

6        Q    Ten or less?

7        A    More than ten.

8        Q    What's your best estimate?  I don't want to

9   keep guessing numbers.

10       A    Best estimate would be 40 maybe.

11       Q    Did you ever request to be paid for that?

12       A    No.

13       Q    Did you ever enter it on your timecard as

14   time worked?

15       A    I would handwrite the time I actually left,

16   but I knew my scheduled time may have been different

17   from the time that I actually worked.

18       Q    You always understood, I believe, from your

19   testimony that at FedEx you were paid from

20   scheduled -- scheduled start time till end of shift,

21   unless a manager changed your timecard?

22       A    Yes.

23       Q    Did you ever ask a manager to change your

24   timecard and show that you had worked extra minutes

25   before the start of your shift or extra minutes

50

1       A    Yes, I believe.

2       Q    Was there -- As a CSA, was there downtime

3    or slow periods where, if you wanted to just pause

4    and take a rest, you could do that?  Or was it

5    constantly going?

6       A    You were constantly going.

7       Q    Constantly busy?

8       A    Right.

9       Q    Okay.  And you didn't work any split shifts

10    as a CSA?

11       A    No.

12       Q    Same question that I asked you regarding

13    the end of the day or end of your shift as a

14    handler.

15            With regard to a CSA, at the end of your

16    shift, would you pretty much punch out and go home?

17    Or were there ever occasions that you worked after

18    clocking out?

19       A    Yes, there were occasions when I worked

20    after clocking out.  If I noticed something needed

21    to be done, or you might have been so busy that day

22    that you didn't see all the supplies were low or

23    something like that.  So I would just go ahead and

24    do what needed to be done before I left.

25       Q    How frequently would you do that?

1        A     Just occasionally.

2        Q     Any reason you couldn't do those tasks

3   before clocking out?

4              MR. BREGMAN:  Objection.  Argumentative.

5              THE WITNESS:  Yes.  It may have been a very

6   busy day, and you just didn't have time.

7   BY MR. McCONNELL:

8        Q     Okay.  Are you required to clock out at a

9   certain time at the end of your shift?  Or are you

10  allowed to stay later if work still needs to be

11  done --

12             MR. BREGMAN:  Objection.  Vague and

13  ambiguous.

14  BY MR. McCONNELL:

15       Q     -- before you clock out?

16       A     I believe, if I can recall, that it was

17  kind of like they didn't want you to work over too

18  much, you know.  It was like, if you can get your

19  work done in your shift time, then you need to.

20       Q     Were you ever disciplined for not

21  accomplishing something at the end of the day when

22  you came in the next day that a manager pulled you

23  aside and said you didn't finish?

24       A     No.

25       Q     Okay.  And what's your best estimate of --

52

1   on the occasional times when you worked later to

2   restock supplies after you'd clocked out or to clean

3   up or to attend to what needed to be doing, what's

4   your best estimate of how much time that may have

5   involved?  From how many minutes to how many

6   minutes?

7        A    I would say 50 percent of the time.

8        Q    Okay.  As much as from zero minutes to how

9   many minutes?

10       A    Fifteen, twenty, something like that.

11       Q    And, again, no manager said, "You can't --

12   You can't put this in on your pay card.  You can't

13   do this while you're still on the clock"?

14       A    Right.

15       Q    Okay.  Who was your manager when you were a

16   CSA?

17       A    Deanna Raleigh.

18       Q    I'm sorry?

19       A    Deanna --

20       Q    Deanna.

21       A    -- Raleigh.  Mm-hmm.

22       Q    R-e-i-l-l-y?

23       A    R-a-l-i-e-g-h [sic], I believe.

24       Q    Ah.  Wasn't even close.  Like Raleigh,

25   North Carolina?

70

1    handler job or the CSA job?

2              MR. BREGMAN:  Objection.  Vague and

3    ambiguous.

4              THE WITNESS:  Can you repeat that, please?

5    BY MR. McCONNELL:

6        Q    Sure.  At Stockton when you were a handler

7    and when you were a CSA, is there anything that

8    prevented from you doing the little straightening up

9    that you were -- you've told me you did sometimes

10   off the clock, is there anything that prevented from

11   you doing it on the clock?

