EXHIBIT 11

1  ANDRÉ E. JARDINI, ESQ.   (State Bar No. 71335)
   aej@kpclegal.com
2  GWEN FREEMAN, ESQ.   (State Bar No. 104094)
   gf@kpclegal.com
3  KNAPP, PETERSEN & CLARKE
   A Professional Corporation
4  500 North Brand Boulevard, 20th floor
   Glendale, California 91203-1904
5  (818) 547-5000
   Facsimile:   (818) 547-5329
6
   MICHAEL S. DUBERCHIN ESQ.   (State Bar No. 108338)
7  msdlaw@earthlink.net
   LAW OFFICES OF MICHAEL S. DUBERCHIN
8  4768 Park Granada, Suite 212
   Calabasas, CA  91302
9  (818) 222-7484
   Facsimile:  (818) 222-7480
10
   GLEN ROBERT BREGMAN, ESQ.  (State Bar No. 100363)
11 glenbregmanlaw@aol.com
   LAW OFFICES OF GLEN ROBERT BREGMAN
12 16633 Ventura Boulevard, Suite 1200
   Encino, CA  91436
13 (818) 981-9793
   Facsimile:  (818) 981-9807
14
   Attorneys for Plaintiffs, JACK FOSTER, CYNTHIA GUERRERO,
15 GILBERT R. DIAZ, GLEN RAY BROWN, and RICARDO GONZALEZ

16                SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                    FOR THE COUNTY OF LOS ANGELES

18

19 JACK FOSTER, CYNTHIA GUERRERO,          )  NO.      BC 282300
   GILBERT R. DIAZ, GLEN RAY BROWN,        )
20 individuals, on behalf of themselves and all )  Hearing Date:              3/3/06
   other similarly situated,                )  Time:                  8:30 a.m.
21                                          )  Dept.:                        36
             Plaintiffs,                    )  Judge:      Hon. Gregory W. Alarcon
22                                          )
   v.                                       )  Complaint Filed:          9/27/2002
23                                          )  Trial Date:                4/18/2006
   FEDEX EXPRESS, FEDERAL EXPRESS,          )
24 FEDEX CORPORATION, FDX                   )  DECLARATION OF ARA KARAMIAN IN
   CORPORATION, AND DOES 1 through 50,      )  SUPPORT OF PLAINTIFFS' OPPOSITION
25 inclusive,                               )  TO FEDERAL EXPRESS'S MOTION FOR
                                            )  SUMMARY JUDGMENT
26             Defendants.                  )
                                            )
27                                          )
                                            )
28                                          )

KNAPP,
PETERSEN
& CLARKE

18000\00745\pld\155_AEJplYV.wpd        DECLARATION OF ARA KARAMIAN

KPC 00125

2-13

ARA KARAMIAN declares:

1.    I am a former employee of Federal Express, having been employed by that company for more than 14 years.

2.    I make this declaration of my own volition and based upon my personal knowledge of my experiences at Federal Express and the policies and practices which have existed at the company during the time of my employment.  If called as a witness, I could and would testify to the facts in this declaration.

3.    I began my career with Federal Express in Canada, in 1991.  I was a courier in Canada for Federal Express from 1991 to 1997.

4.    In 1997, I became a courier for Federal Express in the United States.  I worked at the JGX station, located at 2000 San Fernando Road, Glendale, California.  I held the position of courier at the JGX station for almost seven years, from 1997 to April 2003.

5.    In April 2003, I was promoted to manager at Federal Express.

6.    In June 2004, I transferred to the SMOA station in Santa Monica as a manager for Federal Express.

7.    In November 2005, a new senior manager at SMOA terminated my services for reasons which are the subject of a dispute and an internal appeal at the company.

8.    During my time as a manager at Federal Express, from April 2003 through November 2005, an approximately two-and-a half-year period, I supervised couriers, courier handlers, handlers and service agents at Federal Express.  One of my job duties at SMOA was review of between 175 and 200 employee time cards on a daily basis.

9.    When I started with Federal Express, I admired the company and particularly its brand and place in the industry.  I believed in its mission and served faithfully as a courier, despite the practices which I now know to have been illegal which occurred during that time.

10.    When I became a manager, my feelings toward the company changed profoundly.  I was asked to do things which I believed were not right and which affected

KNAPP,
PETERSEN
& CLARKE

KPC 00126

*DECLARATION OF ARA KARAMIAN*

K:\08000\00745\pld\155_AEJplYV.wpd

1  the rights to fair pay by the people I supervised.

2      11.    At Federal Express there is intense pressure to comply with budgetary

3  requirements which are handed down from senior management. For instance, managers are

4  limited as to the number of employee hours, designated as FTEs (full-time equivalents) that

5  may be used on a daily and weekly basis. Also controlled closely are the stops per route

6  and other objective performance criteria for couriers. The primary factor on which

7  managers are measured is "to make the numbers," regardless of the conditions that must be

8  imposed on employees to succeed.

9      12.    This pressure to produce has led to common practices at Federal Express

10  which result in employees not being paid for hours that are worked. Further, required meal

11  breaks are not afforded to employees. Records are changed to reflect meal breaks have

12  occurred, when they have not. This has been my experience at the company as a courier

13  and as a manager from 1997 until November 2004.

14  MEAL BREAK VIOLATIONS

15      13.    Federal Express is adamant, through its senior management and managers,

16  that employees record an unpaid meal break on their time card. This meal break is to be

17  taken during the middle of a shift, when work loads are lighter. Federal Express operations

18  are much heavier in the morning and afternoon periods then they are during the middle of

19  the day. Meal breaks and split shifts benefit Federal Express because this period of time is

20  unpaid to its employees during a time when there is less to do.

21      14.    As a courier, I was directed to include a meal break in my time records every

22  day, if I worked more than six hours. The meal break was to be at least a half an hour and

23  usually one hour in duration.

24      15.    Often, as a courier, given the press of business, I was required to work during

25  what should have been my unpaid meal break. I was required to enter an unpaid meal

26  break (code 13/ code 14) regardless of whether I had, in fact, received a break.

27      16.    I, as well as other couriers I knew, understood that a meal break notation on

28  the time card, resulting in a one hour unpaid period, was required, <u>regardless of whether the</u>

KNAPP,
PETERSEN
& CLARKE

3

*DECLARATION OF ARA KARAMIAN*

KPC 00127

K:\08000\00745\pld\155_AEJplYV.wpd

1   meal break was actually taken.

2       17.   As a courier, and as a manager, I knew and understood that the courier was

3   placed in an untenable position.  If no meal break was noted on the time card, the manager

4   would ask that such a meal break be included.  If an employee insisted that no meal break

5   was taken, a break violation would have occurred, and the employee would be disciplined.

6   An employee was, therefore, on a regular basis, forced to decide whether to be disciplined

7   or to forego an hour of pay.  Invariably, an employee in that situation recorded a meal break

8   after the fact and gave up one hour of pay.  I was frequently put to this choice and simply

9   entered a meal break on my time card even though it was not taken.

10      18.   This situation occurred frequently during the time that I was a manager at

11  Federal Express.  As a manager, upon direction by senior management, I frequently

12  required an employee to enter a meal break even though it was not taken.

13      19.   I was directed by senior management to obtain an employee's consent to

14  include a meal break on the time card.  If the employee did not agree, discipline would

15  occur.

16      20.   As a courier, I very often worked during my meal break.  This was

17  necessarily done to accomplish all of my duties in the time that was given me by Federal

18  Express.  On these occasions, I entered a code 13/code 14 meal break on my time card even

19  though I had worked during this period.  This was done because Federal Express required

20  the meal break entry, whether or not a break was taken.

21      21.   As a manager, I was not directed to, nor did I, review stop records to see if

22  couriers were working during their unpaid meal breaks and split shifts.  In my experience, I

23  knew this was happening, but Federal Express did not regularly monitor this issue, and

24  assure payment for this work though records existed at Federal Express that would have

25  readily reported the problem.  The only time I reviewed stop records, at all, was when an

26  employee had recorded no meal break or was otherwise in violation, and I was determining

27  where in the day to insert a meal break.  I did so at Federal Express's direction.

28  ////

KNAPP,
PETERSEN
& CLARKE

4

*DECLARATION OF ARA KARAMIAN*

KPC 00128

K:\08000\00745\pld\155_AEJplYV.wpd

## IN 2005, FEDERAL EXPRESS TRIED TO CONTROL BREAK VIOLATIONS

22.     During my time as a courier and my time as a manager through the ending months of 2004, Federal Express did not make any systematic effort to eliminate meal break violations.

23.     Starting in 2005, there was a new emphasis at Federal Express on attempting to eliminate break violations.  This new initiative was taken as a result of allegations made in the class action lawsuit.

24.     Meetings were called to talk to employees.  Letters were sent concerning time card compliance.  The vice president of the western region encouraged that breaks be taken.

25.     Despite this new initiative, break violations continued.  The break reports we periodically received showed that meal break violations continued to occur frequently.

26.     The Federal Express response to break violations was, as described above, to direct its managers to simply include a break if no break had occurred.

27.     Federal Express did not address the issue of the overwork of its employees as a cause of break violations.  No efforts were taken, to my knowledge, to reduce the work by employee so that employees could actually take their breaks.

## FEDERAL EXPRESS TIME RECORDS ARE REGULARLY ALTERED

28.     As a manager in the SMOA station, I was tasked with reviewing the time cards of all employees.  I was a PM manager and was required to achieve one hundred percent time card compliance by the start of the next day.

29.     Under those circumstances, I had no option, as senior management well knew, but to change employee time cards to reflect that required paid and unpaid breaks were taken, that the employees worked less than 12 hours per day, and other requirements.

30.     During my time as a manager, I saw records at Federal Express that clearly showed that other managers were changing employee records to reflect compliance with break requirements and other requirements, when, in fact, the employee had not received the appropriate break.

////

KNAPP,
PETERSEN
& CLARKE

*DECLARATION OF ARA KARAMIAN*

KPC 00129

K:\08000\00745\pld\155_AEJplYV.wpd

31.     Managers had the ability to change time cards on their computers remotely from home. I have seen evidence that this practice regularly occurred.

32.     In connection with my termination, I put together some of this information. Attached as exhibit 101 is a list of employees, dates, and managers of instances when time cards were changed without the employee's consent.

33.     The following are examples of these practices. Exhibit 102 shows computer information concerning the time card of employee no. 412404 on September 25, 2004. The computer information, as changed by the manager, reflects an unpaid break (code 13 to code 14) from 1230 to 1300. The attached time card reflects that no such break occurred, as no entry was made concerning the break. This is an example of a manager simply adding a break to an employee's time card when no break was taken.

34.     Exhibit 103 is a computer record that was pulled up concerning employee no. 389467 on September 27, 2004, reflecting that the original record involved a work day of greater than eight hours, with less than a one hour break. The original computer data showed that only a half an hour break was taken between 1500 and 1530, with the day ending at 1810. The second page of exhibit 3 shows that the manager simply added a break at the end of the day beyond the time that the employee worked or was paid, from 1830 to 1900, using code 13 and code 14 to reflect the break. This is an example of managers changing employee time cards to insert breaks that never occurred.

35.     Exhibit 104 is a record of employee no. 394271 dated September 25, 2004, which reflects that more than six hours were worked without any unpaid break at all. A break was, thereafter, added to the workday.

36.     Exhibit 105 involves employee no. 230330 on March 12, 2005, and shows that a break was added at the end of the day, after the employee had concluded work, so that it would not appear that a break violation had occurred. The second page of exhibit 5 shows the time card as submitted by the employee, which shows that no unpaid break was taken.

////

KNAPP,
PETERSEN
& CLARKE

6

KPC 00130

K:\08000\0074S\pld\155_AEJplYV.wpd

37.     As a manager, more recently, I received periodic reports concerning stops which occurred within unpaid breaks.  Stops were package scans or stops which were recorded on the tracker device by couriers.  The tracker device, through the FAMIS system would record the actual time that any delivery, package scan, or stop occurred.  The time card correspondingly reflects the time, by use of the 13 and 14 codes, that an unpaid break was taken.

38.     Federal Express has always, during my tenure as a courier and manager, had the ability to compare the tracking times, reflecting work by an employee, with the break times, as reflected on the time card.

39.     As a manager, I started receiving reports concerning stops within a break in the year 2005.  Attached hereto as exhibit 106 are Stops Within Break Reports for August 23, 25, 26, 30 and 31, 2005.  The report reflects 23 times when an employee had a scan time within the period of an unpaid break.

40.     For purposes of break violations, Federal Express has always considered, and properly so, that a scan time at the starting time or ending time of a break would be a break violation, since less than the full uninterrupted period of a break would have been given.

41.     For instance, in exhibit 107, employee no. 41295 recorded a break time from 1018 to 1118.  However, three scans occurred at 1018.  This is a break violation, even though the event happened on the first minute of the purported break.

42.     It was not uncommon, as a manager, for multiple break violations to be observed on any given day.  When we were confronted with these break violations as managers, we were instructed to include breaks in the time cards wherever we could.  Attached as exhibit 108 are further records concerning shifts by Federal Express employees where either no required unpaid break was taken or less than the appropriate amount of time was recorded for the break.  These records were all "corrected" by managers at Federal Express.

