1  André E. Jardini, Bar No. 71335
   aej@kpclegal.com
2  KNAPP, PETERSEN & CLARKE
   550 North Brand Boulevard, Suite 1500
3  Glendale, California 91203-1922
   Telephone: (818) 547-5000
4  Facsimile: (818) 547-5329

5  Glen Robert Bregman, Bar No. 100363
   glenbregmanlaw@aol.com
6  LAW OFFICES OF GLEN ROBERT BREGMAN
   16633 Ventura Boulevard, Suite 1000
7  Encino, CA 91436
   Telephone: (818) 981-9793
8  Facsimile: (818) 981-9807

9  Michael S. Duberchin, Bar No. 108338
   msdlaw@earthlink.net
10 LAW OFFICES OF MICHAEL S. DUBERCHIN
   P. O. Box 8806
11 Calabasas, CA 91372
   TEL: (818) 246-8487 ; (818) 222-7484
12 FAX: (818) 246-6277

13 Attorneys for Plaintiffs
   DANIEL FORRAND, ARA KARAMIAN,
14 YVETTE GREEN and EUGENE COLON, on
   behalf of themselves, and all others similarly
15 situated

16                UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18

| 19 | DANIEL FORRAND, ARA KARAMIAN, YVETTE GREEN and EUGENE COLON, on behalf of themselves, and all others similarly situated, | ) | NO.  CV08-1360 DSF (PJWx) |
|---|---|---|---|
| 20 | | ) | Date:                        April 15, 2013 |
| 21 | | ) | Time:                        1:30 p.m.<br>Ctrm:                            840 |
| 22 | Plaintiff,<br>        v. | ) | Judge:     The Hon. Dale S. Fischer |
| 23 | FEDERAL EXPRESS CORPORATION, | ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |
| 24 | Defendant. | ) | |
| 25 | | ) | [Filed Concurrently with Plaintiffs' Notice of Motion and Motion for Class Certification and Declarations of André E. Jardini and Yvette Green] |
| 26 | | ) | |
| 27 | | ) | |
| 28 | | | |

KNAPP,
PETERSEN
& CLARKE

1618045.1  08000/00863

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

I.     INTRODUCTION ...................................................................... 2

II.    PROCEDURAL HISTORY ......................................................... 3

    A.     Yvette Green Is A Proper Class Representative ...................... 4

    B.     FedEx Must Pay Its Employees For All Hours Worked, Which Includes All Time Spent Under An Employer's Control...................................................................................... 4

    C.     The *Foster* Data Is Relevant To Show That FedEx Has Access To Data Serving As Common Proof To Common Class Wide Claims ................................................................. 6

III.   FEDEX IS REQUIRED TO PAY FOR ALL HOURS WORKED ................ 6

    A.     FedEx Is Required To Pay For All Time Employees Spend On-The-Clock ......................................................................... 6

        1.     The Class Members are Under FedEx Control From Clock In to Clock Out ................................................... 8

        2.     Hours Worked Can Include Unproductive time ............ 9

        3.     FedEx Had Ultimate Control Over when the Employees Clocked In and Out ...................................... 9

        4.     FedEx Employees Are Not Permitted to Leave Once They Clock In ........................................................ 10

    B.     FedEx Is Required To Pay For All Time Spent Working, Even During Unpaid Meal Periods ......................................... 10

IV.    PLAINTIFF PRESENTS SIGNIFICANT, INDISPUTABLE COMMON PROOF CONCERNING FEDEX'S FAILURE TO PAY ALL WAGES OWED ......................................................... 11

    A.     The Unpaid On-The-Clock Class Was Routinely Denied Pay For Time Worked ........................................................... 12

    B.     The Working Unpaid Breaks Class Was Routinely Denied Pay For Time Spent Working During Unpaid Breaks ................. 14

V.     ALL REQUIREMENTS OF RULE 23(a) ARE SATISFIED ...................... 16

    A.     Numerosity .......................................................................... 16

    B.     Commonality........................................................................ 16

    C.     Typicality ............................................................................ 19

-i-

KNAPP,
PETERSEN
& CLARKE

1

## TABLE OF CONTENTS (cont.)

2
Page

3    D.    Adequacy..................................................................................20

4 VI.   RULE 23(b) IS SATISFIED ...............................................................20

5    A.    This Court Should Properly Certify The Unpaid On-the-
            clock Class of Employees Who Were Not Paid for Begin-
6          Shift Time and End-Shift Time...............................................23

7    B.    This Court Should Properly Certify An Unpaid Meal Break
            Class of Employees Who Worked During Meal Breaks .....................25
8
   VII.  CONCLUSION ................................................................................26
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**KNAPP,**   27
**PETERSEN**
**& CLARKE**  28

1618045.1   08000/00863

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguilar v. Association for Retarded Citizens,*
   234 Cal.App.3d 21 (1991) ..................................................................... 9

*Armour v. Wantock,*
   323 U.S. 126 (1944) ....................................................................... 24, 25

*Brinker Restaurant Corp. v. Superior Court,*
   53 Cal.4th 1004 (2012)................................................. 10, 11, 18, 25, 26

*Ciciaros v. Summit Logistics, Inc.,*
   133 Cal. App. 4th 949 (2005)............................................................... 11

*Crawford v. Honig,*
   37 F.3d 485 (9th Cir. 1994)................................................................. 20

*Epstein v. MCA, Inc.,*
   50 F.3d 644 (9th Cir. 1995)................................................................. 23

*Forrand v. Fed. Exp. Corp.,*
   401 F. App'x 198 (9th Cir. 2010)...................................... 4, 6, 12, 20, 24

*Foster v. Federal Express Corp,*
   Los Angeles Superior Court Case No. BC282300 ............... 2, 3, 9, 10, 14, 15, 23

*Gen Tel. Co. of the Southwest v. Falcon,*
   457 U.S. 147 (1982) ........................................................................... 19

*Gentry v. C & D Oil Co.,*
   102 F.R.D. 490 (W.D. Ark. 1984)........................................................ 19

*Haley v. Medtronic, Inc.,*
   169 F.R.D. 643 (C.D. Cal. 1996) ........................................................ 16

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998)........................................................ 17, 19

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992)............................................................... 19

1618045.1  08000/00863

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

*In re Activision Sec. Litg.,*
   621 F. Supp. 415 (N.D. Cal. 1985) ................................................................. 20

*In re Amerifirst Sec. Litg.,*
   139 F.R.D. 423 (S.D. Fla. 1991) ................................................................... 19

*In re Itel Sec. Litg.,*
   89 F.R.D. 104 (N.D. Cal. 1981) ................................................................... 16

*In re Paxil Litig,*
   212 F.R.D. 539 (C.D. Cal. 2003) ................................................................. 16

*Jaimez v. Daiohs USA, Inc.,*
   181 Cal. App. 4th 1286 (2010) ............................................................. 25, 26

*Kamar v. Radio Shack Corp.,*
   254 F.R.D. 387 (C.D. Cal. 2008) ................................................................. 16

*Mayfield v. Dalton,*
   109 F.3d 1423 (9th Cir. 1997). No ............................................................... 20

*Morillion v. Royal Packing Co.,*
   22 Cal.4th 575, 94 Cal.Rptr.2d 3, 995 P.2d 139 (2000) ....................... 6, 7, 9, 18