12             MR. BREGMAN:  Same objection.

13             THE WITNESS:  My workload.  Sometimes I

14   just didn't have enough time or enough help to get

15   everything completely done.

16   BY MR. McCONNELL:

17       Q    Okay.  And on those occasions did you ask

18   to have your time adjusted so that you could be paid

19   for that?

20       A    No.

21       Q    Okay.

22             (Exhibit No. 10 was marked for

23             identification by the reporter.)

24             THE WITNESS:  Okay.

25   BY MR. McCONNELL:

```
 1    scheduled; but if you had to -- something was

 2    pressing or you had to get a package out before, you

 3    may have had to take it at a later time.

 4    BY MR. McCONNELL:

 5         Q    Okay.  But you're always able to get it in

 6    on those occasions where you did work enough to take

 7    a lunch break?

 8         A    Yes.

 9         Q    And it was uninterrupted once you started

10    it?

11         A    No, I wouldn't say that.

12         Q    Okay.  What would interrupt a lunch that --

13    You would clock out for lunch, is that right, code

14    13?

15         A    Right.  And I may have been in the

16    lunchroom, and a CSA or someone else may have called

17    me over to either help with something or, if they

18    needed to know something about the operations with

19    international, they may, you know, come and

20    interrupt you and ask you, you know, "Could you run

21    and show me this?" or "Could you do this?" and --

22    You didn't have to, but --

23         Q    Yeah.  But they're so close that a

24    co-worker could just grab you or see you and say,

25    "What's the answer to this issue?" type of thing?
```

86

1     A     Well, it wasn't really close.  You were,
2  like, down the station from where you normally
3  worked.
4     Q     Okay.  All right.  Did you keep any record
5  of any hours that you worked other than what you
6  generated on your timecards for FedEx?  Any notes?
7  Any calendars?  Any diaries?
8     A     If I did, I probably don't have it.  I used
9  to, like, have a little calendar.  And I might write
10 my hours in there and --
11          MR. BREGMAN:  Is the answer "yes" or "no"?
12          THE WITNESS:  Yes.
13          MR. BREGMAN:  No.  Did you --
14          THE WITNESS:  No.
15          MR. BREGMAN:  Listen to the question.
16          THE WITNESS:  I -- Okay.  State it again,
17 please.
18 BY MR. McCONNELL:
19    Q     You're doing fine.
20    A     Okay.
21    Q     Did you keep any kind of notation at all or
22 any kind of record when you worked at Stockton of
23 the hours that you worked?
24    A     Occasionally, yes.
25    Q     Okay.  And for what purpose did you do

KPC 00103

EXHIBIT 9

1   André E. Jardini (State Bar No. 71335)
    aej@kpclegal.com
2   KNAPP, PETERSEN & CLARKE
    550 North Brand Boulevard, Ste 1500
3   Glendale, California 91203-1904
    Telephone: (818) 547-5000
4   Facsimile: (818) 547-5329

5   Glen Robert Bregman, Esq.  State Bar No. 100363
    glenbregmanlaw@aol.com
6   LAW OFFICES OF GLEN ROBERT BREGMAN
    16633 Ventura Boulevard, Suite 1240
7   Encino, CA  91436
    Telephone: (818) 981-9793
8   Facsimile: (818) 981-9807

9   Michael S. Duberchin, Esq. (State Bar No. 108338
    msdlaw@earthlink.net
10  LAW OFFICES OF MICHAEL S. DUBERCHIN
    500 North Brand Boulevard, 20th Floor
11  Glendale, California 91203-1904
    Telephone: (818) 246-8487
12  Facsimile: (818) 246-6277

13  Attorneys for Plaintiffs
    DANIEL FORRAND, ARA KARAMIAN,
14  YVETTE GREEN and EUGENE COLON, on
    behalf of themselves and all others similarly situated

15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18

19  DANIEL FORRAND, ARA            )  NO.   CV08-1360 DSF (PJWx)
    KARAMIAN, YVETTE GREEN and     )
20  EUGENE COLON, on behalf of     )  Ctrm:                        840
    themselves, and all others similarly )
21  situated,                      )  Judge:      The Hon. Dale S. Fischer
                                   )  Trial Date:              6/16/2009
22              Plaintiffs.        )
                                   )  DECLARATION OF ARA
23        v.                       )  KARAMIAN IN SUPPORT OF
                                   )  PLAINTIFFS' MOTION FOR CLASS
24  FEDERAL EXPRESS CORPORATION,   )  CERTIFICATION
                                   )
25              Defendant.         )
                                   )