43.     Time records were changed for other reasons.  For instance, employees were forbidden to work more than 12 hours.  In exhibit 109 (page 3), a memo was sent from a

KNAPP,
PETERSEN
& CLARKE

7

DECLARATION OF ARA KARAMIAN

KPC 00131

K:\08000\00745\pld\155_ABJpIYV.wpd

1  senior manager reflecting that on May 27, 2005, two employees worked more than 12

2  hours. The computer data for those employees was simply changed by their managers. The

3  two records reflect total time of 11 hours, 59 minutes and 11 hours, 55 minutes, despite the

4  fact that more than 12 hours was worked in each instance.

5       44.    In none of the instances of which I am aware that employees worked during a

6  period designated as an unpaid break, or where an unpaid break was inserted by a manager

7  into the time records, were employees paid for the time actually worked. In other words,

8  under those circumstances, a half an hour or one hour of pay was withheld from an

9  employee who actually worked for the company during that time.

10 <u>EMPLOYEES WORKED DURING THE BEGIN-SHIFT AND END-SHIFT PERIODS</u>

11      45.    I understand that the time after an employee punches in and before the

12 scheduled start time, a period of time for which the employee is not paid, is being referred

13 to in this case as the begin-shift time.

14      46.    Similarly, the time at the end of the day, after an employee logs out on the

15 computer and before punching out and leaving the premises, has been designated as end-

16 shift time.

17      47.    As a courier, I frequently commenced working by preparing my truck for my

18 route after I physically punched in on the time clock but before my actual start time in the

19 FAMIS system. Therefore, I was not paid for this time.

20      48.    During my years as a courier, I frequently observed Federal Express

21 employees starting their work before their scheduled start time.

22      49.    As a courier, there was tremendous pressure to have our trucks ready to go at

23 the time we were set by schedule to leave the building. If we took longer than the time

24 allowed between our scheduled start time and time we left the building, we would be

25 behind on our route, would not make the required number of stops per day, and could not

26 successfully complete our work. Therefore, the common solution was to simply arrive at

27 work early, punch in on the time clock, and prepare our trucks for our route. All of this

28 activity occurred before our actual start time in the FAMIS system and was, therefore,

KNAPP,
PETERSEN
& CLARKE

8

DECLARATION OF ARA KARAMIAN

KPC 00132

K:\08000\00745\pld\155_AEJplYV.wpd

1    unpaid.

2         50.    When I was a courier, it was expected by my managers that I would come in

3    early to set up the truck.  I did so in order to accomplish all of those things necessary to

4    have the truck ready before the time set for departure from the building.

5         51.    Other couriers, particularly if they had many packages or worked at a slower

6    pace, would, of necessity, need to arrive at work earlier in order to be prepared to make

7    deliveries on the schedule dictated by Federal Express.

8         52.    During the time that I was a courier, it was known to me, as stated by

9    managers on numerous occasions, that I was not permitted to alter my start time.  That

10   alteration would change the statistics for the station for the day as to the work schedule.  No

11   manager would do so, except with extreme reluctance.

12        53.    As a manager, I was directed by senior management not to change the start

13   time of any employee, except with extreme reluctance.

14        54.    It was well known to me as a manager, through senior management at Federal

15   Express, that the burden was on the employee to come in early, if necessary, to get their

16   trucks ready, even though their start time would not change to reflect this work.

17        55.    During my time as a manager, I did not counsel employees not to come in

18   early before their scheduled start time; nor, did I manage the work that was being done

19   before the scheduled start times.  My practices were the same as for other managers that I

20   knew and observed.

21        56.    Throughout my tenure as a manager up until 2005, I was not instructed by

22   Federal Express senior management to prevent employees from working before their

23   scheduled start time.  Based on my experience as a courier, I knew it to be necessary in

24   order to meet Federal Express's demands for productivity.

25        57.    It is in the interest of every manager to simply permit this work to occur, as it

26   permits the manager to make his budget without altering the budgeted time for the period.

27        58.    As a manager, I have seen employees come in early to set up their trucks or to

28   perform other work.  It is a common practice, which is accepted at Federal Express.

KNAPP, PETERSEN & CLARKE

9

K:\08000\00745\pld\155_AEJplYV.wpd

KPC 00133

1    Employees are not counseled not to do so.

2        59.    After employees punch in on the time clock, they are not permitted to leave

3    thereafter.

4        60.    The time clock serves the function of mandating that the employee is present

5    on the premises.

6        61.    The only issue which is observed by management concerning the physical

7    punch-in is whether the punch-in time is for a time after the scheduled start time. That

8    would reflect that an employee was late to work. The opposite circumstance of an early

9    punch-in is not managed at all.

10        Federal Express Declines to Take Steps to Prevent Early Punch-in

11        62.    Six or seven months ago, for the first time, in staff meetings in which I

12    participated, senior management brought up the issue of whether there was a way to

13    prevent employees from punching in early. This discussion was a reaction to the current

14    class action lawsuit for wage and hour violations, to which this declaration applies.

15        63.    Management suggested posting a security guard in the morning at the

16    entrance to the building before the scheduled start times of employees. It was discussed

17    whether such a security guard could allow employees to enter and punch in on the physical

18    time clock only within a few minutes of the scheduled start time.

19        64.    Though the company, in these staff meetings, was exploring this procedure,

20    no such procedure was ever adopted. The punch clock is still in the building at SMOA, as

21    it always was, and employees are free to punch in and work before their scheduled start

22    time.

23        65.    Also considered in the staff meetings was getting rid of the punch clock

24    altogether and using only the tracker and the FAMIS system to set the time an employee

25    arrives at work. This would have required only that the computer record the actual time of

26    day that the employee logged on, rather than to permit the employee to enter any time.

27        66.    This procedure was also a reaction to the current class action lawsuit.

28    However, it was never implemented. There is still a punch clock in SMOA station.

KNAPP,
PETERSEN
& CLARKE

10

KPC 00134

K:\08000\00745\pld\155_ABJplYV.wpd

## SPLIT-SHIFT CONDITIONS AND VIOLATIONS

67.  Federal Express dictates to employees when a split-shift must be taken.  A split-shift is a period of two hours or greater, typically mandated to be taken during the middle of the day, when Federal Express is not as busy.

68.  Employees typically do not like split-shifts. which are only for the benefit of Federal Express.  The period is unpaid and is an inconvenience to the employee.

69.  Federal Express states that it pays an additional hour of pay for each hour worked on the day on which a split-shift occurs.  I am informed that this procedure does not comply with California law, which requires that an hour of pay be given, not an extra dollar an hour for each hour worked.

70.  Certain Federal Express employees in our station worked a two-hour shift in the morning, had ten or twelve hours off, and worked another two-hour shift in the evening.  These part-time employees were denied any split-shift compensation at all.

71.  I confronted my senior manager concerning Federal Express's obligation to pay these employees for the split-shift period.  Federal Express continues to refuse to pay for this split-shift period.

72.  Concerning these split-shift periods, I was told that "nowhere at FedEx is guaranteed pay given."  These split-shifts were not paid.

73.  Couriers who have a more than two-hour period in the middle of the day are defined as having had a split-shift.  They receive one dollar an hour extra for the hours that they have worked and no pay for the split-shift.

74.  Handlers who have a split-shift are not given any guaranteed pay.

75.  A courier on his route during a split-shift is required to maintain contact with the dispatcher.  Each delivery van has a text message system known as DADS.

76.  Typically, a dispatcher will not know when a courier is on a meal break.  Messages are transmitted to couriers throughout the day.  Some of these messages contain time sensitive instructions for deliveries or pickups.

////

KNAPP,
PETERSEN
& CLARKE

11

KPC 00135

K:\08000\0074S\pld\155_AElpIYV.wpd

77.     A courier must return to the truck periodically during a meal break to find if any message has been called in concerning a delivery or pickup.  The only alternative is to call in during the meal break to the dispatcher on a cell phone.

78.     Generally, in my experience, couriers do not text in to the dispatcher that they are on a meal break.  Therefore, most commonly, dispatchers do not know whether a courier is on a meal break concerning assignments.

79.     While I was a courier on meal breaks and split-shifts, I remained in uniform.

80.     I have never heard of any courier changing from his or her uniform.

81.     While on a delivery route during the day, during a meal break or a split-shift, it is not practical to change from the Federal Express uniform.  There is nowhere to change nor no real reason to do so.

82.     During the time we are in uniform, from the time we punch in and throughout the day, including during meal breaks and split-shifts, employees of Federal Express must follow the Federal Express code of conduct.

83.     In my experience, as a courier and manager, both myself and other couriers frequently worked during breaks or split-shifts.  If a courier is running late, or encounters traffic, as frequently happens in the Los Angeles area, there is no alternative but to work during these periods in order to stay on schedule.  Even when a split-shift or meal break is spent working, a courier is required to put in a one-hour break, even if the break has not been taken.

84.     I have been told by employees as their manager that they took no break.  As I was instructed by senior management, I told such employees that failing to include a break in their time card would be a break violation.  Their option was to simply include the break, even though it was not taken, or face discipline.  Under these circumstances, invariably, the employee put in a break on the time card, a period for which the employee was not paid, rather than face discipline.

////

////

*DECLARATION OF ARA KARAMIAN*

KNAPP,
PETERSEN
& CLARKE

K:\08000\00745\pld\155_ABJplYV.wpd

KPC 00136

## MANAGEMENT DOES NOT LOOK TO SEE WHETHER PAID BREAKS ARE TAKEN

85.  In addition to the meal break (code 13/14), employees are purportedly required to take paid breaks (code 28/29).  These are ten minute breaks for every four hours or significant portion thereof of the work day.

86.  As a manager before 2005, I never looked to see whether a paid break was being taken by employees I managed.

87.  Federal Express does not direct its managers to review whether paid breaks are taken.

88.  As a courier, I frequently did not take my paid breaks, as the work load was so heavy that there was no extra time in the day to do so.

89.  I would not be surprised if the great proportion of employee work days at Federal Express over the years show violation of paid break requirements.

## AIRLINE DEREGULATION ACT

90.  I have been informed that Federal Express is now taking the position, in 2006, that it does not have to comply with California wage and hour laws at all.

91.  Federal Express apparently cites to an act called the Airline Deregulation Act to support an argument that it does not have to comply with California law.

92.  At no time during my entire career at Federal Express has the company ever informed me as a courier or manager that it is somehow exempt from California wage and hour laws.

93.  To the contrary, Federal Express always recognized its obligation to pay overtime, give breaks, and otherwise comply with California law, whether it actually did so in practice.

94.  At no time during my career at Federal Express was a directive ever issued that Federal Express need not comply with California law as to minimum wage, overtime, rest periods, or any other part of the law.

////

95.   Federal Express agreed with me and its other employees that it would follow California's laws on wages and hours.

96.   Fed Ex has always considered that it was obligated to comply with California wage and hour laws and has always planned and budgeted accordingly.

97.   Fed Ex has always taken the position with its managers that Fed Ex must comply with California wage and hour laws regarding breaks.

DEPARTMENT OF TRANSPORTATION

98.   I am informed that Federal Express claims in 2006 that it need not pay overtime because certain couriers drive DOT trucks.

99.   At all times during my career as a courier and manager at Federal Express, Federal Express has expressly recognized its obligation to pay time and a half for all hours over eight hours per day or 40 hours per week.

100.   Couriers are DOT certified to drive any Federal Express equipment, whether it is a DOT truck or not.

101.   At no time when I was a manager did I ever review time cards for compliance with any DOT regulation.

102.   Before 2005, it was always stated to me at Federal Express that DOT rules would only apply to tractor-trailers which were driven from city to city. The rules were not to apply to deliveries by Federal Express couriers within a city.

103.   Despite all of the foregoing, approximately one year ago, Federal Express couriers were, for the first time in my experience since 1997, asked to fill out DOT logs. These logs would show on a daily basis when the workday started, the number of breaks, etc. The log was attached to the time card.

104.   As I stated, this was a new procedure. At no time during the time I was a courier did we fill out any DOT logs.

105.   I was informed that these logs were kept because there were violations involving employees who were not off duty for more than ten hours between shifts and that Federal Express has been fined by the DOT for these problems.

KPC 00138

*DECLARATION OF ARA KARAMIAN*

KNAPP,
PETERSEN
& CLARKE

K:\08000\00745\pld\155_AEJplYV.wpd

106.   Nonetheless, in September 2005, couriers were directed to stop keeping DOT logs.  At that time, this record keeping ended for all purposes.

107.   Therefore, DOT logs were kept by the company in California, in my experience, only from approximately February 2005 to September 2005.

108.   Federal Express has a number of different size trucks.  No courier is treated differently at Federal Express with regard to his or her pay for breaks or any other aspect of employment due to the size of truck that is operated.

109.   In fact, at peak times, rental trucks are used by Federal Express.

110.   Without regard to whether a truck is owned or rented, or its size, all couriers who work overtime are supposed to be paid overtime under Federal Express policies.

111.   Federal Express has stated, through its managers to its couriers, that it agrees to pay time and a half for all hours over eight hours a day and 40 hours a week.  This is the agreement which is followed by Federal Express concerning payment of its couriers, regardless of the size of truck they drive.

TERMINATION OF MY EMPLOYMENT

112.   My employment has been terminated by Federal Express on two occasions.  In each case, the termination related to changes made to time cards at the direction of senior management, which changes were made by other managers, as well.

113.   In approximately March 2004, my employment was terminated by a manager at the GJX station for changing time records.  I did what other managers do at the request of senior management concerning such changes.  The only problem in that instance was that the employee had not initialed the change, as an agreed change.

114.   I pursued the GFT appeal process at Federal Express.  Federal Express reversed the termination and reinstated my employment, with back pay, commencing June 2004.