*Patrykus v. Gomilla,*
   121 F.R.D. 357 (N.D. Ill. 1988) ................................................................... 19

*Seidman v. American Mobile Systems, Inc.,*
   157 F.R.D. 354 (E.D. Pa. 1994) ................................................................. 19

*Smilow v. Southwestern Bell Mobile Systems, Inc.,*
   323 F.3d 32 (1st Cir. 2003) ......................................................................... 22

*Staton v. Boeing Co.,*
   313 F.3d 447 (9th Cir. 2002) ....................................................................... 17

**STATUTES**

Cal. Code Regs.
   tit. 8, § 11040 ............................................................................................... 7
   tit. 8, § 11140, subd. 2(G) ............................................................................ 6

1618045.1  08000/00863

1

## <u>TABLE OF AUTHORITIES (cont.)</u>

2
<u>Page(s)</u>

3
**MISCELLANEOUS**

4
I Newburg on Class Actions § 3.5 (4th ed. 2004) ..................................................... 16

5

6
Los Angeles Times, January 29, 2013, article
   "Chino warehouse is fined for alleged overtime violations" ............................... 7

7
Moore's Federal Practice, 3d ed. Vol 5, Class Actions
8
   section 23.23[3] ................................................................................................. 19
   section 23.24[5] ................................................................................................. 20
9
   section 23.45[1] ................................................................................................. 21
10
   section 23.45[2][a] ............................................................................................ 22
   section 23.46[2][d] ............................................................................................ 23
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1618045.1 08000/00863

# I. INTRODUCTION

1
2      This case is brought on behalf of a proposed class of employees of defendant
3  Federal Express Corporation ("FedEx") who claim that FedEx has not paid them for
4  all the time they spent working.  The nature of FedEx's business requires that FedEx
5  keep meticulous records concerning the location of millions of packages around the
6  world at any given moment in time, such that packages can be continuously tracked
7  from drop-off to delivery with precision.  This accuracy is critical to FedEx's
8  business model and is achieved by scanning packages at each point during transit.
9  FedEx employees scan those packages when they are working, and the scan records
10  reveal, when compared to the employees' time clock records, that FedEx has not paid
11  its employees for all the time they spent working.

12      This underpayment of wages happens in two ways:

13      1.      FedEx had a policy and practice of paying employees from their
14  scheduled start time to their scheduled end time, despite the fact that it was necessary
15  for employees to clock in and start working 10-20 minutes before their scheduled
16  start time.  This practice was pervasive at FedEx until it was changed in April of
17  2006 subsequent to a class-wide settlement in *Foster v. Federal Express Corp*, Los
18  Angeles Superior Court Case No. BC282300 (*"Foster"*), wherein FedEx paid a
19  <u>certified </u>class of couriers using the same scanning and time clock devices, and
20  subject to the same employment practices, $30 million dollars in unpaid wages.  In
21  short, before April of 2006, FedEx did not pay its employees from the time they
22  punched in to work until they punched out. (Carlson Depo. 27:22-28:25, 31:22-33:1,
23  47:18-20, attached as exh. 13 to Declaration of André E. Jardini , "Jardini Dec.,"
24  Healy Depo. 27:2-23, exh. 15 to Jardini Dec. )

25      2.      FedEx had a policy and practice of failing to pay for services rendered
26  during unpaid meal breaks.  Acknowledging this failure, in February 2007, FedEx
27  modified their scanning equipment programs to prevent employees from performing
28  scans during their meal breaks, and on June 30, 2007, FedEx began to automatically

KNAPP,
PETERSEN
& CLARKE

-2-

1    pay for all meal break time if any scan appeared in the unpaid meal break period.

2    (Declaration of André E. Jardini (Jardini Dec. ¶ 18, exh. 17.) Prior to this time,

3    employees that worked (i.e. scanned packages) during their unpaid meal periods

4    were not paid for that work, despite the fact that FedEx knew, electronically, and

5    indisputably, that such work was being performed.

6    Accordingly, Plaintiff Yvette Green, on behalf of herself and all others

7    similarly situated, seeks to certify the following classes:

8    For employees, who were denied pay for on-the-clock but off-shift time spent

9    under the control of FedEx, an "Unpaid On-the-clock Class" class is defined as

10   follows:

11   All California hourly, non-exempt employees of FedEx who utilize the

12   FAMIS timekeeping system (except couriers, courier/handlers and customer

13   service representatives excluded under *Foster v. FedEx*) who were paid from

14   their scheduled start time to their scheduled end time instead of from clock-in

15   to clock-out from September 11, 2003 to April 1, 2006[1]. ("Unpaid On-the-

16   clock Class")

17   For employees who were denied pay for off-the-clock time spent working, a

18   "Working Meal Break Class" is defined as follows:

19   All hourly, non-exempt employees of FedEx who utilize the FAMIS

20   timekeeping system with job codes beginning with "R" and "F" who have

21   worked during their unpaid meal break from September 11, 2003 to June 30,

22   2007 ("Working Meal Break Class").

23   **II. PROCEDURAL HISTORY**

24   The complaint herein was filed on September 11, 2007.  A first amended

25

26   [1] Employees in this class are easily identified.  Based on discovery to date, FedEx
     has disclosed that the employees in the Unpaid On-the-clock Class generally have
27   job codes beginning with "R" and "F." (Mullady Depo. 27:9-16, 28:3-29:6 Jardini
     Decl. exh. 14; *see also* Jardini Dec. exh. 5-6.)

KNAPP,
PETERSEN
& CLARKE    28

-3-

1  complaint was filed October 31, 2007, which sets forth causes of action for

2  nonpayment of wages and unfair business practices. This Court denied plaintiff's

3  previous motion for class certification on February 18, 2009, and dismissed the case

4  for lack of subject matter jurisdiction on March 30, 2009. Plaintiff appealed on April

5  9, 2009, and a decision was issued January 13, 2011, affirming in part, staying in

6  part, reversing in part, and remanding in part, this Court's order on class certification.

7      The Ninth Circuit determined that this Court should consider class treatment

8  anew and that data developed in the *Foster* case should be considered.

9  **A.  Yvette Green Is A Proper Class Representative**

10     The Ninth Circuit determined that Yvette Green could not be excluded as a

11 class representative as she worked for defendants as a "handler" which is a distinct

12 job title from "courier/handler," who are expressly excluded from this action.[2]

13 (Mullady Depo. 23:7-25:10, exh. 14 to Jardini Dec.) The court affirmed this Court's

14 exclusion of Plaintiffs Forrand and Colon as class representatives. *Forrand v. Fed.*

15 *Exp. Corp.*, 401 F. App'x 198, 199 (9th Cir. 2010) (Attached as exh. 7 to Jardini Dec

16 for the Court's convenience.)  Accordingly, plaintiff seeks only to appoint Yvette

17 Green as the class representative herein.

18 **B.  FedEx Must Pay Its Employees For All Hours Worked, Which Includes**

19    **All Time Spent Under An Employer's Control**

20     The Ninth Circuit clarified the appropriate "standard for determining when

21 employee time should be compensated as "hours worked" under California law."

22 *Forrand,* 401 F. App'x at199-200 *citing Rutti v. Lojack Corp., Inc.,* 596 F.3d 1046,

23 1061–62 (9th Cir.2010) (separate opinion by Silverman, J.).