26

27

28

KNAPP,
PETERSEN
& CLARKE

                              - 1 -

                                                      KPC 00104

## DECLARATION OF ARA KARAMIAN

I, Ara Karamian, declare as follows:

1.      I am over the age of 18 years.  The following facts are within my personal knowledge, and if called as a witness, I could and would be qualified to testify thereto.

2.      I am a named representative of a class of approximately 21,000 current and former California employees of Federal Express.  I make this declaration in support of plaintiffs' motion for class certification.

3.      I began working for FedEx prior to 2000 as a courier.  In April of 2003 I was promoted to the position of station manager at the JGX station located in Glendale, California.  I later, around mid-2004 I became station manager at the SMOA station located in Marina Del Rey, California, where I worked until November of 2005.

4.      At both locations, I was the evening shift manager, and my regular shift began at 2:00 pm and ended at 11:00 or midnight.

5.      Both at JGX and SMOA stations, my duties included supervising the activities of between 20 and 30 hourly employees, including: couriers, shuttle drivers, handlers, courier-handlers and customer service associates.

6.      In my experience, I noticed that handlers and shuttle drivers frequently were not provided uninterrupted 30 minute meal breaks.  This was because their workload was often such that they didn't have time to take an uninterrupted 30 minute lunch break.

7.      I estimate that handlers were not provided lunch breaks 50% of the time. Situations frequently arise that interfere with their lunch breaks, such as being required to go with a shuttle driver to the airport, or deal with a late truck coming into the station.  About 20-30% of the handlers complained to me about being unable to take their lunches.

KNAPP,
PETERSEN
& CLARKE

-2-

KPC 00105

1      8.     Handlers frequently missed rest breaks, many of them on a *daily basis*.

2      9.     Handlers also worked split-shifts, some on a daily basis.

3      10.    Shuttle drivers also not provided meal breaks due to their workloads.

4   When they were not driving their shuttles between locations, they were often pressed

5   into duty to help other employees.  We were frequently understaffed and in need of

6   assistance in many areas of the station.  I estimate that between 20-40% of shuttle

7   drivers were not provided with meal breaks on more than two occasions per week.

8      11.    I estimate that between 30-50% of shuttle drivers were not provided rest

9   breaks more than twice per week.

10     12.    Employees frequently clocked in before their scheduled start times.  As

11  their manager, I frequently directed as many as 3 to 10 employees to perform tasks

12  prior to their scheduled start times.  Consistent with practices at FedEx, those

13  employee's time cards were not changed to reflect an earlier start time, so they were

14  still paid from their scheduled start time and not the clock-in time.  This practice was

15  reinforced by senior management.

16     13.    I understand that by bringing this lawsuit on my own behalf, and as a

17  class representative, I assume a duty to the other employees who are members of the

18  class. I understand that I am acting on their behalf, as well as on my own behalf. I

19  also understand that I cannot compromise my own individual claim in this case at the

20  expense of the class of employees I am representing, and that I have a duty to protect

21  the interests of the class.

22     14.    I feel very strongly that while I worked at FedEx, I and the other

23  employees were subjected to unlawful practices. I am willing to serve as a class

24  representative because I believe it is appropriate to stand up for my fellow

25  employees. I understand that I have a duty of trust and confidence to the class

26  members to make sure that their interests are advanced by this case and I will refrain

27  from seeking solely to advance my own personal interests at the expense of the other

28  class members.

KNAPP,
PETERSEN
& CLARKE

-3-

KPC 00106

15.   I do not have any conflicts of interest with the class members.

16.   I believe I am an adequate class representative for the reasons set forth herein. I have been exposed to the same unlawful practices as the other class members, and I will act on their behalf to attempt to rectify the wrongdoing they and I have been exposed to.

Executed on this __8th__ day of November, 2008, at __Santa Clarita__ (city), California.

I declare under penalty of perjury that the foregoing is true and correct.