115.   Based on this history, Federal Express ultimately did not have a problem, as a company, with my conduct, as it was the same conduct that other managers undertook.

////

116.   Again, in November 2005, I was terminated this time by a new senior manager at the SMOA facility.  Again, the reason was for changing employee codes on a time card concerning package codes and pretrip and posttrip codes, budgeted categories. These changes did not affect employee pay.

117.   I have appealed this termination, which has so far been upheld by Federal Express, though the appeal has not concluded.

118.   In connection with this termination, I have informed Federal Express that other employees at the management level do the exact same thing that I have been terminated for doing.

119.   My experiences in this regard do not affect my testimony, as I have given it in this declaration.  The statements I make herein are within my own personal knowledge and are true, unaffected by my termination of employment.

120.   I received a notice concerning this class action.

121.   I opted-out as I understood all managers who were formerly hourly employees were doing.

122.   I felt pressured to go along with this decision to show senior management that I was a loyal manager.

123.   Even in opting out, I knew that the wage and hour practices of Federal Express were illegal, that the lawsuit was justified, and that countless thousands of employee worked hours had gone unpaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 13, 2006, at Glendale, California.

ARA KARAMIAN

KNAPP,
PETERSEN
& CLARKE

16

DECLARATION OF ARA KARAMIAN

KPC 00140

K:\08000\00745\pld\l55_AEJplYV.wpd

EXHIBIT 12

1 | ANDRÉ E. JARDINI, ESQ.   (State Bar No. 71335)
KNAPP, PETERSEN & CLARKE
2 | A Professional Corporation
500 North Brand Boulevard
3 | Twentieth Floor
Glendale, California 91203-1904
4 | (818) 547-5000
Facsimile:  (818) 547-5329
5 |
6 | MICHAEL S. DUBERCHIN ESQ.  (State Bar No. 108338)
LAW OFFICES OF
MICHAEL S. DUBERCHIN
7 | 4768 Park Granada
Suite 212
8 | Calabasas, CA  91302
(818) 222-7484
9 | Facsimile:  (818) 222-7480

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

SEP 2 7 2002

John A. Clarke, Executive Officer/Clerk
By _____, Deputy

10 | GLEN ROBERT BREGMAN, ESQ.  (State Bar No. 100363)
LAW OFFICES OF
11 | GLEN ROBERT BREGMAN
16633 Ventura Boulevard
12 | Suite 1200
Encino, CA  91436
13 | (818) 981-9793
Facsimile:  (818) 981-9807

BC 282300

14 |
Attorneys for Plaintiffs
15 | JACK FOSTER, CYNTHIA GUERRERO,
GILBERT R. DIAZ AND GLEN RAY BROWN
16 |
17 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
18 | FOR THE COUNTY OF LOS ANGELES
19 |

| | |
|---|---|
| 20  JACK FOSTER, CYNTHIA | NO. |
| 21  GUERRERO, GILBERT R. DIAZ, GLEN RAY BROWN, individuals, on behalf of | |
| 22  themselves and all other similarly situated, | COMPLAINT FOR COMPENSATORY |
|    Plaintiffs, | AND EXEMPLARY DAMAGES; |
| 23  v. | 1. NONPAYMENT OF WAGES |
| 24  FED EX EXPRESS, FEDERAL | 2. UNFAIR BUSINESS PRACTICES |
| 25  EXPRESS, FED EX CORPORATION, FDX CORPORATION, AND DOES 1 | CLASS ACTION [CODE CIV. PROC., § 382] |
| 26  through 50, inclusive, | |
| 27    Defendants. | |
| 28 | |

00034

1       Plaintiffs, Jack Foster, Cynthia Guerrero, Gilbert R. Diaz, Glen Ray Brown,

2  individuals, ("plaintiffs") on behalf of themselves and all others similarly situated

3  (collectively "Plaintiff Class") allege as follows:

PARTIES

4

5       1.      Plaintiff Jack Foster is a citizen of the State of California and resides in the

6  County of Los Angeles.

7       2.      Cynthia Guerrero is a citizen of the State of California and resides in the

8  County of Los Angeles.

9       3.      Gilbert R. Diaz is a citizen of the State of California and resides in the

10  County of Los Angeles.

11       4.      Glen Ray Brown is a citizen of the State of California and resides in the

12  County of Los Angeles.

13       5.      Defendant Fed Ex Express is a worldwide corporation, the world's largest

14  express transportation company. Its world headquarters is located in the State of

15  Tennessee. At all times relevant hereto, Fed Ex Express did significant business in the

16  State of California and has substantial continuous contacts with the State of California. At

17  all times relevant herein, Fed Ex Express employed each plaintiff in the State of California,

18  County of Los Angeles.

19       6.      Federal Express Corporation is a corporation. At all times relevant hereto,

20  Federal Express Corporation did significant business in the State of California and has

21  substantial continuous contacts with the State of California. Federal Express Corporation

22  employed each plaintiff in the State of California, County of Los Angeles.

23       7.      Fed Ex Corporation is a corporation. At all times relevant hereto, Fed Ex

24  Corporation did significant business in the State of California and has substantial

25  continuous contacts with the State of California. Fed Ex Corporation employed each

26  plaintiff in the State of California, County of Los Angeles.

27       8.      FDX Corporation is a corporation. At all times relevant hereto, FDX

28  Corporation did significant business in the State of California and has substantial

00035

KPC 00142

1  continuous contacts with the State of California. FDX Corporation employed each plaintiff

2  in the State of California, County of Los Angeles.

3       9.   Plaintiffs are unaware of the names and capacities of the defendants sued

4  herein as DOES 1 through 50, inclusive. Plaintiff is informed and believes, and upon that

5  basis alleges, that each of the defendants sued herein as DOES 1 through 50, inclusive, is

6  responsible in some manner for the wrongs alleged herein and is legally liable to the

7  plaintiffs. Plaintiffs will amend this complaint to allege their true names and capacities

8  when such information is ascertained.

9       10.   Plaintiffs are informed and believe and on that basis allege that at all times

10  relevant herein each of the defendants was acting as the agent, employee and/or joint

11  venturer of the remaining defendants and in so doing the things herein described, was

12  acting within the scope of such agency, employment and/or joint venture except where

13  designated otherwise.

14                        <u>CLASS ALLEGATIONS</u>

15       11.   Plaintiffs bring this action on behalf of themselves and all others similarly

16  situated, as a class action under section 382, Code of Civil Procedure. The class which

17  plaintiffs seek to represent is composed of and defined as follows: All California

18  employees of defendants paid on an hourly basis as nonexempt employees for the period of

19  October 15, 1998, to the present.

20       12.   This action has been brought and may properly be maintained as a class

21  action, under the provisions of Code of Civil Procedure section 382, because there is a

22  well-defined community of interest in the litigation and the proposed class is easily

23  ascertainable.

24       13.   <u>Numerosity</u>: The Plaintiff Class is so numerous that the individual joinder

25  of all members is impracticable under the circumstances of this case. While the exact

26  number of class members is presently unknown to plaintiffs, plaintiffs are informed and

27  believe that during the time period concerned herein, defendants, as a matter of corporate

28  practice, engaged in violations of law concerning their practices in the payment of

3

COMPLAINT FOR DAMAGES

00036

KPC 00143

1    employees and that said wage and hour violations occurred universally throughout the

2    offices of defendants in California over at least the last four years. Defendants employ

3    more than 200,000 employees worldwide, and plaintiffs are informed and believe and

4    thereupon allege that the number of nonexempt employees in the State of California

5    numbers in the many thousands of individuals.

6       14.    **Common Questions Predominate:** Common questions of law and fact exist

7    as to all members of the Plaintiff Class and predominate over any questions which affect

8    only individual members of the class. These common questions of law and fact include,

9    without limitation:

10        a.      Whether defendants violated wage and hour laws in establishing a

11    corporate policy of failing to pay for the services of hourly employees;

12        b.      Whether defendants violated wage and hour laws, in adopting a

13    practice to arbitrarily deduct, and fail to pay for, time spent by nonexempt employees at the

14    service of defendants;

15        c.      Whether defendants established policies statewide in California to

16    require services of its employees and to allot a maximum time for the completion of those

17    services, with the full knowledge that those services could not be humanly accomplished in

18    the allotted time.

19        d.     The amount of the penalties owed by defendants for willful failure to

20    pay wages;

21        e.     The appropriate nature of class-wide equitable relief in the form of an

22    injunction to prevent such wage and hour violations in the future.

23       15.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the

24    Plaintiff Class. Plaintiffs and all members of the Plaintiff Class sustained damages arising

25    out of defendants' adoption of policies and a common course of conduct in violation of law

26    as complained of herein. The damages of each member of the Plaintiff Class were caused

27    directly by the defendants' wrongful conduct in violation of the wage and hour laws alleged

28    herein.

4

00037

KPC 00144

16.   **Adequacy:**  Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff Class.  Plaintiffs reside in California, and are, or have been, nonexempt employees of defendants as to whom defendants failed to pay wages earned. Plaintiffs have retained counsel who have substantial experience in the prosecution of wage and hour cases and in the prosecution of complex class action litigation.

17.   **Superiority:**  A class action is superior to other available means for the fair and efficient adjudication of this controversy, since the individual joinder of all members of the class is impracticable.  Class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Furthermore, as the damage suffered by each individual of the class may be small, on a relative basis, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them.  Moreover, an important public benefit will be realized by addressing the matter as a class action.  The cost to the court system of adjudication of such individualized litigation would be substantial.  Individualized litigation would also present the potential for inconsistent or contradictory judgments.

18.   Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class proceeding.

## INTRODUCTION

19.   This action arises out of the prevalent practices engaged in by defendants in willfully failing to pay wages to nonexempt employees for services rendered.

20.   Defendants have engaged in at least the following violations with regard to their employees in the State of California:

a.   Establishing as a policy and enforcing on hourly nonexempt employees that they work "off the clock" such that employees are not paid for services rendered to the company, in violation of state law.

b.   The establishment of artificial time allotments for the accomplishment

5

COMPLAINT FOR DAMAGES

00038

KPC 00145

1    of required tasks such that the time spent by employees to accomplish necessary work are

2    artificially foreshortened and therefore not paid by defendants, in violation of state law.

3          c.     The establishment of goals on a station-by-station basis that

4    encourages management to reduce the amount of hours actually spent by employees, and to

5    fail to pay for those hours spent by employees, in the interest of appearing more efficient to

6    garner management incentives and prizes, in violation of state law.

7          d.     The encouragement and ratification of conduct by managers in simply

8    amending employee time records to reduce the hours reflected on those records, resulting in

9    a failure to pay wages for work performed

10         e.     Failure to pay overtime compensation earned by employees.

11       21.    The conduct of defendants, which has been abetted and encouraged

12   throughout defendants' offices in the State of California for many years, has resulted in

13   unwarranted profits to defendants at the expense of their employees.

14       22.    Damages are warranted to repay employees for this egregious and illegal

15   conduct.

16       23.    Injunctive relief is necessary to prevent such conduct in the future.

17       24.    Defendants have established a written policy and practice to maintain

18   employee time records for a period of three years.  Nonetheless, in violation of this policy,

19   and with the intent of obscuring its unlawful conduct in failing to pay wages to its

20   employees, defendants have embarked on a practice of destroying employee time record

21   less than three years old, including current records.

22   FIRST CAUSE OF ACTION

23   (For Nonpayment of Wages, Violation of Labor Code Sections 204, 210,

24   Against All Defendants)

25       25.    Plaintiffs allege and incorporate herein by reference the allegations of

26   Paragraphs 1 through 24, inclusive.

27       26.    At all times relevant herein Labor Code section 204 required the payment of

28   all wages earned by the members of the Plaintiff Class.

00039

KPC 00146

27.   At all times relevant herein, Industrial Welfare Commission Wage Order No. 4-2001 (8 Cal. Code Reg. § 11040) provides for payment of overtime compensation at not less than one and half times the employees regular rate of pay for all hours worked in excess of eight hours in any workday and for the first eight hours worked on the seventh consecutive day of work in a work week and double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight hours on the seventh consecutive day of work in a workweek.

28.   Members of the Plaintiff Class worked regular time and overtime hours for defendants which were not paid.

29.   Defendants have failed to pay wages earned to members of the Plaintiff Class pursuant to the policies as herein alleged.

30.   Defendants' failure to pay the regular and overtime wages of Plaintiff Class members, violates the provisions of Labor Code sections 201 and 1198, and is therefore unlawful.

31.   Civil penalties should be awarded pursuant to Labor Code section 558.

32.   Pursuant to Labor Code section 1194(a) plaintiffs request that the court award reasonable attorneys' fees and costs incurred in this action.

33.   Pursuant to Labor Code sections 218.6 and 1194(a), plaintiffs request that the court award interest on all due and unpaid wages, at the legal rates specified by Civil Code section 3289(b) accruing from the date the wages were due and payable.

34.   In doing the acts herein described, defendants acted consciously to deprive their employees of compensation which had been earned.  These acts were committed with malice, oppression and fraud, and punitive damages are warranted pursuant to Civil Code section 3294.

### SECOND CAUSE OF ACTION

(Unfair Business Practices Against All Defendants)

35.   Plaintiffs allege and incorporate herein by reference the allegations of paragraphs 1 through 34, inclusive.

00040

COMPLAINT FOR DAMAGES

KPC 00147

36.   Plaintiffs bring this action both in their individual capacities and on behalf on all nonexempt employees of defendants as to whom defendants failed to pay wages over the last four years.