24

---

25 [2] Couriers, courier/handlers, and customer service representatives are expressly
excluded from this class as they resolved their claims in connection with the *Foster*
26 settlement. The *Foster* case was extensively litigated and involved the same
employment practices, employee scanning and timekeeping systems, which yielded
27 voluminous discovery and exhaustive expert analysis, wherein the employees were
also represented by Plaintiff's counsel herein.

28

KNAPP,
PETERSEN
& CLARKE

-4-

The Ninth Circuit explained:

> As enunciated in *Rutti*, "Under California law it is the level of the employer's control over its employees that is determinative." *Id.* at 1062 (internal quotation marks removed); *see also Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 578, 94 Cal.Rptr.2d 3, 995 P.2d 139 (2000) (interpreting DLSE's "hours worked" definition and holding that employee can be under an employer's control even when the employee is not "suffered or permitted to work"); *Bono Enters., Inc. v. Bradshaw*, 32 Cal.App.4th 968, 975, 38 Cal.Rptr.2d 549 (1995) (determining that "[w]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control"), *disapproved on other grounds by Tidewater Marine W., Inc. v. Bradshaw*, 14 Cal.4th 557, 59 Cal.Rptr.2d 186, 927 P.2d 296 (1996).

The Ninth Circuit directs that this standard must be applied "to determine whether the level of FedEx's control over employees within the proposed general class when they are on-the-clock but off-shift is sufficient to render the on-the-clock but off-shift time compensable under California law, first, in determining whether Rule 23 certification is proper and, subsequently, in deciding the merits." *Id.*

Plaintiff now seeks to certify a class of employees who were denied pay for on-the-clock but off-shift time spent under the control of FedEx. Plaintiff further seeks to certify a class of employees who were denied pay for off-the-clock time spent working, as is readily verified by electronic data.

KNAPP,
PETERSEN
& CLARKE

-5-

1618045.1  08000/00863

**C.    The _Foster_ Data Is Relevant To Show That FedEx Has Access To Data Serving As Common Proof To Common Class Wide Claims**

The Ninth Circuit determined that "the existence of the _Foster_ data is relevant merely because it is evidence that FedEx has access to the kind of data at issue in this case." _Forrand_, 401 F. App'x at 200.  Plaintiff does not seek to use the _Foster_ data to calculate damages; such issues are inappropriately addressed at the class certification stage.  Rather, the _Foster_ data illustrates the impermissible employment practices of which FedEx is now accused, and proves that evidence specific to the putative class members here exists.

The employees in _Foster_ utilized the same FAMIS timekeeping system used by the employees in this case.  The _Foster_ data affirmatively proves that there is a common method of proof that is relatively easy to adduce and is reliable.  (Jardini Dec. exh. 17, defense counsel confirms data produced in this case "similar to _Foster_ data.")  The existence of such proof favors class certification.

**III.    FEDEX IS REQUIRED TO PAY FOR ALL HOURS WORKED**

**A.    FedEx Is Required To Pay For All Time Employees Spend On-The-Clock**

FedEx is required to pay its employees from the time they clock in to the time they clock out.  In the seminal case on the issue, _Morillion v. Royal Packing Co._, 22 Cal. 4th 575, 582 (2000), the California Supreme Court affirmatively established that whenever an employees is under the control of her employer, <u>regardless of whether that employee is actually working</u>, the employee must be compensated for that time as "hours worked."  In _Morillion_, the California Supreme Court determined that employees must be paid for time they spend traveling to and from the fields on employer-provided buses pursuant to the IWC wage order which defines "hours worked" as "the time during which an employee is subject to the control of an employer, … includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so."  Cal. Code Regs., tit. 8, § 11140, subd. 2(G). The wage order governing agricultural employees at issue in _Morillion,_ contains the

KNAPP, PETERSEN & CLARKE

-6-

1  identical, *verbatim* definition of "hours worked" as the wage order governing this

2  case.  Cal. Code Regs. tit. 8, § 11040

3       The *Morillion* court cited extensively to similar decisions to make the point

4  that it doesn't matter whether the employee is engaged in a productive task or not,

5  only that they are subject to the employer's control.  Indeed, "an employee who is

6  subject to an employer's control does not have to be working during that time to be

7  compensated." *Morillion,* 22 Cal. 4th at 582.  Citing, *Bono Enterprises, Inc. v.*

8  *Bradshaw* (1995) 32 Cal.App.4th 968, 974-975, the Supreme Court explains,

9  "[e]mployees who were required to remain on the work premises during their lunch

10 hour had to be compensated for that time under the definition of "hours worked."

11 Further, "time an employer required personal attendant employees to spend at its

12 premises, even when they were allowed to sleep, should be considered "hours

13 worked." *Morillion*, 22 Cal. 4th at 583, *citing Aguilar v. Association for Retarded*

14 *Citizens* (1991) 234 Cal.App.3d 21, 30

15      FedEx required that its employees clock in prior to their scheduled start time,

16 but did not pay employees for the period worked between the clock-in time and the

17 scheduled start time.  John Chisum, a Business Systems Analyst for FedEx testified

18 that FedEx had a policy that employees clock-in during a 20 minute pre-shift window

19 to provide the many employees that arrive for a particular shift sufficient time to

20 clock in prior to their scheduled start times. Chisum explained that it was necessary

21 for employees to clock in well in advance of their shift "[w]ithin [a] twenty minute

22 window, you know, because there may be forty people coming in on a shift at one

23 time so they're not – In order to give them enough time to get all clocked in and not

24 be late, they have a twenty minute grace period so that they all start clocking in

25 during that period and it adjusts up to their shift start." Mr. Chisum further

26 confirmed that the employees were paid from their scheduled shift start time and not

27 from the actual clock-in time. (Chisum Depo. 4:23-5:13; 10:6-11:9.)

28      Interestingly, an article appearing in today's January 29, 2013, Los Angeles

KNAPP,
PETERSEN
& CLARKE

-7-

1   Times titled "Chino warehouse is fined for alleged overtime violations" discusses

2   $1.3 million in charges levied by the State Labor Commissioner against an employer

3   Quetico for this exact same practice. (Jardini Dec. ¶ 11, exh. 10.)  As explained in

4   the article, employers are obligated for the time spent by employees prior to their

5   scheduled start time on the employer's premises.  Quetico employees reported to

6   work prior to their scheduled start times to wait in line to punch time cards.  This

7   article illustrates that time under the employer's control, even pre-shift time, must be

8   compensated. State Labor Commissioner Julie Su is quoted as saying "Wage theft

9   takes many forms… My office will crack town on any employer who is taking hard-

10  earned wages from workers by falsifying time cards and systematically preventing

11  employees from taking a full meal break.  We are also intent on eliminating the

12  competitive advantage that labor law violators gain over employers who play by the

13  rules." *Id.*

14          **1.      The Class Members are Under FedEx Control From Clock In to**

15                  **Clock Out**

16          Clocking in on a time clock necessarily means that the employee is under the

17  control of the employer.  Otherwise, being "on the clock" has no purpose.  As FedEx

18  admits, the point of requiring the employees to punch in on a clock is to ensure that

19  the employees are verifiably present at the place of employment. (Carlson Depo.,

20  61:1-62:2, 92:9-12, 107:13-18, 143:19-144:4, 144:16-145:4, attached as exh.13 to

21  Jardini Dec.) FedEx refers to this as a meaningless "time stamp" and attempts to

22  characterize the clocking in and out at FedEx locations as somehow different from

23  that of other employers.  This distinction fails.  Having a documented, fudge-proof

24  method of verifying an employee's presence is why <u>all</u> employers have, historically,

25  required employees to "punch a clock."  That is what "punching a clock" means.