_Ara Karamian_

Ara Karamian

-1-

KNAPP, PETERSEN & CLARKE

EXHIBIT 10

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3           FOR THE COUNTY OF LOS ANGELES

4

5   DANIEL FORRAND, ARA              )

6   KARAMIAN, YVETTE GREEN and  )

7   EUGENE COLON, on behalf of   )

8   themselves and all others    )

9   similarly situated,          )

10               Plaintiffs,      )

11          vs.                    )   CV08-01360 DSF (PJW)

12  FEDERAL EXPRESS               )

13  CORPORATION,                  )

14               Defendant.       )

15  _____   )

16

17      VIDEOTAPED DEPOSITION OF ARA KARAMIAN

18          THURSDAY, AUGUST 28, 2008

19

20              ***ORIGINAL***

21

22

23                          Reported by:

24                          Marla D. Williams, CSR

25                          Certificate No. 11924

KPC 00108

53

```
 1    BY MR. McCONNELL:

 2        Q    Okay.  I don't understand what you mean by

 3    "yes and no."

 4        A    You could sometimes observe it.  You could

 5    sometimes not observe it.  I mean, you're not always

 6    with them, next to them --

 7        Q    Okay.

 8        A    -- when they take their lunches.

 9        Q    More often than not, you were not observing

10    them when they took their lunches?

11        A    Yes.

12        Q    Okay.  And same thing with the shuttle

13    drivers?

14        A    Yes.

15        Q    Okay.  And did handlers and shuttle drivers

16    in your experience have any difficulty getting their

17    lunches in?

18        A    Yes.

19        Q    What -- What problem did the handlers have?

20        A    The workload was as such that they didn't

21    have time to take a break.

22        Q    Okay.  Well, if it's busiest for handlers

23    between 5:30 and 8:00, what would prevent a handler

24    from taking their lunch after 8:00?

25             MR. BREGMAN:  Objection.  Argumentative.
```

KPC 00109

1    BY MR. McCONNELL:

2        Q    In your observation, if you know.

3        A    Because every day situation arises.  Either

4    they're going with the shuttle driver to the airport

5    or there's a late truck coming in, stuff like that

6    every day.

7        Q    Okay.  Did -- Do you have any idea or a

8    best estimate of what percentage of the time

9    handlers were not able to take a lunch?

10       A    Eighty percent of the time.

11       Q    No lunch at all during a shift or a later

12   lunch?

13       A    Some cases, yes, no lunch.

14       Q    Okay.  What percent of the time no lunch

15   for handlers?

16       A    Again, I have to estimate.

17       Q    Your best estimate.

18       A    Fifty percent.

19       Q    Okay.  And you're saying just, if I

20   understand your testimony, as to handlers, even

21   though they were busiest from 5:30 to 8:00,

22   something -- the press of business perhaps as much

23   as 50 percent of the time kept them from taking

24   their lunch at all during the shift?

25       A    Yes.

KPC 00110

1      Q      Okay.  And did they complain to you as a

2  manager about that, the handlers?

3      A      Some.

4      Q      Okay.  Many of them?

5      A      Yes.

6      Q      Okay.  Any idea of the percentage of the

7  handlers that complained about that?

8      A      Twenty, thirty percent.

9      Q      Okay.  And what did you do to try and

10  ensure that they got their lunches?

11      A      I tried to staff more people that they --

12  they can go on lunches.

13      Q      Mm-hmm.  Anything else that you tried to

14  do?

15      A      Not that I can remember now.

16      Q      Okay.  How about rest breaks?  Did

17  employees -- Did handlers take rest breaks, like,

18  two per shift, ten minutes the first half of the

19  shift and ten minutes in the second half of the

20  shift?  Was that ever a problem for handlers?

21      A      Some they did; some they didn't.

22      Q      Okay.  And those are paid, are they not,

23  whether they take them or not?