37.   Defendants establishment of policy and encouragement of its managers to fail to pay wages is immoral, unethical, oppressive, unscrupulous, substantially injurious to plaintiffs and the Plaintiff Class and has been implemented through the use of economic force. It is an unfair business practice under Business & Professions Code section 17200 et. seq, for defendants to consciously, deliberately and in bad faith underpay its employees by adopting these practices.

38.   Specifically, defendants, and each of them, by their continuing course of conduct of failing and refusing to pay wages earned by its employees, have engaged, and continue to engage in, conduct which was, and is, "unlawful, unfair and fraudulent," within the meaning of Business & Professions Code section 17200 et seq.

39.   Defendants, and each of them, accordingly, should be ordered to restore to plaintiffs and the Plaintiff Class those amounts which defendants have wrongfully retained, in violation of wage and hour law and in violation of their duty to refrain from "unlawful, unfair and fraudulent" conduct, as proscribed by Business & Professions Code 17200 et seq.

40.   As a direct and proximate result of these violations, defendants, and each of them, have obtained the services of the plaintiffs and the Plaintiff Class and have not paid for those services, all to the profit of defendants and the detriment of plaintiffs and the Plaintiff Class. The profit so obtained should be disgorged from defendants as ill-gotten gains.

41.   The acts as herein alleged are continuing. Unless enjoined, defendants will continue to reap the benefits of the services of its nonexempt employees while failing to pay for those services. Injunctive relief is warranted.

42.   The wrongful conduct of defendants, and each of them, unless restrained and enjoined by an order of this court, will cause great and irreparable harm to plaintiffs and the

8

1    Plaintiff Class in that defendants will continue to violate the wage and hour law with

2    impunity and continue to engage in conduct prohibited by Business & Professions Code

3    section 17200 et seq.  Plaintiffs and the Plaintiff Class have no adequate remedy of law for

4    the injuries they have suffered and that they will continue to suffer in the future, unless

5    defendants' wrongful conduct is restrained and enjoined and unless defendants are

6    compelled to refrain from their "unfair, unlawful and fraudulent" acts and practices.

7    Plaintiffs and the Plaintiff Class therefore pray for a temporary restraining order,

8    preliminary injunction and permanent injunction enjoining such conduct.

9            43.    Defendants' practice of destroying employee time records to prevent

10   investigation and disclosure of their violation of law in failing to pay wages is an unfair

11   business practice violative of Business and Professions Code section 17200 et seq.

12           WHEREFORE, plaintiffs pray for relief as follows:

13           1.     For a temporary restraining order, preliminary injunction and permanent

14   injunction restraining defendants and their agents and employees from continuing to violate

15   the wage and hour law.

16           2.     For a temporary restraining order, preliminary injunction and permanent

17   injunction prohibiting defendants and their agents and employees from continuing to

18   withhold from plaintiff and the members of the Plaintiff Class the wages and hours due for

19   services rendered which have been unpaid in violation of wage and hour laws.

20           3.     For a temporary restraining order, preliminary injunction and permanent

21   injunction mandating that defendants and their agents and employees pay to plaintiffs and

22   the members of the Plaintiff Class those sums due and owing to them which defendants

23   have not paid for services rendered as wages, in violation of wage and hour law.

24           4.     For a temporary restraining order, preliminary injunction and permanent

25   injunction restraining defendants and their agents and employees from continuing to

26   commit unlawful, unfair and fraudulent practices in violation of Business & Professions

27   Code 17200 et seq., including from continuing to commit violations of the wage and hour

28   law by use of economic force against plaintiffs and the members of the Plaintiff Class.

00042

KPC 00149

5.    For a temporary restraining order, preliminary injunction and permanent injunction preventing defendants from destroying employee time records during the pendency of this lawsuit and, thereafter, only if such records are more than three years old.

6.    For restitution to plaintiffs and the members of the Plaintiff Class of those wages which defendants have wrongfully refused to pay, in violation of wage and hour law.

7.    For compensatory damages in an amount according to proof to plaintiffs and the members of the Plaintiff Class.

8.    For an award of exemplary damages for the purpose of punishing defendants and deterring their unlawful conduct in the future.

9.    For interest on all sums awarded.

10.    For reasonable attorneys' fees incurred.

11.    For costs of suit.

12.    For such other and further relief as the court finds proper.


DATED: September 26, 2002    KNAPP, PETERSEN & CLARKE


By: _____
        ANDRE E. JARDINI

Attorneys for Plaintiffs, JACK FOSTER, CYNTHIA
GUERRERO, GILBERT R. DIAZ AND GLEN RAY
BROWN

00043

KPC 00150

EXHIBIT 13

1   ANDRÉ E. JARDINI, ESQ.   (State Bar No. 71335)
    KNAPP, PETERSEN & CLARKE
2   A Professional Corporation
    500 North Brand Boulevard
3   Twentieth Floor
    Glendale, California 91203-1904
4   (818) 547-5000
    Facsimile:   (818) 547-5329
5
    MICHAEL S. DUBERCHIN ESQ.   (State Bar No. 108338)
6   LAW OFFICES OF MICHAEL S. DUBERCHIN
    4768 Park Granada, Suite 212
7   Calabasas, CA  91302
    (818) 222-7484
8   Facsimile:  (818) 222-7480

9   GLEN ROBERT BREGMAN, ESQ.   (State Bar No. 100363)
    LAW OFFICES OF GLEN ROBERT BREGMAN
10  16633 Ventura Boulevard, Suite 1200
    Encino, CA  91436
11  (818) 981-9793
    Facsimile:  (818) 981-9807
12
    Attorneys for Plaintiffs
13  JACK FOSTER, CYNTHIA GUERRERO,
    GILBERT R. DIAZ, GLEN RAY BROWN
14  AND RICARDO GONZALES

15              SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                  FOR THE COUNTY OF LOS ANGELES

17

18  JACK FOSTER, CYNTHIA              ) NO.      BC 282300
    GUERRERO, GILBERT R. DIAZ, GLEN   )
19  RAY BROWN, individuals, on behalf of ) CLASS ACTION
    themselves and all other similarly situated, )
20                                    ) Date:                 3/3/06
            Plaintiffs,               ) Time:           8:30 a.m.
21                                    ) Dept:                    36
        v.                            )
22                                    ) DECLARATION OF JACK FOSTER
    FED EX EXPRESS, FEDERAL           ) IN SUPPORT OF PLAINTIFFS'
23  EXPRESS, FED EX CORPORATION,      ) MOTION FOR SUMMARY
    FDX CORPORATION, AND DOES 1       ) ADJUDICATION
24  through 50, inclusive,            )
                                      ) Complaint Filed:          9/27/02
25          Defendants.               ) Judge:   The Hon. Gregory W. Alarcon
                                      ) Trial Date:              4/18/06
26

27

28

KNAPP,
PETERSEN
& CLARKE

                                   1

1    JACK FOSTER declares:

2         1.    I am a named representative of a class of approximately 12,500 current and

3    former employees of Federal Express. I make this declaration in support of plaintiffs'

4    motion for summary adjudication. The facts set forth herein are true of my own personal

5    knowledge, and if called upon to testify thereto, I could and would competently do so under

6    oath.

7         2.    I worked as a courier for Federal Express from October 1995 to approximately

8    March of 2002 at the following locations: Downtown Los Angeles (SPQA) and Santa Fe

9    Springs (JDYA).

10        3.    My manager at SPQA was John Collins. My manager at JDYA was Eugene

11   Mc Donald. I would typically arrive at least ten minutes prior to the scheduled start time

12   and punch in. This time was necessary to gather my equipment and supplies for my truck.

13   After punching in, we were not permitted to leave the premises.

14        4.    I frequently worked through my unpaid meal breaks, and I know the same was

15   true for other couriers. We did not usually have sufficient time to pick up and deliver the

16   packages as we were supposed to, if we did not sometimes work through our breaks. The

17   company has very rigid time requirements that, I believe, are based on engineering studies,

18   but which do not take into account the types of delays which, it can be predicted, will

19   sometimes occur, such as adverse traffic conditions and customer-caused delays.

20        5.    Sometimes couriers, such as myself, worked split shifts, which means that the

21   courier would work a three to four hour period in the morning, have a break for two to three

22   hours, and then work for another shift. We did not always have advance notice of when a

23   split shift would be required. These split shifts created a large period of time in the middle

24   of the day during which we were not paid at our hourly rate. While this may have benefitted

25   Federal Express, it was severely inconvenient for the couriers.

26        6.    During the so-called "break period," we were not allowed to go more than five

27   miles from the route, which left me, and other carriers, stranded in the location of our last

28   delivery. Sometimes, traveling back to our station to pick up our private automobile would

KNAPP,
PETERSEN
& CLARKE

K:\08009\00745\pld\134_AEljplMM.wpd          *DECLARATION OF JACK FOSTER*

1 be impossible since doing this would take a substantial part of the so-called "break period"
2 anyway.

3       7.     Couriers are required to remain in uniform and responsible for the truck
4 during the unpaid meal break or split shift.

5       8.     The Federal Express trucks have a communication system from the dispatch
6 known as DADS.  This is a text message system, by which the dispatch could give us
7 directions as to packages which needed to be picked up or delivered, or customers who
8 needed service.  Often, the messages we received on the DADS System were time-sensitive.
9 That is, we might be required to pick up or deliver a package by a certain time, based on the
10 customer's request.

11       9.     Because I was responsible to read the text messages from dispatch, I could not
12 leave the truck for any extended period, for fear of missing a time-sensitive message.  Other
13 couriers, to my knowledge, were similarly so restricted by the pressure to remain in contact
14 with the station by staying in their truck during their meal breaks and split shifts.

15      10.    In my experience, most couriers did not drive their truck at all during their
16 unpaid meal break or split shift.

17      11.    We were required to enter the odometer reading at the beginning of a meal
18 break or split shift and at the end of that period.  We used the 13 and 14 codes on our tracker
19 devices to record the time of our meal break or split shift.  Odometer readings were entered
20 at that time.  Most often, the mileage reflected by these odometer readings would be zero
21 miles traveled during a split shift or meal break.

22      I declare under penalty of perjury under the laws of the State of California that the
23 foregoing is true and correct.

24      Executed on January 9, 2006, at Glendale, California.

25

26

27                             JACK FOSTER

28

3

*DECLARATION OF JACK FOSTER*

1   ANDRÉ E. JARDINI, ESQ.  (State Bar No. 71335)
    KNAPP, PETERSEN & CLARKE
2   A Professional Corporation
    500 North Brand Boulevard
3   Twentieth Floor
    Glendale, California 91203-1904
4   (818) 547-5000
    Facsimile:  (818) 547-5329
5
    MICHAEL S. DUBERCHIN ESQ.  (State Bar No. 108338)
6   LAW OFFICES OF MICHAEL S. DUBERCHIN
    4768 Park Granada, Suite 212
7   Calabasas, CA  91302
    (818) 222-7484
8   Facsimile:  (818) 222-7480
9   GLEN ROBERT BREGMAN, ESQ.  (State Bar No. 100363)
    LAW OFFICES OF GLEN ROBERT BREGMAN
10  16633 Ventura Boulevard, Suite 1200
    Encino, CA  91436
11  (818) 981-9793
    Facsimile:  (818) 981-9807
12
    Attorneys for Plaintiffs
13  JACK FOSTER, CYNTHIA GUERRERO,
    GILBERT R. DIAZ, GLEN RAY BROWN
14  AND RICARDO GONZALEZ

15

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17              FOR THE COUNTY OF LOS ANGELES

18  JACK FOSTER, CYNTHIA              )   NO.    BC 282300
    GUERRERO, GILBERT R. DIAZ, GLEN   )
19  RAY BROWN, individuals, on behalf of )
    themselves and all other similarly situated; )  Hearing Date:          3/26/04
20                                    )   Time:              8:30 a.m.
            Plaintiffs,               )   Dept.:                    52
21                                    )   Judge:    Hon. Susan Bryant-Deason
    v.                                )
22                                    )   Complaint Filed:        9/27/02
    FED EX EXPRESS, FEDERAL           )   Trial Date:             6/23/04
23  EXPRESS, FED EX CORPORATION,      )
    FDX CORPORATION, AND DOES 1       )
24  through 50, inclusive,            )   DECLARATION OF JACK FOSTER IN
                                      )   SUPPORT OF MOTION FOR CLASS
25          Defendants.               )   CERTIFICATION
                                      )
26  _____)

27  ////

28  ////

KNAPP,
PETERSEN
& CLARKE

                              1

JACK FOSTER declares:

1.      I am a plaintiff in the above-referenced action.

2.      I worked as a courier at Federal Express from October 1995 to around March 2002 at the following locations:  downtown Los Angeles (SBQA) and Santa Fe Springs (JDYA).

3.      My manager at SBQA was John Collins.  My manager at JDYA was Eugene McDonald.  I would typically arrive at least ten minutes prior to the scheduled start time and punch in.  This time was necessary to gather my equipment to to my truck.  After punching in, we were not permitted to leave the premises.

4.      I frequently worked through my breaks, and I know the same was true for other couriers.  We did not usually have sufficient time to pick up and deliver the packages as we were supposed to, if we did not sometimes work through our breaks.  The company has very rigid time requirements that, I believe, are based on engineering studies, but which do not take into account the types of delays which, it can be predicted, will sometimes occur, such as adverse traffic conditions and customer-driven delays.

5.      I am aware of situations where, if a lunch or break code was not entered because the courier was working through lunch or breaks, the manager would alter the data in the computer to reflect that lunch, or a longer lunch, was taken or that a break was taken when it was not.  This would result in the courier not being paid for time which was, in fact, worked.