26  Employees are, of course, not free to leave after clocking in, or the act has no

27  meaning whatsoever.  Of course, the flip side of ensuring that the employees do not

28  cheat the employer is that the employer cannot cheat the employees, either, as we

KNAPP,
PETERSEN
& CLARKE

-8-

1  learned from the State Labor Commissioner's recent crack-down on Quetico. (*See*

2  Jardini Dec. exh 10.) FedEx was unique as an employer in failing to pay employees

3  from the time they punch in for work. FedEx has corrected this prohibited

4  employment practice in recognition of its illegality.

5        **2.**     **Hours Worked Can Include Unproductive time**

6       FedEx has argued that employees engage in various pursuits after clocking in,

7  but before the scheduled start time, and that these activities may not be productive or

8  profitable to FedEx. However, the law is quite clear that all time spent under the

9  control of the employer must be paid as "hours worked." *Morillion, supra*, 22 Cal.

10  4th at 582. Even pre-shift time spent idle, waiting in line to clock-in must be

11  compensated, and the failure to do so has been categorized as "wage theft." (Jardini

12  Dec. exh. 10.) This is a common issue of law to be determined as to the class.

13       Under controlling authority, merely requiring the presence of the employee is

14  sufficient control and constitutes "hours worked." *Aguilar v. Association for*

15  *Retarded Citizens*, 234 Cal. App. 3d 21, 30 (1991) (all hours employee is on

16  premises, even while asleep, are hours worked), *Quetico*, exh. 10 to Jardini Dec.

17       Moreover, as the state court in *Foster v. FedEx* recognized, the <u>frequent</u>

18  occurrence of employees clocking in <u>significantly</u> before their scheduled start time –

19  provable statistically – gives rise to an inference that FedEx does require early clock

20  in and late clock out by the expedient of requiring that employees complete a set

21  number of tasks for which the allotted scheduled time is insufficient. ("This early

22  arrival evidence [compilation of time cards] would tend to support the Plaintiff's

23  argument that the extra time is needed to prepare for the beginning of their shift,

24  which is a reasonable inference that the Court may draw.") (*Foster v. FedEx* Order

25  on Class Certification, pgs. 8-9.)

26       **3.**     **FedEx Had Ultimate Control Over when the Employees Clocked In**

27                 **and Out**

28       FedEx has complete control of when their employees clock in. This fact is

KNAPP,
PETERSEN
& CLARKE

-9-

1  conclusively demonstrated by the undisputed fact that, in the wake of *Foster v.*
2  *FedEx*, FedEx <u>did</u> create and institute a policy prohibiting employees from clocking
3  in earlier than 5 minutes before their scheduled start time. And, FedEx agreed to pay
4  for that time. (Carlson Depo. 27:25-28:25, 31:22-33:1, attached as exh. 13 to Jardini
5  Dec.) Thus, FedEx cannot deny that it had, and always had, the right to change the
6  policy, and ultimately did. The truth is that until forced to, FedEx did not want to
7  change its policy condoning early pre-shift clocking in because FedEx enjoyed the
8  luxury of having its employees on hand, and on call, particularly when it believed it
9  would get away with not paying for it. In the words of the State Labor
10 Commissioner, by having its employees on hand and working during their unpaid
11 pre-shift period, FedEx gained a "competitive advantage" in reducing labor costs
12 over "employers who play by the rules." (Jardini Dec. exh. 10.)

13  **4.    FedEx Employees Are Not Permitted to Leave Once They Clock In**

14          FedEx does not permit its employees to leave after they have clocked in, or
15 conducted their "integrity check" as FedEx would label it. (Declaration of Yvette
16 Green "Green Dec." ¶8, Carlson Depo. 145:5-146:16.) FedEx has failed to produce
17 documents to support any other conclusion. Clocking in can only function as an
18 integrity check if the employee is then not allowed to leave, because if the employee
19 is allowed to leave, that employee's actual presence at the time they begin their
20 scheduled shift is not, in fact, ensured. And, not allowing the employee to leave is
21 plainly exercising control.

22 **B.    FedEx Is Required To Pay For All Time Spent Working, Even During**
23        **Unpaid Meal Periods**

24          In *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1039 (2012),
25 the California Supreme Court addressed the scope of an employer's obligation to
26 "provide" meal periods under California law, and considered exactly what employers
27 must do to comply with the law. *Brinker* clarifies that while employers are not
28 required to police employees' breaks, they must affirmatively provide breaks and

KNAPP,
PETERSEN
& CLARKE

-10-

1  manage working conditions such that employees are granted breaks free of all duties.

2      In *Brinker*, the California Supreme Court agreed with the employees that an

3  employer must actually relieve workers of all duty so they can take their statutorily-

4  mandated meal periods, as held in *Ciciaros v. Summit Logistics, Inc.*, 133 Cal. App.

5  4th 949 (2005).  *Brinker*, 53 Cal. 4th at 1040.  In so holding, the court also cited two

6  other worker-friendly decisions that interpreted the employer's duty in the same

7  protective way. See *id.* (*citing Jaimez v. Daiohs USA, Inc.*, 181 Cal. App. 4th 1286

8  (2010), *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625 (S.D. Cal. 2010)).

9      *Brinker* holds that the employer must take the active step of "afford[ing] an off

10  duty meal period," which means "**actually relieving an employee of all duty**" and

11  "relinquish[ing] control over their activities," without "**pressuring employees to**

12  **perform their duties in ways that omit breaks**," and without "**exerting coercion**

13  **against the taking of, creating incentives to forego, or otherwise encouraging the**

14  **skipping of legally protected breaks**." *Id.* at 1040 (emphasis added).  Adopting a

15  written policy that purportedly "allows" meal periods is not enough. See *id.* at 1040.

16  What is required of the employer is to afford workers "[b]ona fide relief from duty

17  and the relinquishing of control" over the workers' activities. *Id.* at 1039.

18      Here, electronic evidence conclusively proves that FedEx employees were

19  regularly working during their unpaid breaks.  Since 2007, FedEx recognized its

20  obligation to pay for such work.  As explained by defense counsel, "[s]ince

21  6/30/2007, meal break time is automatically paid if stop detail appears in meal break

22  records." (Jardini Dec. ¶ 18, ex. 17.) A meal break is not afforded when FedEx

23  knows and condones the regular and usual unpaid work by its employees during meal

24  breaks.

25  **IV.  PLAINTIFF PRESENTS SIGNIFICANT, INDISPUTABLE COMMON**

26      **PROOF CONCERNING FEDEX'S FAILURE TO PAY ALL WAGES OWED**

27      It is a common question of law whether class members should be paid from

28  their clock in/out time or their scheduled start/stop times.  Each class member used

KNAPP,
PETERSEN
& CLARKE

-11-

1  the same clock in/out system ("FAMIS") to record when they reported to and

2  departed from work for the day.  Further, it is a common question of law whether

3  employees should be paid for time worked during unpaid meal periods.