24      A      Yes.

25      Q      Okay.

56

```
1              MR. BREGMAN:  You're talking about the

2    breaks?

3              MR. McCONNELL:  Rest breaks.

4              MR. BREGMAN:  Rest breaks.  Okay.

5              MR. McCONNELL:  For handlers.

6    BY MR. McCONNELL:

7         Q    Okay.  What -- What's your best estimate of

8    how many -- how much of the time handlers would have

9    problems getting rest breaks in?

10        A    Twenty, thirty percent of them.

11        Q    Okay.  Is that 20 percent -- 20 or 30

12   percent of all handlers had problems with that at

13   some time or that some other number of handlers only

14   had problems 20 or 30 percent of the time?

15             MR. BREGMAN:  Objection.  Vague and

16   ambiguous.

17             THE WITNESS:  Repeat the question.

18   BY MR. McCONNELL:

19        Q    Sure.  I'm trying to understand the

20   frequency with which, when you were an operations

21   manager for FedEx, handlers had -- were unable to

22   get their ten-minute breaks twice per shift.

23        A    They were unable, yes.

24        Q    Right.  And your best estimate of how many

25   had problems with that and how frequently would be
```

KPC 00112

1    what?

2              MR. BREGMAN:  Objection.  Vague and

3    ambiguous and compound.

4              THE WITNESS:  Many of them, daily basis.

5    BY MR. McCONNELL:

6        Q    Many on a daily basis.  Okay.

7              Any percentage?  Twenty to thirty percent,

8    something less than that?

9        A    It --

10             MR. BREGMAN:  Don't guess.

11             THE WITNESS:  Yeah.  It varies.  One day

12   could be 100 percent; one day can be 10 percent.

13   BY MR. McCONNELL:

14       Q    Okay.  And did you keep any record of how

15   many of your employees were unable to take lunches

16   or were unable to take rest breaks?

17       A    I kept a record?  No.

18       Q    No.  Okay.

19             Do handlers ever take split shifts when you

20   were managing them?

21       A    Yes.

22       Q    How frequently?

23       A    Some on a daily basis.

24       Q    And when would the split come?  When in the

25   shift?

KPC 00113

58

```
 1              MR. BREGMAN:  Objection.  Ambiguous.

 2              THE WITNESS:  What do you mean?  I don't

 3   understand the question.

 4   BY MR. McCONNELL:

 5       Q    When would the split shift begin?

 6            Let's assume that they started a shift at

 7   2:00.  When would split begin?

 8       A    5:00 p.m., 5:30 p.m.

 9       Q    Okay.  And then off for two hours and then

10   back for another number of hours?

11       A    Or they would work the a.m. shift, then

12   they would come for the p.m.

13       Q    How much time in between?

14       A    Anywhere between four to eight hours.

15       Q    Okay.  And the four to eight hours were two

16   different shifts on the same day?

17       A    Yes.

18       Q    Okay.  And the split shift is somewhere

19   between two and three or four hours, but it's still

20   the same shift?

21              MR. BREGMAN:  Objection.

22   BY MR. McCONNELL:

23       Q    Is that right?

24              MR. BREGMAN:  I think you're misstating

25   what his testimony is.
```

59

```
 1    BY MR. McCONNELL:

 2         Q    Is that correct?

 3         A    Yes.

 4         Q    Okay.  On the regularly -- Were split

 5    shifts regularly scheduled, or did it depend upon a

 6    day-to-day operational needs?

 7         A    Regularly scheduled.

 8         Q    Okay.  And how frequently was the schedule

 9    posted while you were manager?

10         A    Once a week.

11         Q    So an employee would know at the beginning

12    of the week, "This week I have split shifts on all

13    of these days," or no days or however many; is that

14    correct?

15         A    Yes.

16         Q    Okay.  And were they allowed to leave the

17    building during split shifts, the handlers?

18         A    Yes.

19         Q    Did you ever tell them that they couldn't

20    change uniforms or go to a library or drive their

21    personal car someplace during a split shift?

22         A    Most of them, they would.

23         Q    They would do all of those things?

24         A    Yes.

25         Q    Okay.  But they were not restricted in
```