6.      Managers change the time in order to meet their goals and win bonuses under the Federal Express productivity incentive program, and this is well known.

7.      Sometimes the couriers work split shifts, which means that the courier will work a three- to four-hour period in the morning, have a break for two to three hours, and then work for another shift.  During the so-called break period, we are not allowed to go more than five miles from the route, which leaves us stranded in that location.  Sometimes, traveling back to our domicile location and then back out to the route would take a

///

*Declaration of Jack Foster*

00415

KPC 00155

1  substantial part of the so-called break period anyway.  We remain in uniform and

2  responsible for the truck.

3          I declare under penalty of perjury under the laws of the State of California that the

4  foregoing is true and correct.

5          Executed on January 8, 2004, at Pomona, California.

6

7

8                                                                    JACK FOSTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Declaration of Jack Foster*

NAPP,
ETCHSON
G   IE

\08000\00745\pld\044_GFpIYV.wpd

00416

KPC 00156

EXHIBIT 14

1  ANDRÉ E. JARDINI, ESQ.   (State Bar No. 71335)
   aej@kpclegal.com
2  KNAPP, PETERSEN & CLARKE
   A Professional Corporation
3  500 North Brand Boulevard, 20th Floor
   Glendale, California 91203-1904
4  (818) 547-5000
   Facsimile:  (818) 547-5329
5
   MICHAEL S. DUBERCHIN ESQ.  (State Bar No. 108338)
6  msdlaw@earthlink.net
   LAW OFFICES OF
7  MICHAEL S. DUBERCHIN
   4768 Park Granada, Suite 212
8  Calabasas, CA  91302
   (818) 222-7484
9  Facsimile:  (818) 222-7480

10 GLEN ROBERT BREGMAN, ESQ.  (State Bar No. 100363)
   GlenBregmanLaw@aol.com
11 LAW OFFICES OF
   GLEN ROBERT BREGMAN
12 16633 Ventura Boulevard, Suite 1200
   Encino, CA  91436
13 (818) 981-9793
   Facsimile:  (818) 981-9807
14
   Attorneys for Plaintiffs
15 JACK FOSTER, CYNTHIA GUERRERO,
   GILBERT R. DIAZ AND GLEN RAY BROWN
16

17              SUPERIOR COURT OF THE STATE OF CALIFORNIA

18                     FOR THE COUNTY OF LOS ANGELES

19

20 JACK FOSTER, CYNTHIA            )  NO.      BC 282300
   GUERRERO, GILBERT R. DIAZ, GLEN )
21 RAY BROWN, individuals, on behalf of )  CLASS ACTION
   themselves and all other similarly situated, )
22                                 )  Complaint Filed:        9/27/02
                                   )  Trial Date:             4/18/06
23          Plaintiffs,            )
                                   )  Hearing Date:           3/3/06
24 v.                              )  Time:                 8:30 a.m.
                                   )  Dept.:                    36
25 FED EX EXPRESS, FEDERAL         )  Judge:      Hon. Gregory W. Alarcon
   EXPRESS, FED EX CORPORATION,    )
26 9FDX CORPORATION, AND DOES 1    )  DECLARATION OF RICHARD
   through 50, inclusive,          )  DROGIN, Ph.D.
27                                 )
          Defendants.             )
28

KNAPP,
PETERSEN
& CLARKE

                                      1                           00402

1    RICHARD DROGIN, Ph.D. declares:

2  **Introduction**

3      1.      The facts set forth herein are personally known to me, and I have firsthand

4  knowledge of same.  If called as a witness, I could and would competently testify thereto.

5      2.      I hold a Ph.D. in statistics from the University of California at Berkeley,

6  earned in 1970.  I am currently an Emeritus Professor in the Department of Statistics at

7  California State University, Hayward, where I have taught graduate and undergraduate

8  courses in data analysis, non-parametric methods, regression analysis, sample surveys,

9  probability theory, queuing theory, simulation methods, and design of statistical software.  I

10  have been employed at California State University, Hayward, since 1973, and became an

11  Emeritus Professor in 1996.

12      3.      I am a partner in the statistical consulting firm of Drogin, Kakigi &

13  Associates.  This firm provides consulting services and computerized database

14  management.  I have previously submitted a declaration in this matter, dated January 9,

15  2006, and my resume was attached to that declaration.  My qualifications have not changed

16  since that time.

17      4.      I have been retained by Plaintiffs' counsel to review data provided in

18  discovery in the Foster v. FedEx case. Since submitting my January 9, 2006 declaration I

19  have received additional data, updating data previously provided to cover the period

20  through November 2005.  The combined data files, including the new data and previously

21  provided data, are:

22          a.      Shift Data - A computer file containing 12,778,475 records giving

23  information about each shift worked by a courier, courier/handler and service agent

24  employed by FedEx in California from October 15, 1998 through November 2005.  This

25  data gives the date, employee number, and start and end time for each shift.

26          b.      Task Data - A computer file containing 128,132,363 records

27  identifying every task recorded during all shifts worked by the employees described in 3a.

28  Each record has a field for time and odometer reading for the task, and a task code

KNAPP,
PETERSEN
( )RKE

2

**00403**

1  indicating what task was performed.  Among the tasks recorded in this file are the paid and

2  unpaid breaks taken.[1]

3        c.    Stop Action Data - A computer file containing 186,771,354 records

4  identifying the stop times for pickups and deliveries by the employees described in 3a)

5  above, for the period from March 2003 through October 2005.

6        d.    Random Sample of Shifts - Paper record copies of 682 daily time card

7  records produced by FedEx.  These documents were part of an initial random sample of

8  1000 shifts selected from the population of all shifts described in 3a) above.[2]

9      This declaration presents various summary statistics derived from this raw data.

10  **Punch-In Time Before Shift and Punch-Out After Shift**

11      5.    The computerized shift data described in 3a. above shows the start work and

12  end work times.  However, the corresponding paper daily time card records usually show a

13  punch-in and punch-out time also, which are not recorded in the computerized data shift

14  data produced by defendants.  I understand that plaintiffs' counsel refers to the time

15  between the punch-in and start work time, plus the time between the end work and

16  punch-out time as "unpaid time".  In order to study unpaid time, a random sample of 1000

17  shifts worked were selected from the FAMIS computer file described in 3a. above.

18  Plaintiff's counsel then requested that FedEx provide copies of the paper daily time cards

19  corresponding to the 1000 shifts in the sample.  Subsequently, defendants produced 682

20  records, out of the 1000 requested.  Defendants claimed that the other 318 not produced

21  were either destroyed, lost or missing.  485 daily time card records[3] out of the 682 produced

---

[1] Unpaid breaks are designated by task codes 13 and 14, and paid breaks are designated by task codes 28 and 29.

[2] The random sampling was taken from the population of shift data available at the time of sampling, which included all shift records provided for the period from March 1998 through February 2005.

[3] In my previous declaration I reported slightly different results based on 478 time card records identified as legible.  As a result of ongoing quality control, an additional 7 cards have been deciphered and reclassified as "legible."

**00404**

3

KNAPP, RSEN RKE

1   (485 out of 682 is 71.1%), showed legible punch in and punch out times.  452 out of these

2   485 records (93.2%) showed at least 1 minute of unpaid time.  The average unpaid time for

3   these 485 shifts was 16.51 minutes per shift.[4]

4   **Unpaid Breaks**

5        6.      By comparing the times recorded for tasks performed in the stop action data

6   with the times when unpaid breaks were taken, at least some of the cases when an

7   employee worked during an unpaid break can be identified. There are a total of 8,132,317

8   unpaid breaks designated in the task data described in paragraph 3 above during the full

9   period October 15, 1998 through November 2005 when break data is available. The stop

10  action data is available in electronic form for only part of this period, from March 2003

11  through October 2005.  During this limited period, 2,998,203 unpaid breaks were recorded.

12  During these unpaid breaks, a total of 1,774,023 stops were recorded.  These stops occurred

13  during 690,903 separate unpaid breaks.  In other words, 690,903 unpaid breaks can be

14  identified where an employee recorded a task performed during their break, in the limited

15  time period for which stop action data is available.  Appendix 1 gives a detailed table

16  breaking this information down by year and month.

17

18               Stops During Unpaid Breaks

19                  3/2003 - 10/2005

20  Total Unpaid Breaks                            2,998,203

21  Number Unpaid Breaks with Stops during Break     690,903

22  Number Stops during Unpaid Breaks              1,774,023

23

24       7.      From the data described in 3a) and 3b) there are 2,281,528 shifts of length 5

25  hours or more, but less than 8 hours. In 17.7% of these shifts there are no recorded breaks

26

---

27  [4] Additional daily time card records were produced by FedEx in early February, 2006, as a

28  result of my request for records from a second random sample of shifts, augmenting the
first random sample.  As of the time of writing this declaration I have not yet analyzed the
additional data, and results reported here are based solely on the first random sample.

KNAPP,
PETERSEN
CLARKE

4

1   taken, either paid or unpaid.  In 35.6% of these shifts there were no unpaid breaks recorded.

2   These results are shown in detail by year and month in Appendix 2.

3

4                          Unpaid Breaks During Shifts

5                       Of Length at least 5 but less than 8 hours

6                          10/1998 - 11/2005 - 10/2005

7   Number of Shifts                              2,281,528

8   Shifts with No Breaks (Paid or Unpaid)          402,778

9   Shifts with No Unpaid Breaks                    811,245

10

11       8.     There were 5,588,779 shifts of length 8 hours or more.  In 14.8% of these

12  shifts the longest unpaid break was between 1 and 59 minutes long, less than the 60

13  minutes I understand is required by state law.  These results are shown in detail by year and

14  month in Appendix 3.

15  **Split Shifts and other Unpaid Breaks**

16       9.     There are 6,828,180 unpaid breaks designated in the task data described in

17  paragraph 3 above.[5]  Among these unpaid breaks, 95.2% showed a change in odometer

18  reading during the break of 5 miles or less.  Among the 296,477 unpaid breaks of duration

19  2 hours or more, 83% of showed a change in odometer reading during the break of 5 miles

20  or less.  A detailed breakdown of change in mileage during split shifts is shown in

21  Appendix 4.

22  **Paid Breaks**

23       10.    There are a total of 9,066,332 paid breaks designated in the task data

24  described in paragraph 3 above during the full period October 15, 1998 through November

25  2005 when break data is available, and 3,301,065 paid breaks taken during the period

26  March 2003 through October 2005. During this limited period, a total of 1,295,224 stops

27

KNAPP,
 RSEN
 RKE

28  _____

[5] Unpaid breaks are identified by task codes 13 and 14.  Split shifts are defined as shifts
with an unpaid break of 2 hours or more.

were recorded during these paid breaks.  These stops occurred during 768,737 separate paid breaks.  In other words, 768,737 paid breaks can be identified where an employee recorded a task performed during their break, in the limited time period for which stop action data is available.  Appendix 1 gives a detailed table breaking this information down by year and month.

<u>Stops During Paid Breaks</u>

3/2003 - 10/2005

| | |
|---|---|
| Total Paid Breaks | 3,301,065 |
| Number Paid Breaks with Stops during Break | 768,737 |
| Number Stops during Paid Breaks | 1,295,224 |

11.     There were 1,663,660 shifts of length 4 hours or more, but less than 6 hours during the period October 1998 through November 2005.  No paid break was taken in 53.1% of these shifts.  These results are shown in detail by year and month in Appendix 5.

12.     There were 6,999,118 shifts of length 6 hours or more during the period October 1998 through November 2005. No paid break was taken in 21% of these shifts, and in 43.2% of these shifts only 1 paid break was taken.  These results are shown in detail by year and month in Appendix 6.

13.     Plaintiff's counsel has requested that I tabulate information about stops during breaks for selected employees.  This information is compiled in Appendix 7.

////
////
////
////
////
////
////

KNAPP,
PETERSEN
& CLARKE

6

K:\08000\00745\pld\165_AEJplMM.wpd

*DECLARATION OF RICHARD DROGIN*

14.    The facts set forth herein are personally known to me, and I have firsthand knowledge of same.  If called as a witness, I could and would competently testify thereto.

I make this declaration under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on February 16 , 2006, at Berkeley, California.

_Richard Drogin_

RICHARD DROGIN, Ph.D.

7

KNAPP,
PETERSEN
CLARKE

EXHIBIT 15

ORIGINAL FILE

| | |
|---|---|
| JACK FOSTER, CYNTHIA GUERRERO, GILBERT R. DIAZ, GLEN RAY BROWN, individually, and on behalf of themselves and all other similarly situated, | ) ) ) ) ) CASE NO. BC 282300 (related to BC273082) |
| | ) |
| Plaintiffs, | ) Department 36 |
| | ) ) ▮▮▮▮▮RULING ON |
| v. | ) MOTION FOR CLASS CERTIFICATION |
| | ) |
| FED EX EXPRESS et al. | ) Hearing Date:  November 30, 2004 |
| Defendants. | ) Moving Party:  Plaintiffs Jack Foster, |
| | ) Cynthia Guerrero, Gilbert R. Diaz, and Glen |
| | ) Ray Brown |
| | ) |
| | ) |

DEC 0 8 2004

LOS ANGELES
SUPERIOR COURT

Plaintiffs commenced this action against Defendants for (1) Nonpayment of Wages and (2) Unfair Business Practices, arising from Defendants allegedly failing to pay hourly nonexempt employees for work performed "off the clock."  Plaintiffs allege, inter alia, that Defendants have an "off the clock" policy of requiring nonexempt employees from being paid overtime; encouraging management to reduce the amount of hours actually expended by employees in an attempt to appear more efficient; and amending employee work records to reduce the hours reflected on those records.  Plaintiffs now move to certify the class as "All California employees of defendants paid on an hourly basis as nonexempt employees for the period of October 15, 1998, to the present."  Complaint ¶11.