4      Following the appeal, the parties engaged in extensive discovery, including the

5  production of thousands of pages of documents, interrogatories and Fed. R. Civ. P.

6  Rule 30(b)(6) depositions.  To date, FedEx has not been forthcoming in producing

7  the clear, illustrative data which we know they maintain.  (Jardini Dec. ¶ 3.)

8      In the *Foster* action, FedEx produced Shift Data, Task Data, Stop Action Data

9  and Shift Data, which was subject to expert analysis to study the amount of unpaid

10  time worked by the FedEx employees at issue.  The average unpaid time for the

11  extensive data analyzed was 16.51 minutes per shift.  (Drogin Dec. ¶¶ 4-5, attached

12  as ex. 20 to Jardini Dec.)  As observed by the Ninth Circuit, "the existence of the

13  *Foster* data is relevant merely because it is evidence that FedEx has access to the

14  kind of data at issue in this case." *Forrand*, 401 F. App'x at 200.  Defense counsel

15  has confirmed that the data available to the parties and the Court herein is "similar to

16  *Foster* data."  (Jardini Dec. ex. 17, #4.)  Accordingly, as the *Foster* court determined

17  "liability under each of the Plaintiffs' claims has the potential to be established based

18  upon common proof." (*Foster* Order granting Class Certification, pg. 15, Jardini

19  Dec. ex. 21.)  Plaintiff herein presents significant, indisputable common proof

20  concerning FedEx's failure to pay to pay all wages owed.  Accordingly, class

21  certification is proper.

22  **A.    The Unpaid On-The-Clock Class Was Routinely Denied Pay For Time**

23  **Worked**

24      FedEx's admitted procedure was that it did not begin to pay employees when

25  they punched in, but only from a later designated time, the "scheduled start time."

26  (Carlson Depo. 31:22-33:1, Green Depo. 43:18-22; Karamian Decl. ¶ 12.)

27      This practice occurred with Plaintiff Yvette Green's employment.  Ms. Green

28  would arrive early, along with the 20 other handlers assigned to her shift, clock-in,

KNAPP,
PETERSEN
& CLARKE

-12-

1  and start working. (Green Dec. ¶¶ 6-16.)  For instance, on March 14, 2005, she

2  punched in 17 minutes before her scheduled start time, the time from which she was

3  paid.  Ms. Green's timecards reflect that she regularly clocked in almost a quarter of

4  an hour before her scheduled start time.  (Green Dec. ¶ 9, exh. A: Jan. 14, 2005, 12

5  minutes; Feb. 4, 2005: 13 minutes; Feb. 22, 2005: 13 minutes; Mar. 9, 2005: 13

6  minutes; March 31, 2005: 15 minutes.)

7       Ms. Green recalls it was "imperative that our workstations be organized and

8  prepared before the conveyor belt started running and packages started pouring out."

9  (Green ¶ 10.)  Her daily pre-shift tasks included clearing the workstation of debris

10  and miscellaneous packages, organizing the huge containers the packages were to be

11  loaded into prior to placement in large trucks and emptying the contents of the two

12  dozen courier trucks parked at the warehouse facility.  (Green ¶ 11-12, Green Depo.

13  27:18-29:4; 36:6-37:16.)  This had to be done before the schedule start time because,

14  once the conveyor belt started moving, which was shortly after the scheduled start

15  time, all the handlers were required to assume their positions alongside the belt, and

16  the stream of packages was "non-stop."  They were "pressed for time because

17  package needed to be loaded onto the daily airport shuttle" to meet flight deadlines.

18  (Green ¶ 13.)

19       The managers were aware that the handlers were working prior to their

20  scheduled start time because they were physically present with the handlers while it

21  was happening.  (Green ¶ 14.)  Ms. Green and her co-workers also worked after the

22  shift, after clocking out.  (Green Depo. 42:15-43:10.)

23       Her fellow employees were also not paid for time worked at the end of the day

24  after the "scheduled end time."  (Green Depo. 42:15-10, 70:6-15, 79:11-19, 80:6-20,

25  Green Decl. ¶ 16.)  Employees were required to continue to work, in order to

26  accomplish all of the tasks that they were assigned, which tasks could not be

27  accomplished in the time allotted.  Evidence of this wrongful conduct is FedEx's

28  abrupt change in policy which occurred only after the *Foster* case was filed, certified

KNAPP,
PETERSEN
& CLARKE

-13-

1    and settled. (*Foster v. FedEx* complaint attached as exh.18 to Jardini Decl.,

2    Declaration of class representative Jack Foster attached as exh.19 to Jardini Decl.;

3    Decl. of Richard Drogin, Ph.D. attached as exh. 20 to Jardini Decl., Order on Motion

4    for Class Certification attached as exh. 21 to Jardini Decl.)  In 2006, following the

5    settlement of the *Foster* case FedEx changed its policies.  Under the new policy and

6    procedure, employees were paid from the time they clocked in instead of the

7    scheduled start time, and employees were not permitted to clock in more than 5

8    minutes before their scheduled shift. (Healy Depo. 27:1-23.)

9          As Mr. Karamian, a former manager and courier at FedEx, testified:

10   "employees frequently clocked in before their scheduled start times.  As their

11   manager, I frequently directed as many as 3 to 10 employees to perform tasks prior

12   to their scheduled start times.  Consistent with practices at FedEx, those employee's

13   time cards were not changed and their hours worked were not augmented to reflect

14   an earlier start time, so they were still paid from their scheduled start time and not the

15   clock-in time.  This practice was reinforced by senior management." (Karamian

16   Depo. 64:20-65:11, 69:8-70:9 attached as ex. 22 to Jardini Dec.)

17   **B.    The Working Unpaid Breaks Class Was Routinely Denied Pay For Time**

18          **Spent Working During Unpaid Breaks**

19          Ms. Green cannot recall ever receiving an uninterrupted 30 minute lunch break

20   during her shifts of five hours or more. (Green Decl. ¶ 15.)

21          Former FedEx manager Ara Karamian testified that while working as a

22   manager during the class period at the FedEx Glendale (JGX) and Marina Del Rey

23   (SMOA) stations, he supervised between 20 and 30 hourly employees, including:

24   couriers, shuttle drivers, handlers, courier-handlers and customer service associates.

25   (Karamian Decl. ¶5, attached as exh. 12 to Jardini Dec.)  He noticed that handlers

26   and shuttle drivers frequently were not provided uninterrupted 30 minute meal

27   breaks.  This was because their workload was such that they didn't have time to take

28   an uninterrupted 30 minute lunch break. (Karamian Decl. ¶6.)  He estimates that

-14-

"handlers were not provided lunch breaks 50% of the time.  Situations frequently
arise that interfere with their lunch breaks, such as being required to go with a shuttle
driver to the airport, or deal with a late truck coming into the station.  About 20-30%
of the handlers complained to me about being unable to take their lunches."  Mr.
Karamian observed that shuttle drivers were also not provided meal breaks due to
their heavy and unrealistic workloads.   "When they were not driving their shuttles
between locations, they were often pressed into duty to help other employees.  We
were frequently understaffed and in need of assistance in many areas of the station.  I
estimate that between 20-40% of shuttle drivers were not provided with meal breaks
on more than two occasions per week."  Mr. Karamian further estimates that
"between 30-50% of shuttle drivers were not provided rest breaks more than twice
per week." (Karamian Decl. ¶¶ 7, 10, 11.)