KPC 00115

60

```
 1     terms of how they spent their time?  They just had

 2     to be back at a certain time, on -- handlers on

 3     split shifts?

 4         A     The handlers.

 5         Q     Right.  And it would be the same answer for

 6     the shuttle drivers?

 7         A     No.

 8         Q     Shuttle drivers didn't get split shifts?

 9         A     They did.

10         Q     Okay.  Tell me about shuttle drivers.  How

11     did their split shifts work?

12         A     The same way.  They work in the morning and

13     at the p.m.

14         Q     And how much time in between?

15         A     It varied.  Could have been four, could

16     have been six, could have been two hours.

17         Q     Were there regularly scheduled split shifts

18     for which shuttle drivers were paid split shift

19     premium and posted on the schedule?

20         A     No.

21         Q     Okay.  So split -- So shuttle drivers were

22     working, in effect, two shifts during a day, not one

23     shift that was split by two or three hours; is that

24     right?

25         A     Well, depended.  If they needed, they were
```

KPC 00116

1    short, they would use them.  So it would become a

2    split shift.

3        Q    Okay.  And however much time a shuttle

4    driver would have off between shifts, they were

5    likewise not restricted in terms of how they spent

6    their time or where they went?

7        A    Yeah.  Two, four, six hours.

8        Q    But they could do what they wanted and go

9    where they wanted during that time as long as they

10   were back for the next shift?

11       A    Yes.

12       Q    Okay.  Did shuttle drivers have any

13   difficulties with getting their lunch breaks and

14   rest breaks in your observation when you supervised

15   them?

16       A    Yes.

17       Q    Okay.  And what problems were with the

18   lunch breaks?

19       A    Again, the workload.

20       Q    Okay.  And were lunches scheduled on the

21   schedule for shuttle drivers, or were they able to

22   take them whenever they could fit them in?

23       A    Correct.

24       Q    One or the other?

25       A    Fit them in when they could --

KPC 00117

62

```
1        Q    Okay.

2        A    -- take it.

3        Q    Same way with rest breaks?

4        A    Yes.

5        Q    And did shuttle drivers complain to you of

6    an inability to take lunches at all during a shift?

7        A    Yes.

8        Q    Okay.  When was their downtime or slow time

9    for a shuttle driver on a shift?

10            MR. BREGMAN:  Objection.  Ambiguous.

11            THE WITNESS:  Basically when they were done

12   with their shuttle.

13   BY MR. McCONNELL:

14       Q    Which would be around what time?

15       A    Later at night.

16       Q    Anything prevent them from taking their

17   meal at that time?

18            MR. BREGMAN:  Objection.  Argumentative,

19   ambiguous.

20            THE WITNESS:  Most of the times there

21   were -- packages need to be taken out, give it to

22   some other courier out there.  So that would prevent

23   them, yes.

24   BY MR. McCONNELL:

25       Q    So shuttle driver would be pressed into
```

1   duty to help somebody else?

2        A    That's right.

3        Q    Okay.  I see.

4             And they have any trouble getting --

5   fitting their rest breaks in, shuttle drivers?

6        A    Yes.

7        Q    What kind of problems?

8        A    No time to take it.

9        Q    Do you have an estimate of a percentage of

10  shuttle drivers that you supervised were unable to

11  get a lunch, say, more than twice a week?

12       A    Yes.  Twenty, thirty, forty percent.

13       Q    And how about rest breaks, same question?

14       A    Yes.  Thirty, fifty percent.

15       Q    And are there any documents that you can

16  refer to that would demonstrate to you when people

17  missed rest breaks or lunch breaks?

18       A    Their timecard.

19       Q    Okay.  And how would their timecard show

20  that they did not get a rest break or a meal break?

21  It would be shown on the timecard?

22       A    Yes.

23       Q    Okay.  Okay.  We've talked about handlers'

24  and shuttle drivers' lunches and rest breaks.

25             You -- I understand from your earlier

```
 1    testimony that you didn't observe either handlers or

 2    shuttle drivers until their start of their shift; is

 3    that right?

 4              MR. BREGMAN:  I'm sorry.  You said

 5    "observe"?

 6    BY MR. McCONNELL:

 7         Q    You didn't -- You didn't supervise them

 8    until they started their shift?

 9              MR. BREGMAN:  Objection.  Ambiguous.

10    BY MR. McCONNELL:

11         Q    Is that correct?

12         A    What do you mean supervise them?

13         Q    Well, exercise your responsibility to

14    oversee what they were doing as an operations

15    manager.

16         A    In some cases I did.

17         Q    For what reason?

18         A    If I needed someone to do something at that

19    time, and he was available, we asked him to do.

20         Q    And they weren't -- they weren't scheduled

21    yet?  You could, as a manager, say, "I need you to

22    do this."

23              Would you have them clock in so they could

24    get paid for that time?

25              MR. BREGMAN:  Objection.  Ambiguous.
```

KPC 00120

1          THE WITNESS:  Most of the time they're

2     already clocked in, so we just asked them to start

3     working.