Defendants argue that the lack of commonality between all of the employees should result in a finding that the class action is not a superior method of adjudication of this action. The time records with the time card gap are not indicative that such time should be compensable or for time not working, which the declarations of Defendants' employees all state that the time

1

KPC 00164

12-8

was not compensable. "There is no law against arriving at work early and having coffee...." Defendants' Post Sav-On Suppl. Briefing, 8:3. Defendants also contend that Plaintiffs failed to meet the standards required for class certification of the purported statewide class in that none of the Plaintiffs' claims can be proven by reference to any company-wide policies. Because Defendants do not dispute ascertainability, typicality, and adequacy of counsel, the Court will only focus on the requirements of commonality and superiority.

To certify a lawsuit as a class action, the Court considers the "community of interest" factors: (1) if there are predominant common questions of law or fact; (2) the class representatives have claims or defenses typical of the class; and (3) the class representatives can adequately represent the class. See Sav-On Drug Stores, Inc. v. Superior Court (2004) 34 Cal.4th 319. CCP § 382 governs class action in California and provides that "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the Court," then the class action is a superior form of adjudication that warrants class treatment. "The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class member." Sav-On Drug Store, 34 Cal.4th at 326.

On a motion for class certification, the Court does not address the legal or factual merits, but only engages in a procedural analysis of whether the above standards are met as to "whether...the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants." Id. "Reviewing courts consistently look to the allegations of the complaint and the declarations of attorneys representing the plaintiff class to resolve this question." Id. at 327.

2

00058

KPC 00165

"Significantly, wage and hour disputes (and others in the same general class) routinely proceed as class actions."  Prince v. CLS Transp., Inc. (2004) 118 Cal.App.4th 1320, 1328 (holding that it was erroneous for the trial court to sustain without leave to amend the company's demurrer at the pleading stage without first considering whether class certification is amendable to class treatment).  The Court in Prince also noted that "[o]ther courts have reached the same result in wage and hour cases."  Id. at 1328; citing as examples to Madera Police Officers Assn. v. City of Madera (1984) 36 Cal.3d 403 (class action proper for police officers seeking payment of overtime wages, an accounting, and declaratory relief); Morillion v. Royal Packing Co. (2000) 22 Cal.4th 575, 579 (class action proper for past and present agricultural employees claiming they were entitled to compensation for time spent to and from employer's fields); Bell v. Farmers Ins. Exchange (2001) 87 Cal.App.4th 805 (class action proper to recover for alleged nonpayment of overtime compensation); Parris v. Superior Court (2003) 109 Cal.App.4th 285 (class action proper by group of employees alleging violations of state wage and hour laws regarding overtime compensation).  Nevertheless, a "certification ruling not supported by substantial evidence cannot stand."  Sav-On Drug Stores, 34 Cal.4th at 328.

A.  Commonality

The central legal issue is whether Defendants' practices constitute a violation of the California wage and labor laws.  Plaintiffs assert that each putative class member has been injured in the same manner.  As a result, the following legal issues are common to all class members:  (1) whether Federal Express ("Fed-Ex") violated wage and hour laws in establishing a corporate policy of failing to pay for services of hourly employees; (2) whether Fed-Ex violated wage and hour laws in adopting a practice to arbitrarily deduct or otherwise fail to pay for time spent by nonexempt employees who performed services for Defendants; (3) whether Fed-Ex

3

00059

KPC 00166

established statewide policies requiring its employees to complete particular services within a

maximum time knowing very well that those services could not be performed in the time

allotted; (4) whether Fed-Ex is liable for penalties for willful failure to pay wages; and (5)

whether Plaintiffs are entitled to class-wide equitable relief in the form of an injunction to

prevent such wage and hour violations in the future, as well as what is the appropriate nature of

such relief.

Defendants contend that there is a complete absence of common proof that what

happened to one Fed-Ex employee on any given day, before, during, or after work, similarly

happened to other employees. Specifically, Defendants maintain that: (1) Plaintiffs' time card

evidence is not sufficient as it does not reveal what happened during the time gaps.

Individualized declaration or deposition evidence would have to be viewed to determine whether

or not an employee performed work regularly or sporadically before or after their work schedule;

(2) Fed-Ex's budgeting process and/or bonus programs do not suggest that off the clock work is

regularly or even occasionally utilized to meet budget as evidence by sworn testimony of

managers; and (3) Plaintiffs' evidence of employees scanning packages during rest breaks is

inconclusive as it does not indicate that the employees were not given a break opportunity or

whether the employee voluntarily waived to take a break. Defendants further contend that

Plaintiff Foster and his manager Eugene McDonalds' testimony support Defendants' argument,

because Mr. McDonald testified that he told Mr. Foster to take breaks during the day and Foster

confirmed this testimony. Therefore, Plaintiff's testimony illustrates the fact that individualized

inquiries will be required for each of the class members and their respective managers at least on

this issue.

In reply, Plaintiffs contend that there are still common questions of facts and law as to

4

00060

KPC 00167

begin shift time, end shift time, and split shift time: (1) as to begin shift time, employees are required to be present before the start of their schedule as evidenced by the punching of the time cards. Plaintiffs point to Defendants' opposing papers in support of their theory, as Defendants have declared that employees must punch a time clock to ensure that they are in the building before the start of their scheduled time. Moreover, the subpoenaed records of the employees that gave declarations in support of Defendants' opposition also worked an average of 57.15 minutes per day without pay; (2) as to end shift time, in regular employment situations, employees do not remain at work without compensation, though Fed-Ex employees remain at work longer than they are being paid to complete their tasks. Plaintiffs contend that this allegation constitutes a common question of fact that is provable by documentary evidence and analysis. Moreover, this off the clock work raises another common question of law—whether being required to be on the premise after the scheduled end shift time is sufficient control over the employee to constitute hours worked; and (3) as to split shift time, Plaintiffs state that a common legal question exists with respect to the employees' inability to go beyond the five-mile radius of their last drop off point, in their Fed-Ex vehicle, to effectively use the time for his or her purposes. As a result, employees testify that they typically look for ways to waste time during this period. Plaintiffs have analogized this five-mile radius restriction to the <u>Morillion v. Royal Packing Co.</u>[1] (2000) 22 Cal.4th 575 and <u>Madera Police Officers Ass'n v. City of Madera</u>[2] (1984) 36 Cal.3d 403.

---

1 In <u>Morillion</u>, the employer required the employees to meet for work each day at specified parking lots, where the employer would transport the employees to the fields where the employees actually worked. The Court found that requiring employees to spend time traveling on the employer's buses was compensable under the Industrial Welfare Commission Wage Order No. 14-80, Cal. Code Regs., tit. 8, § 11140, because they were "subject to the control of an employer" and did not also have to be "suffered or permitted to work" during this travel period.

2 In this case, the police association's lawsuit against the city alleges that the restrictions on mealtimes were so restrictive as to convert that time into hours worked and entitled the plaintiffs to overtime compensation for those

00061

KPC 00168

Plaintiffs assert that the common question applicable to all split shift employees is whether the five-mile radius restriction imposes a severe limitation on the employees ability to use time effectively for her or his purpose.  The Madera Court used the two-part test, which according to Plaintiffs, answer this question in the affirmative:  "First, are the restrictions primarily directed toward the fulfillment of the employer's requirements and policies?  Second, are the employees substantially restricted during Code 7 time, so as to be unable to attend private pursuits; to determine whether or not the police officers were able to use their meal times as their own."  Plaintiffs contend that this five-mile radius restriction is imposed for Defendants' own benefit as it facilitates the prompt delivery and pick up of packages and also reduces the wear and tear and mileage accrued on the Fed-Ex trucks.

In order to determine the issue of commonality the Court must ascertain whether there are issues common to the class as a whole sufficient in importance so that their adjudication on a class basis will benefit both the litigants and the court.  Vasquez v. Superior Court (Karp) (1971) 4 Cal.3d 800, 811.  A class may be certified when common questions of law and fact predominate over individualized questions.  As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.  In order to determine whether common questions of fact predominate the trial court must examine the issues framed by the pleadings and the law applicable to the causes of action alleged.  Hicks v. Kaufman & Broad Home Corp. (2001) 89 Cal. App. 4th 908, 916.

---

hours.  There, the Court held that such restrictions substantially limited the plaintiffs from pursuit of private and personal matters unrelated to the employer.

00062

KPC 00169

Oftentimes it is difficult to establish common questions of law and fact in potential wage and hour class actions. However, in the instant action, despite the Defendants' assertion that no company wide policies exist to support the Plaintiffs' allegations, the evidence presented by both Defendants and Plaintiffs establishes a pattern of behavior by Defendants that support a de facto policy which violates California's labor laws.

The Plaintiffs' claims allege that there are three general areas in which a common question of fact and law predominate: (1) the nonpayment of employees for off the clock services (begin shift and end shift); (2) the arbitrary deduction and/or failure to compensate employees for time worked on the Fed-Ex computer payroll system ("FAMIS"). This violation usually manifested in the form of managers inserting missed rest periods; (3) the failure to compensate split shift employees for the time off the clock in which the employees are actually under the control of Defendants.

Defendants submitted numerous declarations from their attorneys and current employees that included letters of warning or termination to managers for the unauthorized alteration of employee's time cards. Coincidentally, each of the warning letters indicate that the manager changed the employees time status to the employees detriment; thus decreasing the employees pay while increasing revenue for Fed-Ex. One such manager, Ann Mims, testified that it was not falsification to alter an employees' time record. She contended that it was expected when the employees actual time did not correspond with their scheduled work time. Ms. Mims was fired and subsequently rehired by Fed-Ex for alteration of employees' time cards. See Deposition of Ann Mims, Exhibit 33, Declaration of Andre' Jardini and Exhibit E of the Declaration of Carolyn Winstead. Ann Mims's testimony establishes Plaintiffs' claims that Defendants'

7

managers are not only capable of manipulating the employees' time records, but they in fact do so.

The evidence that managers are manipulating employees' time sheets supports a common question of fact with regard to the general issue of whether or not employees are actually paid for all of the services rendered. If a trier of fact were to conclude that improper manipulation of employees' time records occurred, then the resulting liability would apply class wide. Each non-exempt employee would be eligible for damages if their time record reflected improper alteration. However, despite the actions of the Defendants that are known, it is the unknown portions of the equation that present a slight problem for the Plaintiffs. For example, what type of evidence would the Plaintiffs have to present to contradict the time worked as listed in FAMIS? The Court need not reach the merits of whether Plaintiffs can prevail on this issue, because otherwise, the motion for class certification will be used as a mini-trial into the merits of the case. As stated above in <u>Sav-On Drug Stores</u>, <u>supra</u>, the certification of a class is essentially a procedural one.

The Court finds that it is the duty of Fed-Ex to monitor whether its employees are working during unpaid breaks. The deposition of Fed-Ex manager Rosalinda Vint reveals that Fed-Ex failed to monitor its employees break period and activities: "Q. Do you look for that at your level of management whether couriers are working through their break? A. Currently? Q. Yes. A. I don't look for it, no." Plaintiffs' Response to Defendants' Supplemental Memorandum Regarding Class Certification, 8:21-28-9:1-2.

As for the nonpayment of employees for off the clock services rendered (begin shift and end shift), both parties agree that Plaintiffs were allowed to clock in upon entering their work

8

facility and that the time card was mandatory for proof that the employee was on the premises

prior to their scheduled begin time.  The conflict arises with regard to what employees do after

they clock in—were they required to perform work or did they sit around the employee break

room, drank coffee, and otherwise did not perform any work related tasks.  Plaintiffs argue that

they prepared for their shifts by gathering necessary equipments.  Defendants argue that

Plaintiffs are free to do whatever they want to do before their actual start time.  The problem

with the begin time issue is that there is no documentation available to determine what the

employees actually did prior to the start of their individual shifts.  Nevertheless, Plaintiffs

provided a compilation of time card records for numerous employees, see Exhibits 5 et seq. of

Declaration of Andre Jardini, which indicate that many Plaintiffs regularly arrive more than 15

minutes before their scheduled start time.  See also the Deposition of Ann Mims, Exhibit 33 of

Declaration of Andre Jardini, pages 42-43.  This early arrival evidence would tend to support

the Plaintiffs' argument that the extra time is needed to prepare for the beginning of their shift,

which is a reasonable inference that the Court may draw.

　　　With regard to working past scheduled end times, the Deposition of Ann Mims, attached

as Exhibit 33 of the Declaration of Andre Jardini suggests that Defendants do not pay for work

done after the last admission on their hand held tracker.  Id., Exhibit 33, pages 43-44.  Normally,

a non-exempt employee does not stay after the end of their shift on the clock performing non-

work activities expecting to be paid.  Thus, the logical theory is that the discrepancy between the

tracker time and the time that an employee actually punches the time clock at the end of the day

establishes unpaid overtime.  See also page 20 of Ms. Mims's deposition wherein she admits that

she occasionally changed the time of an employee that returned to the office after his/her

9

scheduled end time.