Mr. Forrand was told by his manager that there was a mandate enforced by
upper management to keep paid lunches to a minimum, requiring work through
unpaid lunches without compensation.  (Forrand Decl. ¶ 14, exh. 11 to Jardini Dec.)
When Mr. Forrand complained about not being provided uninterrupted meal breaks
or paid lunches,  managers would either do nothing, or tell him to "go get a different
job." (Forrand Decl. ¶¶ 15, 16.)

Frequent references to defendant's disregard for meal breaks throughout the
declarations and evidence are notable, demonstrating a corporate practice at FedEx
of denying required off duty meal breaks.  Further, frequent references to defendant's
corporate practice of allowing and encouraging employees to work during the pre
and post shift gap periods demonstrates compelling evidence of FedEx's failure to
pay employees for all time worked as required under California law.  Expert analysis
of *Foster* data revealed that of 2,998,203 unpaid breaks, 690,903 (23.1) were
interrupted by work events.  (Drogin Decl., ¶ 6.)

That FedEx changed these practices, in 2007 and 2006, respectively, is
compelling evidence that the practices existed and were recognized as illegal.

KNAPP,
PETERSEN
& CLARKE

-15-

1618045.1   08000/00863

# V. ALL REQUIREMENTS OF RULE 23(a) ARE SATISFIED

A court may certify a class if Plaintiff establishes that "each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 395 (C.D. Cal. 2008) *aff'd sub nom. Kamar v. RadioShack Corp.*, 375 F. App'x 734 (9th Cir. 2010). When reviewing a motion for class certification, "the Court is generally bound to take the substantive allegations of the complaint as true. [citations] Nevertheless, the Court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met." *Id.* at 392 (internal citations omitted). "In fact, courts are not only at liberty to but must consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case." *Id.* at 392 (internal quotations and citations omitted, emphasis in original).

## A.  Numerosity

There is no dispute as to numerosity. The proposed class is composed of over 15,000 California employees, clearly satisfying the numerosity requirement. (Jardini Dec., exh. 1, 2.) *See, In re Itel Sec. Litig.*, 89 F.R.D. 104, 111-112 (N.D. Cal. 1981) (prospective classes of 104 and 114 underwriters, respectively, were sufficient to meet numerosity requirement); I *Newburg on Class Actions* § 3.5 (4th ed. 2004) ("[T]he difficulty in joining as few as 40 class members should raise the presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone.").

## B.  Commonality

The "commonality requirement is interpreted to require very little." *In re Paxil Litig,* 212 F.R.D. 539, 543 (C.D. Cal. 2003). As stated in *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal. 1996), the court recognized that for "the commonality requirement to be met, there must only be one single issue common to the proposed class."

KNAPP, PETERSEN & CLARKE

-16-

1618045.1   08000/00863

1    All questions of fact and law need not be common to satisfy Rule 23(a)(2).

2  "The existence of shared legal issues with divergent factual predicates is sufficient,

3  as is a common core of salient facts coupled with disparate legal remedies within the

4  class." "'A class has sufficient commonality' if there are questions of fact and law

5  which are common to the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019

6  (9th Cir. 1998) *citing* Fed. R. Civ. P. 23(a)(2).

7    Courts, including this circuit, have construed the commonality requirement

8  "permissively." *Staton v. Boeing Co.*, 313 F.3d 447, 462 (9th Cir. 2002). "In the

9  Ninth Circuit, the commonality requirement has been "construed permissively," and

10  may be satisfied by either "shared legal issues with divergent factual predicates," or

11  "a common core of salient facts coupled with disparate legal remedies." *Hanlon,* 150

12  F.3d at 1019.

13    As set forth below, plaintiff presents significant evidence of companywide

14  corporate practices and policies of FedEx's failure to provide meal breaks and to pay

15  for all time worked by employees, including begin-shift and end-shift time.

16    The following legal issues are common to the classes:

17    1. Whether FedEx violated wage and hour laws in establishing a corporate

18      policy of failing to pay for services of hourly employees;

19    2. Whether FedEx violated wage and hour laws by failing to pay employees

20      from the time they clocked in to the time they clocked out, but instead paid

21      employees from their scheduled start times to their scheduled end times;

22    3. Whether FedEx violated wage and hour laws in failing to pay its employees

23      the wages due for so-called meal breaks, during which the employee was

24      actually working;

25    4. Whether FedEx is liable for penalties for willful failure to pay wages and

26      the amount;

27    As required by *Hanlon, supra,* 150 F.3d at 1019, these common issues are

28  bound by the following "common core of salient facts:"

KNAPP,
PETERSEN
& CLARKE

-17-

1. It is beyond dispute that FedEx requires its employees to clock in and out on a time clock. (Mullady Depo. 27:9-16, 28:3-29:6.)

2. An employer must pay for all hours worked. ( *Morillion, supra,* 22 Cal.4th at 578) (interpreting DLSE's "hours worked" definition and holding that employee can be under an employer's control even when the employee is not "suffered or permitted to work");

3. Time under the control of the employer is time worked, regardless of the tasks that may or may not have been performed. (*Id.*)

4. FedEx employees are under the control of FedEx from the time of clock in until clock out. (Carlson Depo., 61:1-62:2, 92:9-12, 107:13-18, 143:19-144:4, 144:16-145:4, 145:5-146:16; Karamian Depo. 64:20-65:11, 69:8-70:9)

5. Before April 2006, FedEx did not pay its employees from clock in to clock out, but only from the later scheduled start time to the earlier scheduled end time. (Carlson Depo. 27:25-28:25, 31:22-22:1)

6. Employees who perform work for their employer during an unpaid meal break must be paid for that time. *Brinker, supra,* 53 Cal. 4th at 1038-1040.

The Ninth Circuit affirmed that the law requires that employees be paid for all time spent under the employer's "control." *Morillion, supra,* 22 Cal.4th at 578. Here, this "control" period begins, as in every other employment situation, when the employee clocks in for work. Thus, FedEx must pay its employees from clock in to clock out, and, by not doing so, is liable to the employees for an amount provable by a common method of proof.

FedEx must further pay its employees for all time worked, including time spent working during their unpaid meal period. Because electronic evidence of work exists such that employees scan packages when they are working, such evidence shows work during meal breaks, time worked before 2007 for which FedEx has not paid. (Example of electronic scan data attached to Jardini Dec. exh. 9.)

-18-

KNAPP,
PETERSEN
& CLARKE

1618045.1   08000/00863

1      It is well established that the need for an individualized determination of

2  damages suffered by each class member does not defeat commonality. *Seidman v.*

3  *American Mobile Systems, Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994) (potential need

4  for individual damage calculations in security fraud action does not defeat

5  certification); *In re Amerifirst Sec. Litg.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991)

6  (differences in damages will not defeat commonality); *Patrykus v. Gomilla*, 121

7  F.R.D. 357, 361 (N.D. Ill. 1988) (difference in treatment or damages do not defeat

8  commonality); *Gentry v. C & D Oil Co.*, 102 F.R.D. 490, 493 (W.D. Ark. 1984)

9  (factual differences relating to damages incurred do not bar commonality in antitrust

10  action), cited in Moore's Federal Practice, 3d ed. Vol. 5, Class Actions section

11  23.23[3].