4     BY MR. McCONNELL:

5          Q    Okay.  What did -- What did you do to make

6     sure that they were paid for that time that they

7     worked at your request?

8          MR. BREGMAN:  Objection.  Assumes facts not

9     in evidence.

10          THE WITNESS:  Well, we went with whatever

11     was in the timecard as far as paying them.

12     BY MR. McCONNELL:

13          Q    Okay.  But if somebody -- Did you ask

14     anybody to help you who was not already on duty

15     within a scheduled shift?

16          A    That's hard to know who is --

17          Q    Okay.

18          A    -- punched in, who is not.

19          Q    Okay.

20          A    I mean, if they're there and you need

21     somebody -- something to get done, you ask them to

22     do.

23          Q    Did you do anything to make sure that they

24     were actually on duty and able to receive pay when

25     you asked somebody to help you?  Did you ask them?

1    reviewing their timecards if they were your

2    employees, that you could okay that because you

3    had -- you knew that you had asked that person to

4    start early and do whatever you wanted them to do?

5         A    Yes.

6              MR. BREGMAN:   Objection.

7    BY MR. McCONNELL:

8         Q    All right.   How often did you ask employees

9    before their shift to actually do work at your

10   request?

11        A    Often.

12        Q    Okay.   How frequently?

13        A    On a daily basis.

14        Q    Okay.   How many on a daily basis?

15        A    Three, four, five, ten people.   Varied.

16        Q    And then you would approve on their

17   timecard that they had -- they had an earlier start

18   than scheduled?

19        A    Not in all cases.

20        Q    Why not?

21             MR. BREGMAN:   Objection.   Argumentative.

22   BY MR. McCONNELL:

23        Q    Why not in all cases?

24        A    Because some work was expected from them to

25   do --

KPC 00122

```
1       Q      You expected people --

2       A      -- before their shift.

3       Q      You expected people to work before the

4   start of their shift without pay?

5              MR. BREGMAN:  Objection.  Misstates his

6   testimony and argumentative.

7   BY MR. McCONNELL:

8       Q      Is that your statement, sir?

9       A      No.  FedEx culture is that.

10      Q      No.  My question is:  Did you require

11  employees to work without pay before their scheduled

12  start time and not approve their pay when you

13  reviewed their nightly --

14             MR. BREGMAN:  Objection.

15  BY MR. McCONNELL:

16      Q      -- timecards?

17             MR. BREGMAN:  Objection.  Ambiguous,

18  argumentative, compound.

19             THE WITNESS:  FedEx required that.

20  BY MR. McCONNELL:

21      Q      I'm not asking you who required it.  I'm

22  asking you whether you, having requested somebody

23  who was not yet scheduled to be working, when you

24  asked them to work for you, there were occasions,

25  according to your testimony, when you did not
```

KPC 00123

72

```
 1    their timecard that you had requested before their

 2    actual start time?

 3            MR. BREGMAN:  Objection.  Vague,

 4    ambiguous --

 5            THE WITNESS:  Yes.

 6            MR. BREGMAN:  -- misstates the testimony.

 7    BY MR. McCONNELL:

 8      Q    How frequently?  On a daily basis?

 9      A    Yes.

10            (Exhibit No. 3 was marked for

11            identification by the reporter.)

12    BY MR. McCONNELL:

13      Q    Did anybody senior to you in FedEx

14    management specifically tell you, "Do not approve

15    pay for employees" under the circumstances we've

16    just discussed?

17      A    Yes.

18      Q    Who told you not to approve that work time?

19      A    Senior managers.

20      Q    Senior manager who?

21      A    Ken Smith, Pamela Williams, Rob Seymour.

22      Q    Tell me what Ken Smith as a senior manager

23    ever said to you specifically about your not

24    authorizing somebody to work before the hours when

25    you had requested the work.
```