With respect to the arbitrary deduction of time and/or failure to pay for time spent working on the FAMIS, the manipulation of the FAMIS is actually a hybrid of both the off the clock allegations and missed break allegations. Once again the deposition of Ann Mims (Exhibit 33 of Declaration of Andre Jardini) is helpful. Ms. Mims testified, on page 18 and page 20 of her deposition, that she would alter an employees' time records to cover for employees that started late, when employees worked past their scheduled end time, and when an employee showed large gaps in time within the day without explanation. Plaintiffs' counsel questioned Ms. Mims about an instance when an employees that she managed was documented in FAMIS as taking an unpaid hour and a half break while his Tracker also showed the delivery and pick up of packages during the same period. See exhibits 23 and 24 for the actual timecard and employee stop activity report of Kevin Mitchell and Exhibit 33, pages 71-73, and 78-86. Although Mr. Mitchell's case is just the report of one employee, it supports the Plaintiffs' allegations that they were not always paid for all of the work provided. If a trier of fact determines that Defendants arbitrarily deducted time and/or altered the FAMIS to insert unpaid breaks then liability to one employee would also apply to every employee within the class. Whether or not the employee was actually damages would be an individual issue.

Declarant Robyn King states on paragraph 8 of declaration that she "chose to spend approximately 30 minutes before my scheduled start time doing things like getting equipment ready for my peers and putting in their truck, getting signature paperwork ready, filling out pickup manifests, cleaning my truck, etc." Ms. King also makes the following statement regarding staying past her scheduled end time to work: "I have a scheduled end time each day,

00066

KPC 00173

but I am not required to record it on my time card.  I record my actual end time on my time card

and I get paid for all hours worked up to my actual end time regardless of whether I work past

my scheduled end time."  Paragraph 9 of Robyn King's Declaration.  Apparently, more than one

employees on numerous occasions appear to arrive early for work.  Mark Shem states that on

paragraph 8 "I arrive at work 10-15 minutes before my scheduled start time to get my equipment

together and perform pretrip activities.  I am not getting paid for this time…."  The Court agrees

that more fifty-four of the declarants chosen by Fed-Ex have stated that they actually worked

before the begin shift and end shift periods or during unpaid break.  Such facts are unhelpful to

Fed-Ex on this motion.

As for the failure to compensate split shift employees for the time spent off of the clock

and under the control of Defendants, the split shift employees present a commonality problem in

that some of the employees are able to enjoy their two hour or so break because they live and/or

their work facility is within a five mile radius of their last delivery stop.  Other split shift

employees have routes that are quite a distance from their home and/or reporting facility. Both

parties submitted declarations supporting their side of the argument.

If a trier of fact determined that Defendants are in control of the split shift employees whose

actions are restricted by the five-mile radius rule, then common questions of law and fact

predominate with regard to those particular class members who are forced to sit in their vehicles

during the purported break due.

Accordingly, there may be common question of fact with regard to whether or not a five

mile radius restriction places a severe limitation on the employee's ability to use the time

effectively for his or her own purpose as discussed in Madera supra.  However, a subclass

specifically describing the split shift employees that are restricted by distance and/or some other

00067

KPC 00174

event would have to be created in order to fairly adjudicate this issue as a class.

In summary, the allegation that Defendants alter employee time records on FAMIS apply to both the unpaid rest period claim and the various non-payment of wages claims as well. Common questions of law and fact should predominate if managers are arbitrarily inserting lunch periods for employees that do not take lunch when they find a gap between delivery stops, and/or managers do not pay an employee after the scheduled end time occurs whether or not the employee is finished working for the day. This improper activity results in an employee not being paid for hours worked without regard to any facts surrounding the identity of the employee. This improper practice may also result in nonpayment of overtime for employees that clock in and begin to work before their scheduled time. Ms. Mims's deposition testimony buttresses the Plaintiffs' claims since she testified that she committed the acts alleged, despite her belief she was justified or within her job description. Thus, a de facto policy of non payment of employees for all hours worked[3], does exist, and is supported by the testimony one of Defendants' managers and the numerous warning letters to other managers supplied by Defendants.

With regard to the claims for split shift pay, the policy is undisputed[4], that employees receive premium pay and a guarantee of seven hours of pay on the days that they are scheduled for split shifts. However, it appears that the route of the individual employee and the five-mile restriction is the determining factor with regard to the freedom of the employees to utilize the

---

3 Note, Ms. Mims did not state, nor was she asked, whether or not the employees whose time sheets were changed if they returned after their end shift time, were actually working the extra time that it took to return to the station or not.

4 Defendants attached a copy of the Split Shift Policy as Exhibit D of the Declaration of Carolyn Winstead. The declarations of the managers and employees supplemented the Policy with the commonly followed procedure for employees during the break period.

12

00068

KPC 00175

break period for their own benefit. Many employees declared that their personal vehicles were located far from their last stop. As a consequence, there is not enough time to retrieve their personal vehicle and enjoy their break. <u>See, e.g.,</u> the Declaration of Tracey Ferrara, describing employee Debbie Mattiello's dissatisfaction with the split shift.

B. <u>Superiority</u>

Plaintiffs contend that class adjudication is superior in this action for numerous reasons. First, certification based upon the present facts would best serve the interest of putative class members, the court system, and justice. For example, there are at least an estimated 6200 class members; however, many of the individual claims of the putative class members would not be great enough to justify the expense of individual litigation; discovery data includes consistent sworn testimony of numerous employees that support Plaintiffs' assertion that the Defendants had a company-wide policy of non-payment of wages and overtime. Plaintiffs assert that they calculate the unpaid wage damages that each putative class member would receive to be between $1,670 and $9,990.00 for the last four years. Based upon the unpaid wages, Plaintiffs aver that Defendants have realized approximately $10,354.000 to $61,380.000 in savings at the expense of their employees; thus, class adjudication will deter and redress Defendants' misconduct.

As a practical matter, Plaintiffs argue that Defendants have harassed and intimidated their employees so much, that it is unlikely that the employees would seek individual redress of their claims if the class is not certified. Employees are reticent to complain formally against management that their practices are unfair and that they are entitled to unpaid wages.

Defendants contend that class adjudication is not appropriate under the circumstances. First, Defendants' due process rights to litigate claims on the merits would be violated. Second,

13

00069

KPC 00176

the payment of even the smallest increment of additional daily pay to all of the class members for five and one half years would be extreme.  Fed-Ex submits numerous Truth-In-Lending cases to support its theory that Plaintiffs' claims would violate its due process rights.  Last, the claims of violation of the labor code with regard to forcing class members to work off the clock, forcing split shift class members to stay at their location in between shifts and that class members are encouraged to work without taking their rest periods are all false and have not been substantiated by any evidence proffered by Plaintiffs.

Plaintiffs respond to Defendants' assertions as follows:  Defendants' due process argument is based upon faulty grounds in that Defendants are relying upon Truth-In-Lending case law that concerns excessive penalties; rather than addressing Plaintiffs' claims, which are for actual damages.  The potential for an imposition of a large amount of damages is present because Fed-Ex is a large Corporation with a fairly large number of employees; thus there is no principle of due process that supports Defendants' argument against certification based upon the amount of damages that may be owed.  Moreover, Defendants Truth-In-Lending authority is inapplicable to the instant wage and hour facts.

Because the Court has already found that the element of commonality is met, the Court is inclined to GRANT Plaintiffs' motion to certify the class.

The superiority criterion is manifest in the determination that a class action brought under CCP §382 would produce substantial benefits to the litigants and the judicial system.  Schneider v. Vennard (1986) 183 Cal. App. 3d 1340, 1347.  The court should evaluate whether the proposed class suit is the only effective way to halt and redress the alleged wrongdoing, or to prevent unjust advantage to defendant.  Linder v. Thrifty Oil Co. (2000) 23 Cal. 4th 429, 446.

14

The trial court must consider both the benefits, which a class action would yield and any unfairness to either absent class members or to the defendant, which might result from litigation of the underlying, claims through aggregate procedures rather than through separate trials. This inquiry requires a court to determine the consequences not only of a common trial of questions of liability, but also of the use of techniques like fluid recovery which might be necessary if the benefits of class litigation are to be realized. Blue Chip Stamps v. Superior Court (1976) 18 Cal.3d 382, 389.

As discussed above, this certification motion depends on the outcome of the commonality element. Defendants have not disputed that the other elements are met. Based upon the discussion under the commonality element, liability under each of the Plaintiffs' claims has the potential to be established based upon common proof, whether or not the Defendants participated in the improper behavior that was alleged by Plaintiffs. If the Defendants arbitrarily changed the time on one time card for any reason against company policy, and/or did not pay one employee for services rendered, or continually did not pay split shift employees that were restricted to their vehicles for an extended period of time, then Defendants would be liable to all of the non-exempt, eligible employees that were employed during the class period without any further inquiry or individualized proof. The only obstacle for some putative class members would be exact proof of their damages. Based upon the above analysis, class adjudication would produce substantial benefits to the litigants and the judicial system. The litigants would benefit from the class adjudication, as it will ensure that all claims, regardless of the size, will be redressed and the judicial system will benefit presently and in the future by promoting judicial economy within one action rather than several thousands of separate lawsuits as a result

15

enjoining Defendants from future violation of the California Labor Code. As an additional concern, other companies may change their patterns of practice and/or de facto policies to avoid similar lawsuits. As stated by the Court in Prince, "[c]onsolidation in a class action thereby creates substantial benefits for both the parties and the courts in that class action disposition averts the unnecessary risks of numerous and repetitive administrative and judicial proceedings with the attendant possibility of inconsistent adjudication." Prince v. CLS Transp. (2004) 118 Cal.App.4th 1320, 1328.

C.  Objections

Trial courts have great discretion in deciding whether to grant or deny certification. Nevertheless, the denial of certification to an entire class is an appealable order, but in the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed unless (1) improper criteria were used... or (2) erroneous legal assumptions were made...In accordance with Linder v. Thrifty Oil Co. (2000) 23 Cal.4th 429, 435-436, "...Any valid pertinent reason stated will be sufficient to uphold the order." All objections are overruled.

As previously stated, wages and hour cases routinely proceed as class actions. Prince, 118 Cal.App.4th at 1328. "Other courts have reached the same result in wage and hour cases." Id.; citing to Madera Police Officers Assn. v. City of Madera (1984) 36 Cal.3d 403; Morillion v. Royal Packing Co. (2000) 22 Cal.4th 575, 579; Bell v. Farmers Ins. Exchange (2001) 87 Cal.App.4th 805; Parris v. Superior Court (2003) 109 Cal.App.4th 285. Based on the analysis above, the Court finds that there is substantial evidence for Plaintiffs to have the case proceed as a class action. The Sav-On Drug Store case is helpful to the Plaintiffs' motion.

D.  Oral Testimony

16

**00072**

KPC 00179

CRC 1854(d) provides that "[e]vidence to be considered at the hearing must be presented in accordance with rule 323." Rule 323(a) provides that "[e]vidence received at a law and motion hearing <u>must be</u> by declaration, affidavit, or request for judicial notice without testimony or cross-examination, except as allowed in the court's discretion for good cause shown." (emphasis added). Fed-Ex states that "whether or not Judge Deason's decision regarding live testimony was an order at all is irrelevant." Reply Brief of Fed-Ex's Application for Oral Testimony at Class Certification Hearing, 2:12-13. The Court disagrees. It is not irrelevant that Judge Deason has previously addressed this issue of oral testimony. The Court is not inclined to reconsider what Judge Deason has previously found with regards to live testimony. Moreover, the Court does not find good cause for why oral testimony is necessary, given that such in depth presentation of the facts have already been discussed and Fed-Ex could have presented an even more lengthier declaration or affidavit from such persons.

The general rule is that the evidence must be presented in the form of declarations, affidavits, or requests for judicial notice. More than sufficient evidence have been presented on the issue of whether or not to certify the class or that the case is suitable for class treatment. Fed-Ex's application for oral testimony of Delfin Hernandez, Brian Brown, Angel Neiblas (Group One); Glen Ray Brown, Jack Foster, Gilbert Diaz, and Cynthia Guerrero (Group Two); Ronald J. Carlson, Eugene McDonald, Vincent Cioffi, and Marcus Pena (Group Three) must be DENIED.

Conclusion

Plaintiffs' motion to certify the class is GRANTED. Accordingly, Defendants' cross motion is DENIED. The Class Action Order must comply with CRC 1855 and 1856. The Court is modifying the class as proposed by Plaintiff to also include a subclass relative to the split shift

00073

KPC 00180

employees being required to remain within a five-mile radius.  Accordingly, the Court is ordering that Plaintiffs submit a revised proposed order taking into account the Court's ruling on each element of class certification, as well as attaching class notices to the order, and redefining the class and subclass of split shift employees.


DATED:   November 30, 2004

GREGORY W. ALARCON
SUPERIOR COURT JUDGE

18

00074

KPC 00181

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 12/08/04 | DEPT. 36 |
| HONORABLE GREGORY W. ALARCON        JUDGE | L. WALKER        DEPUTY CLERK |
| HONORABLE                      JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| Deputy Sheriff | NONE        Reporter |

| | | |
|---|---|---|
| 9:00 am | BC282300 | Plaintiff<br>Counsel |
| | JACK FOSTER<br>VS<br>FED EX EXPRESS | Defendant<br>Counsel |
| | RELATED TO BC273082 | |

NATURE OF PROCEEDINGS:

RULING ON SUBMITTED MATTER

In the Matter heretofore taken under submission by the Court on December 1, 2004, the Court now makes its decision and ruling as set forth in the Court's RULING ON MOTION FOR CLASS CERTIFICATION filed herein this date.