12  **C.**   **Typicality**

13      The typicality requirement attempts to ensure that the representative party's

14  interests are substantially aligned with those of the absent class members. *Hanon v.*

15  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Typicality and commonality

16  requirements "tend to merge." *Gen Tel. Co. of the Southwest v. Falcon*, 457 U.S.

17  147, 157 n.13 (1982). The typicality requirement is satisfied if the representative

18  claims arise from the same events, practice, or conduct and are based on the same

19  legal theory, as those of other class members. The Ninth Circuit has held that a class

20  representative's claims meet the typicality requirement if they are reasonably

21  coextensive with those of the class even if the facts and legal theories are not

22  identical. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-1020 (9th Cir. 1998).

23      Here, the legal theories raised by Yvette Green are identical for all members of

24  the proposed classes. Ms. Green worked during unpaid meal breaks. (Green Dec.

25  ¶ 15.) She was unpaid for begin-shift and end-shift hours worked. (Green Depo.

26  27:18-29:4) Individual differences as to the hours each employee may have worked

27  does not diminish typicality, as typicality does not require a complete identity of the

28  claims. As with commonality, it has been specifically held that differences in

KNAPP,
PETERSEN
& CLARKE

-19-

1618045.1  08000/00863

1  damages will not destroy typicality. *In re Activision Sec. Litg.*, 621 F. Supp. 415,

2  428 (N.D. Cal. 1985) (differences in damages among plaintiffs did not defeat

3  typicality), cited in Moore's Federal Practice, 3d Ed., Vol. 5, section 23.24[5].

4  **D.    Adequacy**

5       Because class members who are not named parties to a suit are bound by a

6  judgment, due process is satisfied only where the absent members' interests are

7  adequately protected by the representative class members. *Crawford v. Honig*, 37

8  F.3d 485, 487 (9th Cir. 1994).  The test is whether the named plaintiffs have interests

9  that conflict with, or are antagonistic to the interests of other class members.

10  *Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997).  No such conflict of interest

11  exists here.  The named plaintiff, Yvette Green, has an interest in proving liability

12  against defendants for each of the claims alleged in the complaint, and this interest is

13  identical to the interest of each absent class member for both proposed classes.

14  (Green Dec. ¶¶ 18-21.)

15       The Ninth Circuit has determined that Yvette Green's employment as a

16  "handler" is adequate and does not exclude her from representing the class. *Forrand,*

17  *supra,* at *199.

18       Further, plaintiff has retained counsel with significant experience representing

19  both statewide and nationwide classes of employees in wage and hour litigation, and

20  will adequately represent this class. (Jardini Decl. ¶¶ 24-39.)

21              **VI.  RULE 23(b) IS SATISFIED**

22       Once the four requirements of Rule 23(a) have been met, the district court

23  must determine whether the case meets one of the three requirements of Rule 23(b).

24  Rule 23(b) provides that an action may be maintained as a class action if the

25  prerequisites of subdivision (a) are satisfied and in addition, the prosecution of

26  separate actions by or against individual members of the class would create a risk of

27  inconsistent or varying adjudications with respect to individual members of the class

28  which would establish incompatible standards of conduct for the party opposing the

KNAPP,
PETERSEN
& CLARKE

-20-

1    class (Rule 23(b)(1)), or the court finds that the questions of law or fact common to

2    the members of the class predominate over any questions affecting only individual

3    members, and that a class action is superior to other available methods for the fair

4    and efficient adjudication of the controversy.  (Rule 23(b)(3))

5         The matters pertinent to the Rule 23(b)(3) findings include:  (A) the interest of

6    members of the class in individually controlling the prosecution or defense of

7    separate actions; (B) the extent and nature of any litigation concerning the

8    controversy already commenced by or against members of the class; (C) the

9    desirability or undesirability of concentrating the litigation of the claims in the

10   particular forum; (D) the difficulties likely to be encountered in the management of

11   the class action.

12        The district court finds a predominance of class issues under Rule 23 (b)(3) if:

13             The substantive developments of class members claims require

14        the same proof for each class member; The proposed class is bound

15        together by a mutual interest in resolving common questions more than

16        it is divided by individual interests; The resolution of an issue common

17        to the class would significantly advance the litigation; One or more

18        common issues constitute significant parts of each class members

19        individual cases;  The common questions are all central to the members

20        claims; The same theory of liability is asserted by or against all class

21        members; and All defendants raise the same basic defenses against all

22        class members.

23   Moore's Federal Practice, 3d Ed. § 23.45[1].

24        Concerning the Unpaid On-The-Clock Class and the Working Meal Break

25   Class, the proof of liability concerning FedEx's failure to provide meal and rest

26   breaks, and to pay for all hours worked under California law, is readily available and

27   includes electronic data and time cards, along with expert testimony, internal

28   documents, and selected depositions.  If FedEx is shown to have policies that violate

KNAPP,
PETERSEN
& CLARKE

-21-

1618045.1  08000/00863

1  wage and hour laws as FedEx appears to admit by changing its policies, the litigation

2  as to each individual is substantially advanced, leaving only a calculation of wages

3  due.  As with commonality, courts generally find the predominance standard to be

4  satisfied, even where individual damages issues remain.  *Smilow v. Southwestern*

5  *Bell Mobile Systems, Inc.*, 323 F.3d 32, 40 (1st Cir. 2003).  Thus, the common

6  questions of liability are central to the claims of all members.

7       A class action is superior to other methods of litigation for this type of wage

8  and hour claim.  Superiority is determined by comparing the efficiency and fairness

9  of available methods of adjudicating the matter, which requires the court to look at:

10       The interests of individual class members in controlling their

11       own, separate litigation; The nature and extent of any relevant, pending

12       litigation brought by or against members of the class; The desirability of

13       concentrating the litigation in the particular forum; and any management

14       difficulties that class action is likely to present.

15  Moore's Federal Practice, § 23.45[2][a].

16       In this case, there is no particular benefit to any individual in controlling their

17  own litigation, because the class will establish liability and a fair method of

18  determining the wages owed to each individual.  Moore's Federal Practice, §

19  23.45[2][a].  Further, in this case, the class members' individual damages are not such

20  that the claim could be economically pursued individually, particularly given the

21  aggressive defense funded by the vast resources of FedEx, greatly unequal to the

22  resources available to its employees.  Here, the claim of any particular employee may

23  not be great enough to justify the expense of litigation.  However, when aggregated,

24  substantial sums are at issue.  The enormous net aggregate savings is, of course, the

25  motive prompting FedEx to engage in these illegal and wrongful practices in the first

26  place.  The class action mechanism provides the only deterrence in situations such as

27  this.  The type of wrong alleged — great corporate profit at the expense of numerous

28  individuals — is precisely that which the class action device was designed to remedy.

KNAPP,
PETERSEN
& CLARKE

-22-

1    A single forum for all claims is particularly appropriate where the claims of all

2    class members turn on virtually identical facts and law. *Epstein v. MCA, Inc.*, 50

3    F.3d 644, 668 (9th Cir. 1995), reversed on other grounds, cited in Moore's Federal

4    Practice, 3d Ed., § 23.46[2][d].

5    The proposed classes have a mutual interest in ensuring that all time worked is

6    paid, and the individual interest in getting paid is wholly aligned with the mutual

7    interest.