A copy of the RULING ON MOTION FOR CLASS CERTIFICATION is sent to counsel as noted below via U.S. Mail this date.

Plaintiffs' Motion to Certify the Class is GRANTED. Accordingly, Defendants' cross motion is DENIED.

The Class Action Order must comply with California Rules of Court 1855 and 1856. The Court is modifying the class as proposed by Plaintiffs to also include a subclass relative to the split shift employees being required to remain within a five-mile radius. Accordingly, the Court is ordering that Plaintiffs submit a revissed proposed order taking into account the Court's ruling on each element of class certification, as well as attaching class notices to the order, and redefining the class and subclass of split shift employees.

Page    1 of  3    DEPT. 36

MINUTES ENTERED
12/08/04
COUNTY CLERK

00075

KPC 00182        12-8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| DATE: 12/08/04 | | DEPT. 36 |
|---|---|---|
| HONORABLE GREGORY W. ALARCON    JUDGE | L. WALKER | DEPUTY CLERK |
| HONORABLE    JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| Deputy Sheriff | NONE | Reporter |

| 9:00 am | BC282300 | Plaintiff |
|---|---|---|
| | | Counsel |
| | JACK FOSTER | |
| | VS | Defendant |
| | FED EX EXPRESS | Counsel |
| | | |
| | RELATED TO BC273082 | |

**NATURE OF PROCEEDINGS:**

CLERK'S CERTIFICATE OF MAILING/
NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served Notice of Entry of the above minute order of 12/08/04  upon each party or counsel named below by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original entered herein in a separate sealed envelope for each, addressed as shown below with the postage thereon fully prepaid.

Date: December 8, 2004

John A. Clarke, Executive Officer/Clerk

By: _____
        L. WALKER

KNAPP PETERSEN & CLARKE
Andre E. Jardini
Gwen Freeman
500 N. Brand Blvd., 20th Floor
Glendale, CA 91203-1904

Page   2 of  3    DEPT. 36

| MINUTES ENTERED |
|---|
| 12/08/04 |
| COUNTY CLERK |

00076

KPC 00183

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| DATE: 12/08/04 | | DEPT. 36 |
| HONORABLE GREGORY W. ALARCON | JUDGE   L. WALKER | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| | Deputy Sheriff   NONE | Reporter |

| 9:00 am | BC282300 | Plaintiff Counsel |
|---|---|---|
| | JACK FOSTER VS FED EX EXPRESS | Defendant Counsel |
| | RELATED TO BC273082 | |

NATURE OF PROCEEDINGS:

LAW OFFICE OF MICHAEL S. DUBERCHIN
4768 Park Granada, Suite 212
Calabasas, CA 91302

GLEN R. BREGMAN
16633 Ventura Blvd., Suite 1200
Encino, CA 91436-1809

LITTLER MENDELSON
Keith A. Jacoby
2049 Century Park East, 5th Floor
Los Angeles, CA 90067-3107

Page   3 of   3   DEPT. 36

MINUTES ENTERED
12/08/04
COUNTY CLERK

KPC 00184

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was sent, as indicated, this 17th day of September, 2007 to:

Sandra C. Isom, Esq.
Richard S. McConnell, Esq.
FEDERAL EXPRESS CORPORATION
3620 Hacks Cross Road, Bldg. B, 3rd Floor
Memphis, Tennessee 38125
Tel: (901) 434-8600
Fax: (901) 434-9271
Email:  scisom@fedex.com;
        msmelton@fedex.com
(Via Federal Express)

Aaron Reed, Esq.
LITTLER MENDELSON, P.C.
One Biscayne Tower, Suite 1500
2 South Biscayne Blvd.
Miami, Florida, 33131
Tel: (305) 400-7500
Fax: (305) 603-2552
Email:  richard.mcconnell@fedex.com
        lplangbein@fedex.com
(Via Federal Express)

Attorneys for Defendant, Federal Express Corporation

By: _____

Michael S. Duberchin
LAW OFFICES OF MICHAEL
  S. DUBERCHIN
500 North Brand Boulevard, 20th Floor
Glendale, CA 91302
Telephone  (818) 222-7484
Facsimile:  (818) 222-7480
Email:  msdlaw@earthlink.net
(Via U.S. Mail)

Andre E. Jardini, Esq.
Gwen Freeman, Esq.
KNAPP, PETERSEN & CLARKE
500 North Brand Boulevard, 20th Floor
Glendale, CA 91203-1904
Telephone:  (818) 547-5000
Facsimile:  (818) 547-5319
Email:  aej@kpclegal.com
Email:  gf@kpclegal.com

Glen Robert Bregman
LAW OFFICES OF
ROBERT BREGMAN
16633 Ventura Blvd., Ste. 1240
Encino, CA 91436
Tel: (818) 981-9793
Fax: (818) 981-9807
Email:  glenbregmanlaw@aol.com
(Via U.S. Mail)

Marshall Dore Louis
SINCLAIR, LOUIS, HEATH, NUSSBAUM &
ZAVERTNIK, P.A.
169 East Flagler Street, Suite 1125
Miami, Florida 33131
Tel: (305) 374-0544
Fax: (305) 381-6869
Email:  mdl@sinclairlouis.com
(Via U.S. Mail)

Attorneys for Plaintiffs Ronald Clausnitzer, Anthony W. Bost, Gerald Freeman, Patricia
Kennedy, James Marciano, Fred Ortiz, Sandra Tims, and Elizabeth Tucker,
and others similarly situated

-50-

KPC 00185

537580.1  08000/00822

EXHIBIT 16

1     IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF FLORIDA

2

3  RONALD CLAUSNITZER, ANTHONY W. BOST,
   GERALD FREEMAN, PATRICIA KENNEDY, JAMES
   MARCIANO, FRED ORTIZ, SANDRA TIMS and

4  ELIZABETH TUCKER,

5                       **CERTIFIED COPY**

      PLAINTIFFS,

6

  Vs.            ACTION NO: 06-21451-CIV

7                    Altonaga/Turnoff

8  FEDERAL EXPRESS CORPORATION,

9

      DEFENDANT.

10

11     THE DEPOSITION OF JOHN CHISUM
           MAY 9th, 2007

12

13       A P P E A R A N C E S

14  FOR THE PLAINTIFF:    MR. ANDRE JARDINI
                   KNAPP, PETERSEN &

15                   CLARKE
                   500 N Brand Blvd.

16                   12th Flr.
                   Glendale, CA

17                   91203-1904

18  FOR THE DEFENDANT:    MS. SANDRA ISOM
                   FEDERAL EXPRESS

19                   3620 Hacks Cross Rd.
                   Bldg. B

20                   Memphis, Tn 38125

21

  COURT REPORTER   :   HELEN WALLER DEAL

22

  ATKINSON-BAKER, INC.

23  COURT REPORTERS
   (800) 288-3376

24  www.depo.com

25  FILE NO.:  A103DEB

KPC 00186

1      A.    C-h-i-s-u-m.

2      Q.    And Mr. Chisum, by whom are you

3    employed?

4      A.    Federal Express.

5      Q.    And would that be Fed Ex Express?

6      A.    Yes.  And Express Business System

7    is the department.

8      Q.    Okay.  And what is your job

9    position?

10     A.    I'm a project administrator.

11     Q.    In what department?

12     A.    Systems, business systems analyst

13   in Express Business System.

14     Q.    Express Business Systems.  And

15   what is the function of Express Business

16   Systems as you understand it?

17     A.    We support primarily our

18   operations department with various

19   projects and applications that we, you

20   know -- involved in the maintenance of the

21   aircraft and operation of the aircraft.

22     Q.    How long have you had the

23   position you currently have as project

24   administrator?

25     A.    About nine years.

1       A.   Yes.

2       Q.   And which employees use the

3  Medior system as far as you know?

4       A.   The ones I just mentioned, the

5  aircraft maintenance mechanics.

6       Q.   Anybody else?

7       A.   And there's some warehouse clerks

8  that use, a small number of them as well,

9  but all within the maintenance operations

10 department.

11      Q.   Okay.   These aircraft mechanics

12 and warehouse clerks, are they also

13 employed by Fed Ex Express?

14      A.   Yes.

15      Q.   Are they part of AGFS or DGO?

16      A.   No.

17      Q.   What acronym would you apply or

18 initials would you apply to the mechanics

19 and warehouse clerks?

20      A.   Air operations, AOD is normally

21 what we would call them.

22      Q.   AOD?

23      A.   Right.

24      Q.   And AOD is airline operations?

25      A.   Right.   Air operations department

1     Q.   Okay.

2     A.   Lunch, they use an off the clock,

3   thirty minutes of time when they take

4   their lunch, but --

5     Q.   Okay.  So the meal break is an

6   unpaid period, correct?

7     A.   Right.

8     Q.   And how is the meal break

9   recorded in the Medior System, if at all?

10     A.   If they do nothing, there's a

11   meal built into their schedule.  The

12   schedules I was describing before has a,

13   you know, start and an end time of the

14   shift and then it says when the lunch

15   would occur.  If they do nothing at all,

16   at the time clock I mean, if they do

17   nothing, it's gonna insert this auto lunch

18   in the middle of their shift, so you've

19   got an eight and a half hour long shift

20   which is only gonna pay eight hours

21   because it's assumed you took a thirty

22   minute break.

23     Q.   Is the auto lunch a half and

24   hour?

25     A.   Yes.

KPC 00189

1    Q.   Okay.   And is that the same
2  everywhere?

3    A.   Yes.

4    Q.   What if a person doesn't take
5  their lunch, is there something they can
6  do?

7    A.   They can start -- Just like
8  clocking in and clocking out, there's
9  buttons on the time clock where they can
10  start their meal and stop their meal if
11  they don't take it at that mid point in
12  time.

13    Q.   Are the employees that we've been
14  talking about expected to do that, say the
15  exact time that they start and stop their
16  meal?

17    A.   Yes.   Well, again, if it doesn't,
18  if they're not taking at the midpoint they
19  should document when they did actually
20  take it.

21    Q.   And if -- What if they don't take
22  a lunch at all, is there a way to override
23  the auto lunch?

24    A.   The manager can do that manually
25  and the employee would submit an exception

KPC 00190

1    for normally saying that I didn't take my

2    lunch today so, you know, pay me as if I

3    worked straight through and the manager

4    would delete that lunch record from the

5    time card and put a work record in its

6    place showing that he worked through

7    lunch.

8         Q.   That requires a manual change --

9         A.   Right.

10        Q.   -- by the manager after the

11   employee submits a form.

12        A.   Right.

13        Q.   Are there any other procedures

14   having to do with the unpaid meal break

15   other than you've talked about, auto

16   lunch, the starting and stopping buttons

17   for this form, that can have the manager

18   manually change the records if no lunch

19   was taken?

20        A.   The only thing I can think of is

21   the -- if the -- They have a policy in

22   their employee handbook, the mechanics do,

23   that says if they don't get to take their

24   lunch within plus or minus one hour mid

25   point of the shift that they get paid for

KPC 00191

EXHIBIT 17

1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE SOUTHERN DISTRICT OF FLORIDA

3   RONALD CLAUSNITZER, ANTHONY W. BOST,
    GERALD FREEMAN, PATRICIA KENNEDY, JAMES
4   MARCIANO, FRED ORTIZ, SANDRA TIMS and
    ELIZABETH TUCKER,

5                          **CERTIFIED COPY**

6        PLAINTIFFS,

7   Vs.                    ACTION NO: 06-21451-CIV
                                Altonaga/Turnoff
8
    FEDERAL EXPRESS CORPORATION,
9

10       DEFENDANT.

11

12

13

14        THE DEPOSITION OF SEAN HEALY

15          MEMPHIS, TENNESSEE

16            MAY 8, 2007

17

18

19

20

21
    ATKINSON-BAKER, INC.
22  COURT REPORTERS
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:  HELEN WALLER DEAL

25  FILE NO.:  A103DEA

1    Q.   Any other change that happened in
2   April as you recall?
3    A.   Those were the -- In regards to
4   punch-in and punch-out, those were the big
5   changes.
6    Q.   You've used check-in, clock-in
7   and I've used punch-in and I want to, I
8   want to make sure we're using terminology
9   that later we'll be able to understand.
10   When you say clock-in that's punching in
11   on the physical time clock, correct?
12    A.   That's correct.
13    Q.   And what about check-in/
14   check-out, is check-in punching in on the
15   physical time card?
16    A.   No, I'm sorry, that's getting
17   equipment.
18    Q.   Okay.  So as -- And you've talked
19   about couriers, but this procedure would
20   apply to all hourly employees except those
21   categories you're not talking about,
22   correct?
23    A.   That is correct.
24    Q.   And some of them don't get
25   equipment like service agents for

00653

KPC 00193

1   processes.

2        Q.   Well, let me address kind of a

3   distinction before and after April of

4   2006.  Before April of 2006 were Fed Ex

5   employees paid from the time they punched

6   in?

7        A.   Not with the physical time clock,

8   no.  It was based on their scheduled start

9   time.

10        Q.   And after April, 2006 employees

11   of Fed Ex nationwide were in fact paid

12   from the time they punched in, correct?

13        A.   That's correct.

14        Q.   And that was one of the changes

15   made in April '06, correct?

16        A.   That's correct.

17        Q.   Okay.  Before April of 2006 how

18   were employees paid on a nationwide basis?

19   That is, what was the starting time that

20   started to record the hours for which they

21   would be paid?

22        A.   That would be their scheduled

23   start time.

24        Q.   As opposed to their actual start

25   time?

00654

KPC 00194