8    With respect to manageability, this case presents no unique circumstances

9    which would pose difficulty in management.  Since the class members of both

10   proposed classes are former and present employees, (as opposed, for example, to an

11   unidentified class of consumers of a product) communication with the class is

12   relatively easy as defendant has access to the names and address (or last known

13   addresses) of each class member. Further, once liability is established for FedEx's

14   class wide policies and procedures, as confirmed by FedEx's Rule 30(b)(6) deponent,

15   FedEx has the documents necessary to accurately calculate damages for each class

16   member, rendering this case uniquely manageable.  (Mullady Depo. 40:21-41:3.)

17   **A.    This Court Should Properly Certify The Unpaid On-the-clock Class of**

18   **Employees Who Were Not Paid for Begin-Shift Time and End-Shift Time**

19   Working during Begin-Shift and End-Shift Time, and not getting paid for this

20   time, appears to be the nearly universal experience of all California employees at

21   FedEx.  Such was the case for courier employees and customer service associates

22   certified as a class in the *Foster v. FedEx* case, and the same is true for the

23   employees at issue herein.  The failure to pay employees for Begin-Shift and End-

24   Shift Time presents a common question of fact for all class members.

25   Extensive testimony has revealed that employees typically clock in on the time

26   clock 10 to 20 minutes or more before their scheduled start time. They are then under

27   the control and direction of FedEx, and not permitted to leave the premises.  More

28   commonly than not, employees are expected to, and do, perform job functions for

KNAPP,
PETERSEN
& CLARKE

-23-

1618045.1  08000/00863

1  FedEx during the Begin-Shift and End-Shift Time.  FedEx, however, concedes that

2  employees are not paid for the time after they clock in but before their arbitrarily

3  scheduled start time and after their arbitrarily scheduled end time, but before they

4  actually clock out.

5      This court previously denied class certification as to this claim because "an

6  employee may not have actually worked between the clock-in time and start time or

7  between the end time and clock out time."  (Feb. 18, 2009, Order on Class

8  Certification. )  The Ninth Circuit has now clarified that the question now presented

9  is "whether the level of FedEx's control over employees within the proposed general

10  class when they are on-the-clock but off-shift is sufficient to render the on-the-clock

11  but off-shift time compensable under California law, first, in determining whether

12  Rule 23 certification is proper and, subsequently, in deciding the merits." *Forrand,*

13  *supra,* at *200.

14      As established above, once an employee clocks in, and before that employee

15  clocks out, the employee is — necessarily — under the control of FedEx. If the

16  employer, in this case FedEx, does not want the employee loafing or relaxing, it is

17  the employer's job to manage the employee accordingly.  Although most FedEx

18  employees are busy working during begin-shift time, even if they were not, they

19  would still be entitled to be paid because they are under FedEx's control from the

20  time they clock in.

21      The mere presence of the FedEx employee at the facility is an important

22  benefit, and competitive advantage, that FedEx reaps and was the reason that FedEx

23  designed the system the way it did.  FedEx cannot tolerate the normal employee

24  tardiness that other businesses might accept and, therefore, put a system into place

25  that builds in a time cushion — a wholly appropriate solution to the tardiness issue

26  — but not at the employee's expense.

27      As the Supreme Court held long ago, an employer "may hire a man to do

28  nothing, or to do nothing but wait for something to happen." *Armour v. Wantock,*

KNAPP,
PETERSEN
& CLARKE

-24-

1    323 U.S. 126, 133 (1944).  The court further held that the "Labor Standards Act does
2    not exclude as working time periods contracted for and spent on duty . . .merely
3    because the nature of the duty left time hanging heavy on the employee's hands . . ."
4    *Id.* at 134.

5          Plaintiff's evidence includes evidence obtained in the previous *Foster* action,
6    previously dismissed by this Court. The same clock-in procedures and FAMIS time
7    system that demonstrated, with pinpoint accuracy, the unpaid time owed to couriers,
8    courier/handlers and service agents is utilized for all hourly FedEx employees in
9    California and, therefore, the "data reliability" factor is the same, and the evidence is
10   properly considered as proof that such evidence exists here and is available to assist
11   the parties and this Court in managing this class action. (Mullady Depo. 40:21-41:3.)

12   **B.    This Court Should Properly Certify An Unpaid Meal Break Class of**
13         **Employees Who Worked During Meal Breaks**

14         "As a general rule if the defendant's liability can be determined by facts
15   common to all members of the class, a class will be certified even if the members
16   must individually prove their damages." *Brinker, supra*, at 1022.  At the certification
17   stage, a plaintiff need not do more than advance a common policy applicable to each
18   and every member of the proposed class.  *Id.*  Plaintiffs have done so here.

19         Here, while FedEx will try to opine as to individual issues why class members
20   may have scanned packages during unpaid meal periods, the California Supreme
21   Court has held that speculation about why breaks were missed does not create
22   individualized issues and should not defeat certification.  The case of *Jaimez v.*
23   *DAIOHS USA, Inc.,* 181 Cal.App.4th 1286 (2010), cited with approval in *Brinker*, is
24   instructive.  *Brinker* at 1024-1025.  In *Jaimez* the employer argued, just as FedEx
25   will, that class certification was improper because of varied reasons why employees
26   might decide not to take breaks.  The *Jaimez* Court held instead that the
27   "predominant common factual issue" was whether employees missed meal breaks
28   because of the employers' policies and practices, including "designating delivery

KNAPP,
PETERSEN
& CLARKE

-25-

1   schedules and routes [which] precluded [employees] from timely completing their
2   [duties]." *Jaimez, supra*, 181 Cal.App.4th at pp. 1304-1305. As the *Jaimez* Court
3   noted, "This issue is subject to common proof, including evidence of schedules, a
4   sample of the actual route times, and [employee] testimony. This issue predominates
5   over individualized inquiries… because determinations about hours worked are
6   routine in class actions involving alleged denials of overtime pay and meal/rest
7   periods." *Id*. *Brinker*, citing *Jaimez*, held, "[t]he theory of liability—that [the
8   employer] has a uniform policy, and that that policy… allegedly violates the law—is
9   by its nature a common question eminently suited for class treatment." *Brinker* at
10  1033. The same holds true with regards to FedEx's practices and policies, except
11  here we have electronic evidence confirming whether and when employees worked
12  through their unpaid meal periods. (Example of punch data attached to Jardini Dec.
13  exh. 9 and previously produced in *Foster*- Drogin Dec. ¶¶ 4-5.) FedEx rightfully
14  owes its employees for such time spent working in an unpaid period. It admits its
15  duty by its changed practice in 2007, deciding then to pay the entire meal period if
16  any evidence of work in that period exists.

17  ### VII. CONCLUSION

18  This Court should certify a Rule 23 class of California employees; provide for
19  appropriate notice to the members of the class, and establish a schedule for merits
20  discovery.

21  Dated: January 29, 2013          KNAPP, PETERSEN & CLARKE

22

23

24                                  By: _____
25                                  André E. Jardini
                                    DANIEL FORRAND, ARA
                                    KARAMIAN, YVETTE GREEN
26                                  and EUGENE COLON, on behalf of
                                    themselves, and all others similarly
27                                  situated

28

KNAPP,
PETERSEN
& CLARKE

-26-